John D. Fiero (CA Bar No. 136557)
Debra I. Grassgreen (CA Bar No. 169978)
John W. Lucas (CA Bar No. 271038)
Jason Rosell (CA Bar No. 269126)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA 94111-4500
Telephone: (415) 263-7000
Facsimile: (415) 263-7010
Email: jfiero@pszjlaw.com
dgrassgreen@pszjlaw.com
jlucas@@pszjlaw.com
jrosell@pszjlaw.com

Proposed Counsel for Debtor

**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

| | |
|---|---|
| In re:<br><br>NEWZOOM, INC.,[1]<br><br>Debtor. | Case No.:15-31141-HB<br><br>Chapter 11<br><br>**DECLARATION OF JOHN A. LAWRENCE IN SUPPORT OF FIRST DAY MOTIONS** |

I, John A. Lawrence, hereby declare as follows:

1. I am the President and Chief Executive Officer of NewZoom, Inc. (the "Debtor" or the "Company"). I submit this declaration (the "Declaration") in support of the Debtor's petition and "first day" motions, which are described further below (collectively, the "First Day Motions").

2. Except as otherwise indicated, I have personal knowledge of the information contained herein, either directly or through my supervision of members of the Debtor's management team, or the Debtor's other advisors, and am competent to testify as to the matters set forth herein. Specifically, I have been directly involved in the matters leading up to this chapter 11 filing, including financial planning, forecasting, and the restructuring process. I also have been directly involved in negotiations with key creditor constituencies and the Debtor's efforts to market its assets described herein. I am authorized to submit this declaration on behalf of the Debtor.

---

[1] The last four digits of the Debtor's tax identification number are 9130. The location of the Debtor's headquarters and service address is 22 Fourth Street, San Francisco, CA 94103.

3. The Debtor commenced this chapter 11 case in order to obtain additional financing (the "DIP Financing") and effectuate a reorganization with the assistance and sponsorship of its senior secured creditor, MIHI LLC (the "Lender").

4. Part I of this Declaration describes the Debtor's business and the developments that led to its filing for relief under chapter 11 of the Bankruptcy Code. Part II of this Declaration sets forth the relevant facts supporting certain of the First Day Motions filed concurrently herewith and incorporates by reference the facts of the other First Day Motions.

## II.

## PART I

### A. Overview of the Debtor's Business

5. The Company offers an end-to-end technology and services solution that allows its customers – major brands and retailers – to sell its products to consumers through automated kiosks called "ZoomShops," which are installed and operated by the Company in high-traffic locations such as airports and malls. The Company derives revenue from its customers through a combination of the following: (a) a one-time up-front development fee, (b) the sale or lease of the ZoomShops, and (c) a recurring monthly service fee for each installed ZoomShop, which is either a fixed fee or a percentage of sales from the ZoomShop. The recurring monthly fees are the most significant component of the Company's revenue model, and these in turn are dependent on the number of ZoomShops deployed and the level of product sales through the ZoomShops (for customers who pay the Company a percentage of sales). Most new customers will contract initially for between 10 and 25 ZoomShops, with the goal of deploying more ZoomShops if sales and profitability from the initial stores support the business case for expansion.

6. The Company was formed in 2002. 2014 revenues and expenses were $34.4 million and $38.1 million, respectively. Based on the Company's June 2015 balance sheet, the Company had assets worth $17,009,945 and liabilities of $32,778,419.

### B. Corporate Organization and Ownership

7. The Company is a California corporation. The current members of the Debtor's board of directors are: John Anderson, John Lawrence, and Tom Naughton.

2

8. The Company owns 100% of the capital stock of five foreign subsidiaries: ZoomSystems GmbH (a German GmbH; I am the managing director); ZoomSystems Japan K.K. (a Japanese corporation; I am the director); ZoomSystems Australia Pty Ltd (an Australian corporation; I am the director); ZoomSystems Limited (a Hong Kong corporation; I am the director); and ZoomSystems UK Limited (a UK corporation; Denis Horton and I are the directors). In this Declaration, the foregoing foreign entities are referred to as the "Subsidiaries."

C. **Summary of Prepetition Debt**

9. The Debtor is party to a secured financing arrangement that features Wells Fargo Bank, N.A. as the administrative agent for MIHI, LLC, which is the note purchaser under the documents. MIHI, LLC is affiliated with Macquarie Capital (USA), Inc. ("Macquarie"). The operative loan documents include: a Note Purchase Agreement, dated as of May 26, 2011; a First Amendment to Note Purchase Agreement dated as of May 21, 2012; a Second Amendment to Note Purchase Agreement dated as of May 15, 2013; a Third Amendment to Note Purchase Agreement dated as of June 11, 2014; a Fourth Amendment to Note Purchase Agreement dated as of September 19, 2014; a Fifth Amendment to Note Purchase Agreement dated as of February 11, 2015; and a Sixth Amendment to Note Purchase Agreement and Waiver dated as of August 13, 2015 (collectively, the "Loan").

10. The balance owed on the Loan today is approximately $24,147,371. The obligation to repay the Loan is secured by the Debtor's personal property pursuant to the terms of a Pledge and Security Agreement dated May 26, 2011 as well as a Collateral Assignment of Patents dated May 26, 2011 and a Collateral Assignment of Trademarks dated May 26, 2011 (collectively, the "Security Documents").

11. Based upon information received from my counsel, I am informed and believe that there are no guarantors for the Loan.

12. The Debtor incurs trade debt in the ordinary course of its business. As of the Petition Date, approximately $10.7 million is owing to third party vendors and lessors on account of unsecured obligations.

### D. Events Leading to Chapter 11 Filing

13. Entering 2015, the Company was forecasting growth in revenue and EBITDA, but still needed and wanted to raise additional capital. So in January 2015 the Company began exploring strategic alternatives, primarily focused on a potential sale of the Company but also evaluating a private equity raise from new investors and/or a refinancing of the Macquarie Loan. To date, none of these strategic alternatives have come to fruition.

14. At the same time, the Company's financial performance in 2015 has fallen short of forecasts due to a number of factors, including:

* A shortfall in revenue and EBITDA from the Company's largest customer, caused by a change in product lines by the customer, the Company's the lack of access to such new product line until June 2015, and a reduction in marketing spend by the product manufacturer (approximately $1.3 million impact to cash relative to forecast through June 2015);

* A shortfall in revenue and EBITDA from a key customer in Europe, caused by (i) delays in new store deployments due to disagreements between the customer and its third-party hardware contract manufacturers and (ii) higher than anticipated costs incurred by the Company in supporting the customer's existing store deployments (approximately $800,000 impact to cash relative to forecast through June 2015);

* A shortfall in revenue and EBITDA from six domestic and international customers, caused by delays in securing lease agreements with the locations partners where new stores were forecasted to be opened (approximately $925,000 impact to cash relative to forecast through June 2015); and

* A shortfall in cash caused by a delay in the launch of a large new domestic customer (approximately $460,000 impact to cash relative to forecast through June 2015).

15. As a result of the above shortfalls, combined with the Company's low cash balance entering the year, the Company no longer has sufficient working capital to fund ongoing operations, and has no additional sources of capital readily available.

16. The Debtor commenced this case in order to obtain necessary financing and maximize the value of its assets by proposing a plan of reorganization with the assistance and sponsorship of the Lender, thereby preserving the going concern.

## III.
## PART II

A. **First Day Motions**

17. In order to enable the Debtor to minimize the adverse effects of the commencement of this case, the Debtor has requested various types of relief in the motions filed concurrently with this Declaration (each, a "First Day Motion" and collectively, the "First Day Motions").

18. I have reviewed each of these First Day Motions (including the exhibits and schedules thereto), and I incorporate by reference the factual statements set forth in the First Day Motions. The facts stated therein are true and correct to the best of my knowledge, information and belief, and I believe that the type of relief sought in each of the First Day Motions is: (a) necessary to enable the Debtor to operate under chapter 11 with minimal disruption to its current business operations; and (b) essential to maximizing the value of the Debtor's assets for the benefit of its estates and creditors.

19. It is my further belief that, with respect to those First Day Motions requesting the authority to pay prepetition claims or to continue selected prepetition programs (e.g., those First Day Motions seeking relief related to the Debtor' obligations to its employees, customers, vendors, and certain taxing authorities), the relief requested is essential to the Debtor' efforts to preserve and maximize value in these cases and avoid immediate and irreparable harm to the Debtor and its estates.

20. I believe that any diminution in the relief requested in the First Day Motions could have an immediate and irreparably harmful impact upon the going concern value of the estates, to the detriment of all of the Debtor's stakeholder constituencies. The Debtor believes that payment of the prepetition claims identified in the First Day Motions will forestall such irreparable harm and that all the Debtor's creditors will ultimately benefit from the relief requested therein.

**B.     Motion for Interim and Final Orders (1) Authorizing Postpetition Financing Pursuant to 11 U.S.C. §§ 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1); (2) Authorizing the Use of Cash Collateral; (3) Granting Security Interests and Superpriority Claims; (4) Providing Adequate Protection; (5) Modifying the Automatic Stay; and (6) Granting Related Relief  (the "<u>DIP Financing Motion</u>")**

21.     Based on explanations I have received from counsel, I am informed and believe that on or about May 26, 2011, the Debtor executed and delivered to the Lender a Note Purchase Agreement (as such Note Purchase Agreement may have been amended from time to time, the "Prepetition Loan Agreement"), pursuant to which the Lender agreed to make loans and other financial accommodations to the Debtor, as more specifically described therein.  The Prepetition Loan Agreement and various other loan and security and related documents and agreements are referred to herein as the "Prepetition Agreements".

22.     I am further informed and believe that, pursuant to the Prepetition Loan Agreement, the Lender has made various loans, and, as of the Petition Date, the Debtor was indebted to the Lender as a result of such loans in the aggregate principal amount (including contingent amounts) of not less than $24,147,371(the principal amount plus all accrued interest, costs, fees and other amounts now or hereafter owing or accruing pursuant to the Prepetition Agreements is collectively referred to herein as the "Prepetition Indebtedness").

23.     I am further informed and believe that, pursuant to the Prepetition Loan Agreement, to secure payment of the Prepetition Indebtedness, the Debtor granted to the Lender a security interest in substantially all of its present and after-acquired assets and the proceeds of the foregoing on or about May 26, 2011 pursuant to the terms of a Pledge and Security Agreement (as such Security Agreement may have been amended from time to time, the "Prepetition Security Agreement").  The assets in which the Lender was granted a security interest or lien pursuant to the Prepetition Loan Agreement, the Prepetition Security Agreement, or any document or agreement related to any such agreements are collectively referred to herein as the "Prepetition Collateral".  The Prepetition Collateral secures the Prepetition Indebtedness.

24.     I am further informed and believe that the Lender's agent has perfected its security interests in and liens upon the Prepetition Collateral by, among other things, filing financing

statements and by possession of instruments, certificates, or other property. The Debtor has obtained UCC searches and otherwise reviewed the Prepetition Security Agreement and has determined that the Agent has a timely filed, valid, all-asset UCC on file with the State of California as well as a control agreement with Silicon Valley Bank, where the Debtor's accounts are maintained. Accordingly, the Debtor believes that such perfected security interests in and liens upon the Prepetition Collateral are fully valid, enforceable, nonavoidable, and of first priority, and the Prepetition Indebtedness is fully valid, enforceable, and nonavoidable to the extent of the amount of such obligations set forth herein except that (1) the security grant covers all personal property, excluding foreign subs in excess of 65%, (2) the Debtor does not believe that the Lender has properly perfected an interest in any prepetition commercial tort claims (none are specifically identified) or leaseholds (the Debtor has no evidence of leasehold mortgages).

25. The Debtor has an urgent and immediate need for access to cash collateral and borrowings under proposed Postpetition Loan Agreement[2] with Lender in the principal amount of up to $3,700,000 following entry of the Final DIP Order, of which $1,200,000 would be available under the proposed Interim DIP Order. Without the proposed postpetition financing and use of cash collateral, the Debtor will not have any liquidity to operate its business, and therefore will be unable to fund its ordinary course expenditures or pay the expenses necessary to administer the chapter 11 case. Simply put, without access to financing and continued use of cash collateral, the Debtor will be required to cease operations and liquidate other than as a going concern, causing irreparable harm to the Debtor, its estate and creditors. By contrast, the Debtor intends to promptly file a reorganization plan that will preserve the business as a going concern, and the Postpetition Financing is necessary to fund the operating expenses of the business and the administrative expenses of the bankruptcy case pending the Debtor's reorganization. Accordingly, the Debtor has an urgent and immediate need for the borrowings under the Postpetition Loan Agreement and use of cash collateral contemplated herein.

---

[2] All capitalized terms used in this section of the declaration shall have the meanings ascribed to the in the DIP Financing Motion without re-definition here.

7

DOCS_SF:88582.6

Case: 15-31141    Doc# 2    Filed: 09/10/15    Entered: 09/10/15 06:00:32    Page 7 of 19

26. Based on my discussions with the Company's Chief Restructuring office, I am informed and believe that prior to agreeing to enter into the Postpetition Loan Facility with MIHI, the Debtor contacted several alternative funding sources. The Debtor was advised that any provision of credit would be on substantially less attractive credit terms than those offered by MIHI through the Postpetition Loan Facility. As a result, the Debtor and its professionals negotiated with MIHI and its professionals as to the terms of the Postpetition Loan Facility and the proposed Interim DIP Order, including consensual priming of the Prepetition Indebtedness and access to cash collateral. Such negotiations were conducted at arms' length and in good faith. The Debtor believes that the Postpetition Loan Facility and the other terms of the proposed Interim DIP Order are the best credit terms currently available to this estate.

**C. Motion for Order Authorizing Debtor to (A) Maintain Existing Bank Accounts and (B) Continue Use of Cash Management System ("Cash Management Motion")**

27. Pursuant to the Cash Management Motion, the Debtor requests authorization to (i) maintain its existing bank accounts including the authority to pay routine prepetition banking fees owed to financial institutions, and (ii) continue use of its existing cash management system.

28. In the ordinary course of business, the Debtor maintains a cash management system that provides well-established processes for the collection, concentration, management, disbursement, and investment of funds generated and used in its operations (the "Cash Management System"). The Cash Management System is a centralized process specifically designed to accommodate the Debtor's lenders and customers.

29. The Cash Management System consists of: (a) a credit card depository account (the "Credit Card Account"); (b) a lockbox account (the "Lockbox Account"); (c) two money market accounts (together, the "Money Market Accounts"); (d) two foreign bank accounts (the "Foreign Accounts"); and (e) a central operating account (the "Operating Account"). Funds deposited in the Credit Card Account and Lockbox Account are swept daily into the Operating Account. A complete list of the Bank Accounts is annexed to the Cash Management Motion as Exhibit A.

30. The Bank Accounts, other than the Foreign Accounts, are held at Silicon Valley Bank, which is a depository on the United States Trustee Region 17 List of Authorized Depositories.

8

31. Historically, the Company periodically transferred funds from the Operating Account to its non-debtor foreign subsidiaries' operating accounts in Japan, Australia, and Europe to finance operations (collectively, the "Intercompany Transfers"). No Intercompany Transfers will take place during the pendency of this chapter 11 case without further order of the Court.

32. The Credit Card Account is used to receive remittances from the Company's end-user customers that purchase products from its Company branded kiosks and kiosks operated on behalf of two of the Company's kiosk partners. The funds in the Credit Card Account are swept daily into the Operating Account.

33. The Company invoices its kiosk partners on a monthly basis and directs payment to a "lockbox" at SVB. The balance of the Lockbox Account is swept on a daily basis to the Operating Account.

34. The Operating Account is held at SVB. This is the account from which domestic disbursements are made. The Cash Management System and control of all disbursements is managed from the Company's headquarters in San Francisco by the Company's corporate controller.

35. The Money Market Accounts are restricted accounts and are used to secure letters of credit issued by SVB in favor of certain airport authorities that require a letter of credit in connection with the Company's operating leases at the subject airports. The funds held in the Money Market Accounts are only invested in "AAA" money market and fixed income securities. The primary objective of these investments is the preservation of capital. As of the Petition Date, the combined balance of the Money Market Accounts was approximately $62,300.

36. The Debtor maintains at the Bank of Montreal one collections/disbursement account denominated in Canadian dollars (the "Montreal Account"). The Montreal Account is the Debtor's primary operating account through which Canadian vendor remittances are processed. Funds are transferred to this account from the Operating Account for operating expenses on an as-needed basis.

37. The Bank of Montreal is not a United States Trustee authorized depository. However, the Montreal Account is insured by the Canada Deposit Insurance Corporation up to the amount of $100,000 CAD. Deposits in such account generally do not exceed such amount. This

9

DOCS_SF:88582.6
Case: 15-31141    Doc# 2    Filed: 09/10/15    Entered: 09/10/15 06:00:32    Page 9 of 19

account generally maintains an average balance of $32,000 CAD. As of the Petition Date, the balance of the Montreal Account was approximately $58,000 CAD.

38. The Debtor maintains at the Deutsche Bank AG one collections/disbursement account denominated in Euros (the "German Account"). The German Account is the Debtor's primary operating account through which European vendor remittances are processed. Funds are transferred to this account from the Operating Account for operating expenses on an as-needed basis.

39. The Deutsche Bank AG is not a United States Trustee authorized depository. However, upon information and belief, the German Account is insured by the Entschädigungseinrichtung deutscher Banken GmbH up to the amount of €100,000. Deposits in such account generally do not exceed such amount. This account generally maintains an average balance of €88,000. As of the Petition Date, the balance of the German Account was approximately €64,000.

40. The Company maintains two corporate credit cards that are issued to the Company in the name of certain individuals. SVB is the issuer of one corporate credit card and American Express is the issuer of the other corporate credit card.

41. In the ordinary course of the operation and maintenance of the Cash Management System, the Debtor incurs routine bank charges and fees relating to the administration of the Cash Management System. While it is difficult to readily determine the aggregate amount of unpaid prepetition banking fees as of the Petition Date (given, for example, the applicable banks' varying timing of charging/deducting such fees from a given account), on average, the Debtor pays approximately $2,500 in monthly banking fees and charges associated with the Operating Account.

42. I am informed that, upon the filing of a petition for relief under chapter 11 of the Bankruptcy Code, debtors in possession are normally required by the U.S. Trustee Operating Guidelines (the "UST Guidelines") to (i) close all of existing bank accounts and (ii) open new "debtor in possession" bank accounts. If strictly enforced in this case, the United States Trustee's requirements would cause a severe disruption in the Debtor's activities and would impair the Debtor's ability to operate under chapter 11. Accordingly, the Debtor seeks a waiver of these requirements to the extent set forth in the Cash Management Motion.

10

43.     The cash management procedures utilized by the Debtor are ordinary, usual and essential business practices, and are similar to those used by other major corporate enterprises. The Cash Management Systems provide significant benefits to the Debtor, including the ability to control corporate funds centrally, segregate cash flows, and ensure availability of funds when necessary. The Cash Management Systems also reduce administrative expenses by facilitating the movement of funds and the development of more timely and accurate balance and presentment information.

44.     The operation of the Debtor's business requires that the Cash Management Systems continue during the pendency of these cases. Requiring the Debtor to adopt new cash management systems at this critical stage of these cases would be expensive, would create unnecessary administrative burdens and problems (including the possibility that transactions might not be adequately documented), and would likely disrupt and adversely impact the Debtor's ability to succeed in chapter 11. Indeed, requiring Cash Management Systems changes could irreparably harm the Debtor, its estate and its creditors by creating cash flow interruptions while systems were changed. I believe that maintenance of the existing Cash Management Systems and granting the relief requested in the motion is therefore in the best interests of all creditors and other parties-in-interest.

**D.    Motion for Order Authorizing the Debtor to (i) Pay Pre-petition Employee Wages, Obligations and Contributions to Employee Benefit Plans and (ii) for the Debtor and Banks and Other Financial Institutions to Comply with Procedures Relating Thereto (the "<u>Wage Motion</u>")**

45.     **Salaries and Wages.** The Debtor's approximately 115 Employees are paid twice per month on the 15th and the last day of the month. For example, when Employees are paid on the 15th of the month, it is for wages/salary earned on the 1st through the 15th of that month. The Debtor distributes payroll to nearly all Employees through direct deposit. The Debtor's next payroll (for both salaried and hourly Employees) is scheduled for September 15, 2015, which and relates to the period September 1, 2015 through September 15, 2015. Generally, the aggregate wages/salaries for this payroll period are approximately $480,000. However, prior to the Petition Date, the Debtor's Employees were paid for their earned wages/salary through September 9, 2015 (*i.e.*, through the prepetition period). As a result, the Debtor does not need authorization to pay Employees for

11

DOCS_SF:88582.6

Case: 15-31141    Doc# 2    Filed: 09/10/15    Entered: 09/10/15 06:00:32    Page 11 of 19

prepetition services; however, the Debtor is seeking authorization to the extent necessary to continue paying Employees for their services after the petition date in the ordinary course of business, which for the stub postpetition period the Debtor estimates $192,000 in wages and salary.

46. **Employment Taxes and Fees.** In the ordinary course of business, the Debtor takes certain employee deductions (as applicable) from their Employees' pay, including, inter alia: (a) employer payroll taxes and Employees' portion of FICA and unemployment taxes (comprising most of the employee deductions); (b) Employee contributions to health and disability related benefits (discussed further below); and (c) legally ordered deductions such as wage garnishments, child support and tax levies. The Debtor forwards amounts equal to the applicable employee deductions (which prepetition typically totaled approximately $110,000 per pay period) to the appropriate third-party recipients, including taxing authorities. The Debtor seeks authorization, pursuant to sections 507(a)(5) and (8) of the Bankruptcy Code, to pay the employee deductions to the appropriate parties, including, but not limited to, all priority payroll taxes associated with any Prepetition Wages.

47. **PTO.** In the ordinary course, the Debtor provides paid time off ("PTO") to its employees. The Debtor requests authority to continue to honor PTO earned prepetition by the employees and allow such employees to use prepetition accrued PTO in the ordinary course of business. The Debtor does not intend to "cash out" PTO benefits to the employees at this time. However, the Debtor does intend to honor accrued PTO for all employees by allowing employees to use PTO in the ordinary course. In the event of a postpetition termination of any employee, such employee will be paid for all unused PTO – up to the amount of the priority limit under section 507(a)(4).

48. **Business Expenses.** In addition, the Debtor customarily reimburses its employees for business expenses incurred in performing their duties such as travel, meals, mileage, and telephone use. As of the Petition Date, the Debtor believes there is approximately $10,000 in prepetition employee expense reimbursement claims outstanding. The Debtor seeks authority to pay such prepetition business expenses in the ordinary course and to honor outstanding checks related thereto. Because of the varying timing of submissions of expense reports by employees, it is difficult for the Debtor to accurately estimate how much in prepetition employee expenses may have accrued.

12

DOCS_SF:88582.6
Case: 15-31141   Doc# 2   Filed: 09/10/15   Entered: 09/10/15 06:00:32   Page 12 of 19

Historically, the employee expenses average approximately $100,000 per month. The Debtor seeks authority, but not direction, to pay any prepetition employee expenses and to continue to pay them postpetition in the ordinary course of business to employees to the extent any such claims are posted after the Petition Date. If the Debtor is not granted authority to do so, the individual employees will bear the unfair burden of paying the Debtor's expenses from their personal funds. This would be patently unjust to the employees and would only serve to lower employee morale at a time when the employees' best efforts are crucial to the Debtor and its estate.

49. **Medical.** The Debtor pays ADPTotalSource (the administrator) a premium in the approximate amount of $78,500 per month for employee medical plan that is provided by Aetna or Kaiser. The medical plan is partially self-funded by the participating Employees and the Debtor on a cost-sharing basis (75% by Debtor and 25% by employees). The monthly fee/premium is generally paid at the beginning of the month for coverage during the same month. Here, however, the premium was not paid at the beginning of the month. As a result, the Debtor is seeking authorization to pay any and all prepetition amounts that may be owed to under its medical plan, which the Debtor estimates to be $78,500.

50. **Dental and Vision.** The Debtor offers a dental program to their eligible and participating Employees that is administered by Delta Dental, and a vision plan to Employees with VSP Vision. As with the medical coverage, dental plan premiums are paid on a 75/25 cost-sharing basis. The Debtor generally pays these providers at the beginning of the month for dental ($7,175) and vision ($948) coverage premiums. Here, however, the premium was not paid at the beginning of the month. As a result, the Debtor is seeking authorization to pay any and all prepetition amounts that may be owed to under its dental and vision plans, which the Debtor estimates to be $8,100.

51. **COBRA.** The Debtor seeks to continue to perform any obligations under Section 4980B of the Internal Revenue Code to administer Continuation Health Coverage (26 U.S.C. § 4980B) ("COBRA") in respect to former employees and their covered dependents. ADP is the third-party COBRA administrator for the Debtor (the "COBRA Administrator"). To maintain employee morale and ensure the orderly administration of the estates, the Debtor requests authority to continue performing in their discretion any COBRA related obligations.

13

DOCS_SF:88582.6
Case: 15-31141    Doc# 2    Filed: 09/10/15    Entered: 09/10/15 06:00:32    Page 13 of 19

52. **Employee Life and Other Insurance Benefits.** The Debtor also offers eligible Employees premium-based life insurance coverage and accidental death and dismemberment (AD&D) insurance through Mutual of Omaha. Basic life and AD&D insurance coverage is made available to employees and paid by the Debtor in the approximate amount of $640 per month. Short-term and long-term disability is made available to Employees and their spouse and children at a cost of $1,600 and $1,050 per month, respectively. The monthly premiums for these policies are generally paid at the beginning of each month for coverage during that period. The Debtor believes that it is behind two months' in premiums that relate to the period prior to the Petition Date in the approximate amount of $7,300. Accordingly, the Debtor is seeking authorization to pay any and all prepetition amounts that may be owed to Mutual of Omaha relating to the Debtor's insurance policies.

53. **Retirement Benefits Plan.** The Debtor offers eligible Employees the opportunity to participate in a 401(k) Savings and Retirement Plan ("401(k) Plan"). The Debtor seeks authority to continue to maintain its 401(k) and remit withholdings in the ordinary course of business.

54. **Workers' Compensation.** Under the laws of various states, the Debtor is required to maintain workers' compensation insurance to provide their Employees with coverage for injury claims arising from or related to their employment with the Debtor. The Debtor maintains a workers' compensation benefits program (the "ADPTotalSource PEO Compensation Program") through ADPTotalSource PEO. The ADPTotalSource PEO Compensation Program provides benefits to all Employees in each of the states in which the Debtor operates (*i.e.*, for claims arising from or related to the Employee's employment with the Debtor (together with any premiums, surcharges, deductibles and other charges (discussed below) payable to ADPTotalSource PEO, the "ADPTotalSource PEO Compensation Obligations"). Under the ADPTotalSource PEO Compensation Program, ADPTotalSource PEO acts as a third party administrator and provides guaranteed cost insurance coverage at the statutorily-required level for the states in which the Debtor operates. The Debtor pay ADPTotalSource PEO approximately $12,500 per month for the ADPTotalSource PEO Workers' Compensation Program. Given the timing of the bankruptcy filing, the Debtor does not believe that it owes ADPTotalSource PEO any premiums on account of

14

prepetition period. However, in the event the Debtor determines that it does owe ADPTotalSource PEO, it seeks authorization to, in their sole discretion, to pay prepetition and postpetition claims arising from their Workers' Compensation Obligations that come due after the Petition Date.

**E. Motion of the Debtor For an Order Under Section 366 of the Bankruptcy Code (A) Prohibiting Utility Providers From Altering, Refusing or Discontinuing Service, (B) Deeming Utilities Adequately Assured of Future Performance, and (C) Establishing Procedures For Determining Adequate Assurance of Payment ("<u>Utility Motion</u>")**

55. Pursuant to the Utility Motion, the Debtor request entry of an order (a) prohibiting its utility providers from altering, refusing or discontinuing service; (b) deeming the utility providers adequately assured of future performance; and (c) establishing procedures for determining additional adequate assurance of future payment.

56. The Debtor receives essential utility services from a number of utility companies. In the normal course of its daily business operations, the Debtor has relationships with various utility companies and other providers (each a "<u>Utility Provider</u>" and collectively, the "<u>Utility Providers</u>") for the provision of telephone, cellular phone, gas, internet, electricity, water, trash and other related services. The Debtor estimate that its average monthly payments to the Utility Providers aggregate approximately $82,000 The Debtor is prepare to deposit into a segregated account approximately $51,000, which represents approximately two-weeks of the monthly average invoice determined on an annual basis.

57. At this critical time, and given the nature of the Debtor' business, continued and uninterrupted utility service is essential to the Debtor' ongoing operations. The Debtor uses the power generated by the utilities to run its systems and operate its facilities. If the Debtor lost any utility service, the Debtor would be unable to operate, causing immediate and irreparable harm. It is therefore critical that the Court prohibit the Utility Providers from altering, refusing, or discontinuing service to the Debtor. Therefore, I believe the relief requested in the Utilities Motion is essential to these estates and its reorganization efforts.

### F. Motion for an Order Setting 503(b)(9) Claims Bar Date ("503(B)(9) Bar Date Motion")

58. In the ordinary course of its business, the Debtor receives deliveries of goods from third parties. The Debtor's 503(b)(9) Claims Bar Date Motion seeks to have the Court set a prompt bar date for the filing of claims entitled to priority under Bankruptcy Code section 503(b)(9), specifically 30 days after notice is provided to creditors (with such notice being provided by mail to likely 503(b)(9) creditors within 15 days of the Petition Date). Without the 503(b)(9) Bar Date Motion, there would be no deadline for persons to file priority claims for deliveries made in the 20 days prior to the Petition Date. The Debtor would be at a severe disadvantage if it could not accurately assess the extent of such claims in the considering various potential offers for the purchase of substantially all of its assets, to say nothing of determine how a plan of reorganization might be funded in this case. Accordingly, I believe it is imperative to the rapid and efficient handling of this reorganization effort that the Court grant the relief sought in the 503(b)(9) Claims Motion and set the early claims bar date requested.

### G. Debtor's Motion for Authority to Pay in the Ordinary Course of Business Prepetition Claims Related to Shipping and Warehousing Charges and Related Relief ("Shipping/Warehouse Motion")

59. Pursuant to the Shipping/Warehouse Motion, the Debtor requests entry of an order authorizing, but not directing, payment in the ordinary course of business of certain prepetition claims of shippers, warehousemen, customs brokers, and other transportation lien claimants that have or are capable of asserting possessory liens against the Debtor's goods. The Debtor estimates that, as of the Petition Date, approximately $55,000 remains owing to shippers and warehousemen on account of prepetition obligations.

60. The Debtor's operations require a global network of shipping and warehousing systems to ensure the timely delivery of inventory and product. The Debtor's logistical operations consist of two separate, but interrelated systems: (a) warehousing and transportation of its ZoomShops and (b) warehousing and transportation of the product that is sold at each ZoomShop.

61. The Debtor's inventory of ZoomShops – freestanding retail kiosks – is stored in four warehouses throughout the country and one warehouse each in Japan and Germany. The Debtor currently has 438 ZoomShops in storage. The Debtor maintains a warehouse in Hayward, California

16

where it "stages" ZoomShops for installation. Once a ZoomShop is ready for installation, the Debtor engages a shipping company to pick up the ZoomShop and deliver it to the point of installation (or a warehouse in Japan or Germany).

62. To streamline its operations, the Debtor contracts with Cinram, a third party warehousing and fulfillment company, to store, package, and ship product to its various ZoomShop locations. The product is stored at Cinram's La Vergne, Tennessee warehouse. In general, the product is picked up by a shipper and drop shipped to a shipment hub. A representative of the Debtor will pick up product from the shipment hub and re-stock the local ZoomShop.

63. To the extent that Goods are received from or sent to international destinations, the Debtor is required to pay customs duty charges and the Debtor utilizes the services of customs brokers who facilitate the payment of the customs duty charges and fees. If the Debtor fails to pay any customs broker, shipper, or warehouseman (collectively, the "Lien Claimants") for charges incurred in connection with the use, storage, or transport of the goods, various statutes, tariffs, and agreements permit the Lien Claimants to assert liens against the products in their possession.

64. On average, the Debtor pays approximately $40,000 per month to the Lien Claimants. As of the Petition Date, the Debtor estimates that approximately $55,000 is owed on account of such claims. Payment of the foregoing shipping, customs, and storage charges will avoid disruption in the Debtor's business and enable the Debtor to realize the value of the Goods. The Debtor's business is dependent upon the ability to timely deliver product to its kiosk locations for sale to end-customers. Moreover, if the Debtor is unable to re-stock its kiosks, it may be in violation of various agreements with its kiosk operating partners.

65. The Debtor represents that it will only pay shipping obligations where it believes, in its business judgment, the benefits to its estate and creditors from making such payments would exceed (a) the costs that the estate would incur by bringing an action to compel the turnover of such goods, and (b) the delays associated with such actions. The Debtor does not expect such payments to exceed $55,000.

17

**H. Application for Order Under 28 U.S.C. § 156(c) Authorizing the Retention of Prime Clerk LLC as noticing and Claims Agent for Clerk of the Bankruptcy Court *Nunc Pro Tunc* to the Petition Date ("<u>Notice and Claims Agent Application</u>")**

66. Pursuant to the Notice and Claims Agent Application, the Debtor seeks authority to retain Prime Clerk as its claims and noticing agent. The Debtor has evaluated bids from three potential candidates to serve as its claims and noticing agent. Following that review, and in consideration of the number of anticipated claimants and parties in interest, the nature of the Debtor's business, and the scope of tasks for which the Debtor will require the assistance of a claims and noticing agent, the Debtor submits that the appointment of Prime Clerk as claims and noticing agent is both necessary and in the best interests of the Debtor's estate.

67. The Debtor estimates that there are more than two thousand creditors holding claims against the Debtor's estate, including former employees and other parties-in-interest who require notice of various matters, and in particular the deadline for filing proofs of claim. Additionally, many of these parties may file proofs of claim.

68. I believe that this retention is the most effective and efficient manner of noticing the creditors and parties in interest of the filing of the Case and other developments in the Case. Accordingly, I respectfully request that the Court authorize the Debtor to retain Prime Clerk.

*[Remainder of page intentionally left blank]*

I declare under penalty of perjury that the foregoing is true and correct and that this declaration was executed this 10th day of September, 2015 at San Francisco, California.

Dated: September 10, 2015

_____
John A. Lawrence