John D. Fiero (CA Bar No. 136557)
Debra I. Grassgreen (CA Bar No. 169978)
John W. Lucas (CA Bar No. 271038)
Jason H. Rosell (CA Bar No. 269126)
PACHULSKI STANG ZIEHL & JONES LLP
150 California Street, 15th Floor
San Francisco, CA 94111
Telephone:     (415) 263-7000
Facsimile:     (415) 263-7010
E-mail:        jfiero@pszjlaw.com
               dgrassgreen@pszjlaw.com
               jlucas@pszjlaw.com
               jrosell@pszjlaw.com

Proposed Counsel for Debtor

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No. 15-31141-HB |
| NEWZOOM, INC.,[1] | Chapter 11 |
| Debtor. | **MOTION FOR INTERIM AND FINAL ORDERS (1) AUTHORIZING POSTPETITION FINANCING PURSUANT TO 11 U.S.C. §§ 105, 361, 362, 363, 364(C)(1), 364(C)(2), 364(C)(3) AND 364(D)(1); (2) AUTHORIZING THE USE OF CASH COLLATERAL; (3) GRANTING SECURITY INTERESTS AND SUPERPRIORITY CLAIMS; (4) PROVIDING ADEQUATE PROTECTION; (5) MODIFYING THE AUTOMATIC STAY; AND (6) GRANTING RELATED RELIEF; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

NewZoom, Inc., the above-captioned debtor and debtor in possession (the "Debtor"), hereby moves (the "Motion") this Court for entry of an order substantially in the form attached hereto as **Exhibit A** (the "Interim DIP Order") and, following a final hearing, a final order, among other things:

---

[1] The last four digits of the Debtor's tax identification number are: (9130). The location of the Debtor's headquarters and service address is 22 Fourth Street, San Francisco, CA 94103.

DOCS_SF:88655.4 59938/001

(a)     authorizing the Debtor to obtain postpetition loans, credit, and other financial accommodations, on an interim basis, pending a final hearing on the Motion (the "Final Hearing"), from MIHI, LLC ("MIHI" or "Lender") in accordance with the Postpetition Loan Documents (as defined below), secured by security interests and liens on substantially all of the assets of the Debtor, as set forth in the Postpetition Loan Agreement (as defined below) and herein, pursuant to sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3) and 364(d)(1) of title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code") and Rules 2002, 4001 and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), subject to Permitted Liens and the payment of the Carve-Out, and excluding Avoidance Actions or the proceeds thereof;

(b)     authorizing the Debtor to enter into, be bound by, and perform under the *Senior Secured, Superpriority Debtor-in-Possession Credit Agreement* by and among the Debtor and Lender, substantially in the form attached hereto (without exhibits or schedules) as **Exhibit B** (as such agreement may be modified, supplemented, amended, or restated from time to time, the "Postpetition Loan Agreement," and, together with the other operative postpetition loan documents, the "Credit Documents");[2]

(c)     authorizing the Debtor to grant Lender superpriority administrative claim status pursuant to Bankruptcy Code section 364(c)(1) in respect of all "Obligations," as defined in the Postpetition Loan Agreement (the "DIP Obligations");

(d)     authorizing the Debtor to use the collateral, including cash collateral, that secures the Debtor's obligations to Lender under the prepetition Note Purchase Agreement, and granting adequate protection as set forth herein;

(e)     modifying the automatic stay to the extent set forth herein; and

(f)     setting the Final Hearing for consideration of the entry of an order approving this Motion on a final basis ("Final DIP Order").

In support of the Motion, the Debtor respectfully represents the following:

---

[2]  Capitalized terms not otherwise defined herein have the meaning ascribed to them in the Postpetition Loan Agreement.

2

# I.

## JURISDICTION

The Court has jurisdiction over the matter pursuant to 28 U.S.C. §§ 157 and 1334. This matter is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409.

The statutory basis for the relief requested herein is Bankruptcy Code sections 105, 361, 362, 363, 364, 503(b), and 507 and Bankruptcy Rules 2002, 4001 and 9014.

# II.

## MOTION

As more fully set forth herein and in the Declaration of John A. Lawrence in Support of First Day Motions (the "Lawrence Declaration"), the Debtor has an urgent and immediate need for access to cash collateral and borrowings under the Postpetition Loan Agreement with Lender in the principal amount of up to $3,700,000 following entry of the Final DIP Order, of which $1,200,000 would be available under the proposed Interim DIP Order. Lawrence Decl. ¶ 25.

The Debtor offers an end-to-end technology and services solution that allows its customers -- major brands and retailers -- to sell their products to consumers through automated kiosks called "ZoomShops," which are installed and operated by the Debtor in high-traffic locations such as airports and malls. The Debtor derives revenue from its customers through a combination of: (a) a one-time up-front development fee, (b) the sale or lease of the ZoomShops, and (c) a recurring monthly service fee for each installed ZoomShop, which is either a fixed fee or a percentage of sales from the ZoomShop. The recurring monthly fees are the most significant component of the Debtor's revenue model, and these in turn are dependent on the number of ZoomShops deployed and the level of product sales through the ZoomShops (for customers who pay the Debtor a percentage of sales). Most new customers will contract initially for between ten and twenty-five ZoomShops, with the goal of deploying more ZoomShops if sales and profitability from the initial stores support the business case for expansion. The Debtor employs approximately 115 people. Lawrence Decl. ¶¶ 5 and 45.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

3

Without the proposed postpetition financing and use of cash collateral, the Debtor will not have any liquidity to operate its business, and therefore will be unable to fund its ordinary course expenditures or pay the expenses necessary to administer the chapter 11 case. Simply put, without access to financing and continued use of cash collateral, the Debtor will be required to cease operations and liquidate other than as a going concern, causing irreparable harm to the Debtor, its estate, and creditors. By contrast, and as set forth in the Lawrence Declaration, the Debtor intends to promptly file a reorganization plan that will preserve the business as a going concern and the Postpetition Financing is necessary to fund the operating expenses of the business and the administrative expenses of the bankruptcy case pending the Debtor's reorganization. Lawrence Decl. ¶¶ 13-16. Accordingly, the Debtor has an urgent and immediate need for the borrowings under the Postpetition Loan Agreement and use of cash collateral contemplated herein.

4

## III.
## INTRODUCTORY STATEMENT AND
## COMPLIANCE WITH GUIDELINES FOR FINANCING STIPULATIONS

The relevant provisions of the Postpetition Loan Agreement are as follows:[3]

| Term | Description | Location in Documents |
|---|---|---|
| Borrowing Limits | $1.2 million on an Interim Basis<br>$3.7 million on a Final Basis | Definitions of "Interim Advance" and "Term Loan Commitment" |
| Interest Rate | 12% per annum | Postpetition Loan Agreement § 2.02 |
| Fees | Unused Line Fee of .5%<br>Commitment Fee of 3%<br><br>Reimbursement of Lender's professional fees and costs whether pre- or postpetition | Postpetition Loan Agreement §§ 2.02 and 3.01 (xiv) |
| Maturity Date | December 10, 2015 | Definition of "Maturity Date" |
| Use of Proceeds of Postpetition Loan and Cash Collateral | Disbursement pursuant to the Approved Budget attached to this Motion as Exhibit C, subject to a variance of no more than 10% on a line item and aggregate basis and a condition that is not less than 90% of projected net cash flow. | Postpetition Loan Agreement §§ 5.18 and 5.22<br><br>Exhibit C to this Motion |
| Security, Priority, and Adequate Protection | Consensual Priming Liens<br><br>Junior Liens<br><br>Superpriority Administrative Claims<br><br>Replacement Liens and Superpriority Administrative Claims to the extent of diminution in value of prepetition collateral. | Interim Order ¶¶ 4, 5 and 6 |
| Carve-Out | (1) Pre-default: allowed and unpaid fees and expenses of estate professionals in an aggregate amount not to exceed the amounts set forth for each professional in the Budget, plus (2) $50,000 Post-Default Carve-out Cap, plus (3) $25,000 for a subsequently appointed chapter 7 trustee. | Interim Order ¶ 7<br><br>Definition of "Carve-Out" in Postpetition Loan Agreement |

---

[3]  The following chart summarizes the material terms and conditions of the Postpetition Loan Facility.  In the event of any inconsistency with the Postpetition Loan Agreement, the terms and conditions of the Postpetition Loan Agreement shall control.

5

| Plan and Sale Process Milestones | Milestones for Plan Filing and Approval* <br><br> Milestones for Sale if Plan does not go forward <br><br> Approval of Chief Restructuring Officer <br><br> *Only milestone approved on interim basis is September 22, 2015 plan filing deadline. | Postpetition Loan Agreement §§ 5.26 and 7.01(n) |

Pursuant to the Court's *Guidelines for Cash Collateral and Financing Stipulations* ("Guidelines"), the Debtor has listed below each of the provisions that are identified in the Guidelines as provisions that the Court will not ordinarily approve and has identified whether such provisions are applicable here:

| Provision | Description |
|---|---|
| Cross-collateralization clauses and "roll-ups" | No cross-collateralization protection to any prepetition secured creditor, other than replacement liens as set forth in the Interim DIP Order. Prepetition indemnification obligations for acts related to the Prepetition Loan are part of the DIP "Obligations." *See* Postpetition Loan Agreement § 8.07. |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection, or amount of secured party's lien or debt | **None.** All of the Debtor's stipulations are subject to a challenge by the Committee or a party in interest that obtains standing and commences an adversary proceeding within 60 days of the Petition Date. |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's lien and liens held by persons who are not party to the stipulation | **None.** All of the Debtor's stipulations are subject to a challenge by the Committee or a party in interest that obtains standing and commences an adversary proceeding within 60 days of the Petition Date. |
| Waivers of 11 U.S.C. § 506(c), *unless* the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds | **None.** Surcharge waiver is only effective prior to the Maturity Date. *See* Interim Order ¶ 6. |

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

6

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 6 of 136

| | |
|---|---|
| Provisions that operate, as a practical matter, to divest the debtor in possession of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under other applicable law | The Postpetition Loan Facility imposes certain Plan and Sale Milestones (*See* Postpetition Loan Agreement § 5.26). The only milestone to be approved on an interim basis is the September 22, 2015 plan filing deadline. *See* Interim Order ¶ 26.<br><br>The Postpetition Loan Agreement contains numerous affirmative covenants, negative covenants, and events of default (*see generally*, Articles V, VI and VII). Among other things, under the Postpetition Loan Agreement, the Debtor waives any right it may have to seek authority: (i) to obtain postpetition loans or other financial accommodations, other than from Lender or as otherwise may be expressly permitted pursuant to the Postpetition Loan Documents (*see* Interim Order ¶ 16 and Postpetition Loan Agreement §§ 6.03 - 6.05); (ii) to seek dismissal of the bankruptcy case (*see* Interim Order ¶ 19); and to (iii) to propose, support, or have a chapter 11 plan that does not provide for the indefeasible payment in cash, in full satisfaction of DIP Obligations and the Prepetition Indebtedness on the effective date of such chapter 11 plan (*see* Postpetition Loan Agreement § 7.01(s)).<br><br>In addition, the Interim Order grants Lender a credit-bid right, subject to the challenge period set forth in paragraph 10 of the Interim Order. |
| Releases of liability for the creditor's alleged prepetition torts or breaches of contract | **Yes.** Releases of both the prepetition and postpetition Lender are included, subject to the Challenge Rights set forth in paragraph 10 of the Interim Order. |
| Waivers of, or liens on any of the estate's rights arising under Bankruptcy Code §§ 544, 545, 547, 548, 549, 553, 723(a), or 724(a), or the proceeds of any such rights | **None.** |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee | **Yes.** Without any further order, upon violation of the Interim Order, the occurrence of an Event of Default or the occurrence of the Maturity Date, Lender may cease providing additional loans and demand immediate payment.<br><br>Relief from stay will be granted to further exercise remedies upon the expiration of the third business day following notice, unless the Court orders otherwise at an emergency hearing where the only issue is whether an Event of Default has in fact occurred. *See* Interim Order ¶ 13 and 17. |
| Waivers of procedural requirements, including those of foreclosure mandated under applicable nonbankruptcy law, and for perfection of replacement liens | **Yes.** Lender is not required to file financing statements, mortgages, deeds of trust, security deeds, notices of lien, or similar instruments in any jurisdiction, or take any other action, to attach or perfect the security interests and liens granted under the Postpetition Loan Agreement and the Interim DIP Order. *See* Interim Order ¶ 3. |
| Waivers, effective on default or expiration, of the debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | **None.** The Interim Order only provides for a waiver of the Debtor's right to seek to grant or impose liens under Bankruptcy Code section 364. *See* Interim Order ¶ 16. |

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 7 of 136

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

| Findings of fact on matters extraneous to the approval process | **None.** |
|---|---|
| Provisions providing unreasonable treatment with respect to fees or professionals retained by a creditors' committee compared to any carve-outs provided for professionals retained by the debtor in possession or trustee | **None.** Committee fees are set forth in the Budget at lesser amounts than the Debtor's professionals. *See* Exhibit C. |
| Provisions that provide an inadequate carve-out for a subsequently appointed trustee in the case, whether before or after conversion | **None.** $25,000 Carve-Out for Trustee is included. |

## IV.

## CERTIFICATION

The undersigned counsel for the Debtor has read the Motion; to the best of my knowledge, information, and belief, formed after reasonable inquiry, the terms of the relief sought in the motion are in conformity with the Court's *Guidelines for Cash Collateral and Financing Motions and Stipulations,* except as set forth herein. I understand and have advised the Debtor that the Court may grant appropriate relief under Bankruptcy Rule 9024 if the court determines that a material element of the Motion was not adequately disclosed in the Introductory Statement.

Dated:    September 10, 2015        PACHULSKI STANG ZIEHL & JONES LLP

By: _____
John D. Fiero
Debra I. Grassgreen
John W. Lucas
Jason H. Rosell

Proposed Counsel for Debtor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

8

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

# MEMORANDUM OF POINTS AND AUTHORITIES

## I.

## BACKGROUND

On September 10, 2015 (the "Petition Date"), the Debtor filed with this Court a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor is operating its business and managing its property as a debtor and debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.

No request has been made for the appointment of a trustee or an examiner in this case. No official committee of unsecured creditors has been appointed by the Office of the United States Trustee.

## II.

## THE PREPETITION LOAN AGREEMENT

On or about May 26, 2011, the Debtor executed and delivered to Lender a note purchase agreement (as such note purchase agreement may have been amended from time to time, the "Prepetition Loan Agreement"), pursuant to which Lender agreed to make loans and other financial accommodations to the Debtor, as more specifically described therein. The Prepetition Loan Agreement and various other loan and security and related documents and agreements are referred to herein as the "Prepetition Agreements."

Pursuant to the Prepetition Loan Agreement, Lender has made various loans and, as of the Petition Date, the Debtor was indebted to Lender as a result of such loans in the aggregate principal amount (including contingent amounts pursuant to letters of credit) of not less than $24,147,371.63 (the principal amount plus all accrued interest, costs, fees, and other amounts now or hereafter owing or accruing pursuant to the Prepetition Agreements is collectively referred to herein as the "Prepetition Indebtedness").

In addition, pursuant to the Prepetition Loan Agreement, to secure payment of the Prepetition Indebtedness, the Debtor granted to Lender a security interest in substantially all of its present and after-acquired assets and the proceeds of the foregoing. On or about May 26, 2011, the Debtor executed and delivered to Lender a pledge and security agreement (as such security agreement may

9

have been amended from time to time, the "Prepetition Security Agreement"), pursuant to which the Debtor evidenced the grant of such security interest. The assets in which Lender was granted a security interest or lien pursuant to the Prepetition Loan Agreement, the Prepetition Security Agreement, or any document or agreement related to any such agreements, are collectively referred to herein as the "Prepetition Collateral." The Prepetition Collateral secures the Prepetition Indebtedness.

The Agent has perfected its security interests in and liens upon the Prepetition Collateral by, among other things, filing financing statements and by possession of instruments, certificates, or other property. The Debtor has obtained UCC searches and otherwise reviewed the Prepetition Security Agreement and has determined that the Agent has a timely filed, valid, all-asset financing statement on file with the State of California as well as a control agreement with Silicon Valley Bank, where the Debtor's accounts are maintained. Accordingly, the Debtor believes that such perfected security interests in and liens upon the Prepetition Collateral are fully valid, enforceable, nonavoidable, and of first priority, and the Prepetition Indebtedness is fully valid, enforceable, and nonavoidable to the extent of the amount of such obligations set forth herein except that (1) the security grant covers all personal property, excluding foreign subsidiaries in excess of 65%, and (2) the Debtor does not believe that Lender has properly perfected an interest in any prepetition commercial tort claims (none are specifically identified) or leaseholds (the Debtor has no evidence of leasehold mortgages).

## III.

## PROPOSED DIP FINANCING

**A. The Postpetition Loan Facility and Use of Cash Collateral Are Critical to the Debtor's Continued Operations**

The Debtor requires immediate access to the Postpetition Loan Facility and cash collateral in order to sustain its ongoing operations and administer this chapter 11 case. The Debtor has employees and vendors that depend on the Debtor to satisfy its obligations. The Debtor fully intends to satisfy such obligations on a postpetition basis. Absent immediate funding through the Postpetition Loan Facility and use of cash collateral, the Debtor would be forced to shut down its

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

10

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1   business and convert this case to chapter 7, which would have a tremendously adverse effect on the

2   Debtor's estate, its employees, vendors, and other constituents.

3   **B.    The Debtor's Selection of MIHI as Lender**

4   Prior to agreeing to enter into the Postpetition Loan Facility with MIHI, the Debtor contacted

5   alternative funding sources.  The Debtor was advised that any provision of credit would be on

6   substantially less attractive credit terms than those offered by MIHI through the Postpetition Loan

7   Facility.  As a result, the Debtor and its professionals negotiated with MIHI and its professionals as

8   to the terms of the Postpetition Loan Facility and the proposed Interim DIP Order, including

9   consensual priming of the Prepetition Indebtedness and access to cash collateral.  Such negotiations

10  were conducted at arm's length and in good faith.  The Debtor believes, in the exercise of its sound

11  business judgment, that the Postpetition Loan Facility and the other terms of the proposed Interim

12  DIP Order are the best credit terms currently available to this estate.

13  **IV.**

14  **MEMORANDUM OF POINTS AND AUTHORITIES**

15  **A.    The Postpetition Loan Facility Should Be Approved**

16  **Under Bankruptcy Code Section 364(c), 364(d)(1)**

17  The Debtor needs cash to meet ongoing obligations necessary to run its business and

18  administer its chapter 11 case.  Pursuant to section 364(c) and 364(d)(1) of the Bankruptcy Code, the

19  Debtor requests authority to enter into the Postpetition Loan Agreement as an administrative

20  expense, having priority over other administrative expenses and secured by a senior lien on

21  substantially all of the property of the Debtor's estates, subject to Permitted Liens and the payment

22  of Carve-Out Expenses.  The Postpetition Loan Facility will prime and be senior to the existing

23  obligations under the Prepetition Loan Agreement.

24  Pursuant to section 364(c) of the Bankruptcy Code, a debtor may, in the exercise of business

25  judgment, incur secured debt if the debtor has been unable to obtain unsecured credit and the

26  borrowing is in the best interest of the estate.  *See, e.g., In re Ames Dept. Stores*, 115 B.R. 34, 38

27  (Bankr. S.D.N.Y. 1990) (with respect to postpetition credit, courts "permit debtors-in-possession to

28  exercise their basic business judgment consistent with their fiduciary duties"); *In re Simasko*

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1  *Production Co.*, 47 B.R. 444, 448-9 (D. Colo. 1985) (authorizing interim financing agreement where

2  debtor's best business judgment indicated financing was necessary and reasonable for benefit of

3  estate).

4        Section 364(c) of the Bankruptcy Code provides, in pertinent part, that:

5            (c)  If the trustee [or debtor in possession] is unable to obtain
        unsecured credit allowable-under section 503(b)(1) of this title as an

6        administrative expense, the court, after notice and a hearing, may
        authorize the obtaining of credit or the incurring of debt –

7
                (1)  with priority over any and all administrative expenses of
8        the kind specified in section 503(b) or 507(b) of this title:

9                (2)  secured by a lien on property of the estate that is not
        otherwise subject to a lien; or

10
                (3)  secured by a junior lien on property of the estate that is
11        subject to a lien.

12  11 U.S.C. § 364(c).

13

14        Section 364(d)(1) of the Bankruptcy Code governs the incurrence of senior secured debt or

    "priming" loans.  Pursuant to section 364(d)(1) of the Bankruptcy Code, the Court may, after notice

15  and a hearing, authorize the obtaining of credit or the incurring of debt secured by a senior or equal

16  lien only if –

17            (1)      the trustee is unable to obtain such credit otherwise; and

18            (2)      there is adequate protection of the interest of the holder of the
        lien on the property of the estate on which such senior or equal lien is

19        proposed to be granted.

20  11 U.S.C. § 364(d)(1).

21        In satisfying the standards of section 364 of the Bankruptcy Code, a debtor need not seek

22  credit from every available source, but should make a reasonable effort to seek other sources of

23  credit available under sections 364(a) and (b) of the Bankruptcy Code.  *See, e.g., Bray v.*

24  *Shenandoah Fed. Sav. & Loan (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) (trustee

25  had demonstrated by good faith effort that credit was not available without senior lien by

26  unsuccessfully contacting other financial institutions in immediate geographic area; "the statute

27  imposes no duty to seek credit from every possible lender before concluding that such credit is

28  unavailable").  Instead, a debtor's efforts are to be considered on a case by case basis, particularly

DOCS_SF:88655.4.59938/001                                                    DIP FINANCING MOTION

"[g]iven the 'time is of the essence' nature of this type of financing." *In re Reading Tube Indus.*, 72 B.R. 329, 332 (Bankr. E.D. Pa. 1987). In *In re Sky Valley, Inc.*, 100 B.R. 107, 112-13 (Bankr. N.D. Ga. 1988), the bankruptcy court stated that "it would be unrealistic and unnecessary to require Debtors to conduct such an exhaustive search for financing" where the business suffered from financial stress, had little or no unencumbered property, and the primary property was subject to numerous liens, and thus the debtors' approach of only four lenders was sufficient under such circumstances. *See also In re Stanley Hotel, Inc.*, 15 B.R. 660, 663 (D. Colo. 1981) (section 364(d)(1)(A) of the Bankruptcy Code satisfied where two banks refused to provide unsecured credit to debtor); *see also In re 495 Cent. Park Ave. Corp.*, 136 B.R. 626, 631 (Bankr. S.D.N.Y. 1992) (element satisfied where "specialist in commercial lending practices . . . explained that most banks lend money only in return for a senior secured position. The debtor cannot obtain financing secured by a lien on unencumbered property . . . because there is no property in the estate which is not already subject to a lien.").

The liens that the Debtor proposes to grant to MIHI, as Lender, to secure repayment of the Postpetition Loan Facility will prime the existing prepetition secured debt of MIHI. MIHI consents to the priming proposed hereby. Despite efforts to locate alternative funding sources, the Debtor does not have access to financing on better terms than the proposed Postpetition Loan Facility. Moreover, the Debtor cannot obtain the financing that it requires via unsecured credit allowable under section 503(b)(1) of the Bankruptcy Code. In addition, the Postpetition Loan Facility is essential for the Debtor to obtain credit from vendors because the existence of this facility will afford vendors a level of comfort that the Debtor will be able to pay for the goods and services that it will receive on credit.

As indicated above, section 364(c) of the Bankruptcy Code enumerates certain incentives that a bankruptcy court may grant to postpetition lenders. Such incentives are not exhaustive. Bankruptcy courts frequently have authorized the use of inducements not specified in the statute. *See, e.g., Unsecured Creditors' Comm. V. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 834 F.2d 599 (6th Cir. 1987) (affirming financing order that prohibited any challenges to the validity of already existing liens); *In re Defender Drug Stores*, 126 B.R. 76 (Bankr. D. Ariz.

DOCS_SF-88655.4.59938/001

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1991) (authorizing enhancement fee to postpetition lender), *aff'd*, 145 B.R. 312, 316 (B.A.P. 9th Cir. 1992) ("[b]ankruptcy courts . . . have regularly authorized postpetition financial arrangements containing lender incentives beyond the explicit priorities and liens specified in section 364"); *In re Antico Mfg. Co.*, 31 B.R. 103 (Bankr. E.D.N.Y. 1983) (authorizing lien on prepetition collateral to secure postpetition indebtedness).

The Debtor proposes to grant MIHI, as Lender, certain enhancements in the form of senior liens against the Debtor's prepetition and postpetition assets, debt and security acknowledgements, releases, and waivers of rights under sections 506(c) and 552 of the Bankruptcy Code. The Debtor believes that such enhancements are reasonable in return for the funding available under the Postpetition Loan Facility. The Debtor also proposes to grant MIHI, in its capacity as prepetition lender, replacement liens and superpriority claims for adequate protection, to the extent of diminution in the value of its collateral.

In short, the Debtor respectfully submits that the Postpetition Loan Facility satisfies section 364(c) and (d) of the Bankruptcy Code. The best credit terms available to the Debtor are those set forth in the Postpetition Loan Facility. Thus, the Debtor believes that it is fair, reasonable, and necessary for the Court to approve the Postpetition Loan Facility and enter the Interim DIP Order (and, subsequent to the Final Hearing, the Final DIP Order). In addition to representing the best terms presently available to Debtor, the DIP Financing is also in the best interests of the Debtor's estate. The Postpetition Loan Facility will provide the Debtor needed funding to maintain and operate its business and administer the chapter 11 case. The Postpetition Loan Facility therefore is plainly in the best interests of Debtor's estate.

Based on the foregoing, Lender should be accorded the benefits of section 364(e) of the Bankruptcy Code in respect of the Postpetition Loan Facility because MIHI has offered to extend such financing in good faith. Further, section 364(e) provides a lender with a presumption of good faith. *Weinstein, Eisen, Weiss LLP v. Gill* (*In re Cooper Common, LLC),* 424 F.3d 963, 969 (9th Cir. 2005).

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:88655.4 59938/001

DIP FINANCING MOTION

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

**B.    The Debtor Should Be Granted Access to Cash
Collateral Under Bankruptcy Code Section 363(c)(1)**

The Debtor's use of property of the estate is governed by section 363 of the Bankruptcy Code.  Section 363(c)(1) provides, in pertinent part, that:

> If the business of the debtor is authorized to be operated under section . . . 1108 . . . of this title and unless the court orders otherwise, the trustee [or debtor in possession] may enter into transactions, including the sale or lease of property of the estates, in the ordinary course of business, without notice or hearing, and may use property of the estates in the ordinary course of business without notice or hearing.

11 U.S.C. § 363(c)(1).

The Bankruptcy Code establishes a special requirement, however, regarding the debtor in possession's use of "cash collateral," defined as "cash, negotiable instruments, documents of title, securities, deposit accounts, or other cash equivalents whenever acquired in which the estates and an entity other than the estates have an interest . . . ."  11 U.S.C. § 363(a).  Section 363(c)(2) of the Bankruptcy Code permits the debtor in possession to use, sell, or lease cash collateral under subsection (c)(1) only if either of two alternative circumstances exists:

> (A) each entity that has an interest in such cash collateral consents; or
> (B) the court, after notice and a hearing, authorizes such use, sale, or lease in accordance with the provisions of this section.

11 U.S.C. § 363(c)(2).

Here, MIHI consents to the use of cash collateral consistent with the Budget and such use is absolutely necessary in the Debtor's business judgment to continue operations and maximize the value of these estates.

## V.

## INTERIM DIP ORDER AND FINAL HEARING

Pursuant to Bankruptcy Rule 4001(b)(2) and (c)(2) and local Bankruptcy Rule 4001-2(e) and (f), the Debtor requests that the Court enter the Interim DIP Order to prevent immediate and irreparable harm to the estate pending a final hearing and set a date for the Final Hearing within twenty-one days of the Petition Date.  The Debtor intends for the Final DIP Order to be in

15

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 15 of
136

substantially the same form as the Interim DIP Order and will submit a proposed form no later than seven days prior to the Final Hearing.

The urgent need to preserve the Debtor's business, and avoid immediate and irreparable harm to the estate, makes it imperative that the Debtor be authorized to access postpetition financing on an interim basis and use cash collateral, pending the Final Hearing, in order to continue its operations and administer the chapter 11 case. Without the ability to borrow funds under the Postpetition Loan Agreement and use cash collateral, the Debtor would be unable to meet its postpetition obligations or to fund its working capital needs, thus causing irreparable harm to the value of the Debtor's estate and ending the Debtor's reorganization efforts. Accordingly, the Debtor respectfully requests that, pending the hearing on a Final DIP Order, the Interim DIP Order be approved in all respects and that the terms and provisions of the Interim DIP Order be implemented and be deemed binding and that, after the Final Hearing, the Final DIP Order be approved in all respects and the terms and provisions of the Final DIP Order be implemented and be deemed binding

## VI.

## <u>NOTICE</u>

The Motion has been served on the following parties or, in lieu thereof, on their counsel, if known: (a) the Office of the United States Trustee, (b) the creditors appearing on the list filed in accordance with Rule 1007(d) of the Federal Rules of Bankruptcy Procedure, (c) the Debtor's prepetition and postpetition lender, MIHI, (d) parties that file with the Court and serve upon the Debtor requests for notice of all matters in accordance with Bankruptcy Rule 2002, and (e) any known parties that assert a lien on the Debtor's assets. The Debtor submits that, in light of the nature of the relief requested, no other or further notice need be given.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

## CONCLUSION

Based upon the foregoing, the Debtor requests entry of the Interim DIP Order and the Final DIP Order under sections 105, 361, 362, 363, 364 and 507 of the Bankruptcy Code, Bankruptcy Rule 4001 and local Bankruptcy Rule 4001-2: (i) authorizing the Debtor to (a) enter into and incur credit under the Postpetition Loan Agreement with MIHI, as the Lender, (b) use cash collateral, and (c) provide adequate protection to MIHI, as the Existing Senior Lender, in accordance with the provisions hereof, and (ii) scheduling the Final Hearing.

Dated: September 10, 2015        PACHULSKI STANG ZIEHL & JONES LLP


By: */S/ John D. Fiero*
        John D. Fiero
        Debra I. Grassgreen
        John W. Lucas
        Jason H. Rosell

        Proposed Counsel for Debtor

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

DOCS_SF:88655.4 59938/001

DIP FINANCING MOTION

# **Exhibit List**

**Exhibit A**    Interim DIP Order

**Exhibit B**    Senior Secured, Superpriority Debtor-in-Possession Credit Agreement

**Exhibit C**    Approved Budget

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CALIFORNIA

1

# EXHIBIT A

1  John D. Fiero (CA Bar No. 136557)
   Debra I. Grassgreen (CA Bar No. 169978)
2  John W. Lucas (CA Bar No. 271038)
   Jason H. Rosell (CA Bar No. 269126)
3  PACHULSKI STANG ZIEHL & JONES LLP
   150 California Street, 15th Floor
4  San Francisco, CA 94111
   Telephone:    (415) 263-7000
5  Facsimile:    (415) 263-7010
   E-mail:       jfiero@pszjlaw.com
6                dgrassgreen@pszjlaw.com
                 jlucas@pszjlaw.com
7                jrosell@pszjlaw.com

8  Proposed Counsel for Debtor

9

# UNITED STATES BANKRUPTCY COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

| | |
|---|---|
| In re: | Case No.: 15-31141-HB |
| NEWZOOM, INC.,[1] | Chapter 11 |
|                     Debtor. | INTERIM ORDER (i) APPROVING SECTION 364 BORROWING, (II) GRANTING LIENS, ADEQUATE PROTECTION AND USE OF CASH COLLATERAL, AND (III) GRANTING RELATED RELIEF |

This matter came to be heard on the Motion (the "Motion")[2] of NewZoom, Inc., as debtor and debtor-in-possession (the "Debtor"), for the entry of an order authorizing the Debtor to, among other things:

        (i)        enter into a postpetition credit agreement substantially in the form attached to the Motion (as the same may be amended or restated from time to time, the "Postpetition Loan Agreement"), and all documents, agreements, and instruments delivered pursuant hereto or thereto (as the same may be amended or restated from time to time, including the Postpetition Loan Agreement, the "Postpetition Loan Documents"), in each case with MIHI LLC ("Lender");[3]

        (ii)      borrow money and seek other financial accommodations from the Lender pursuant to the Postpetition Loan Agreement, the other Postpetition Loan Documents, and this Order through and including no later than twenty-one days after

---

[1] The last four digits of the Debtor's tax identification number are: 9130. The location of the Debtor's headquarters and service address is 22 Fourth Street, San Francisco, CA 94103.

[2] Defined terms used herein shall have the same meaning as set forth in the Motion.

[3] For purposes of this Order, the term "Lender" shall also include the Agent under the Postpetition Loan Documents where the context so requires.

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:22   Page 20 of 136

the Petition Date (the "Interim Maturity Date") pending a final hearing on the Motion;

(iii)   grant liens and security interests in certain property of its bankruptcy estate (the "Estate") to secure payment of the foregoing borrowings by, and financial accommodations made to, the Debtor; and

(iv)   grant adequate protection to the Debtor's prepetition secured lender, as described herein, and grant related relief.

The Court has considered the Motion, reviewed the exhibits attached thereto, and has completed a preliminary hearing as provided for under section 364 of title 11 of the United States Code (the "Code") and Rule 4001(c) of the Rules of Bankruptcy Procedure (the "Bankruptcy Rules").

THE COURT HAS BEEN ADVISED THAT THE DEBTOR AND THE LENDER HAVE STIPULATED, SUBJECT TO THE RIGHTS OF PARTIES IN INTEREST SET FORTH IN PARAGRAPH 10 HEREOF, TO THE FOLLOWING:

A.     On September 10, 2015 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Code.  Pursuant to sections 1107 and 1108 of the Code, the Debtor has retained possession of its assets and is authorized thereby, as debtor in possession, to continue the operation and management of its business.

B.     On or about May 26, 2011, the Debtor executed and delivered to the Lender a note purchase agreement (as such note purchase agreement may have been amended from time to time, the "Prepetition Loan Agreement"), pursuant to which Lender agreed to make loans and other financial accommodations to the Debtor, as more specifically described therein.  The Prepetition Loan Agreement and various other loan and security and related documents and agreements are referred to herein as the "Prepetition Agreements."

C.     Pursuant to the Prepetition Loan Agreement, Lender has made various loans, and, as of the Petition Date, the Debtor was indebted to Lender as a result of such loans in the aggregate principal amount (including contingent amounts pursuant to letters of credit) of not less than $24,147,371.63 million (the principal amount plus all accrued interest, costs, fees, and other amounts now or hereafter owing or accruing pursuant to the Prepetition Agreements is collectively referred to herein as the "Prepetition Indebtedness").

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

INTERIM ORDER APPROVING SECTION 364 FINANCING AND GRANTING LIENS, ADEQUATE PROTECTION AND USE OF CASH COLLATERAL

D.     In addition, pursuant to the Prepetition Loan Agreement, to secure payment of the Prepetition Indebtedness, the Debtor granted to Lender a security interest in substantially all of its present and after-acquired assets and the proceeds of the foregoing.  On or about May 26, 2011, the Debtor executed and delivered to Lender a pledge and security agreement (as such security agreement may have been amended from time to time, the "Prepetition Security Agreement"), pursuant to which the Debtor evidenced the grant of such security interest.  The assets in which Lender was granted a security interest or lien pursuant to the Prepetition Loan Agreement, the Prepetition Security Agreement, or any document or agreement related to any such agreements are collectively referred to herein as the "Prepetition Collateral."  The Prepetition Collateral secures the Prepetition Indebtedness.

E.     Lender has perfected its security interests in and liens upon the Prepetition Collateral by, among other things, filing financing statements and by possession of instruments, certificates, or other property.  Such perfected security interests in and liens upon the Prepetition Collateral are fully valid, enforceable, nonavoidable, and of first priority, and the Prepetition Indebtedness is fully valid, enforceable, and nonavoidable to the extent of the amount of such obligations set forth herein.

F.     Subject to the terms and conditions contained herein and in the Postpetition Loan Agreement, Lender has indicated a willingness to provide debtor-in-possession financing solely upon the terms of this Order, the Postpetition Loan Agreement, the "Approved Budget" as defined in the Postpetition Loan Agreement (the "Budget"), and the other Postpetition Loan Documents on an interim basis in an aggregate, principal amount not to exceed $1.2 million for the period this Order is in effect pending a final hearing on the Motion in accordance with Bankruptcy Rule 4001(c) at the time specified in Paragraph 27 hereof, but in any case through no later than the Interim Maturity Date.

BASED UPON THE MOTION, THE RECORD BEFORE THE COURT, AND THE COMBINED CONSENT OF THE DEBTOR AND LENDER TO THE ENTRY OF THIS ORDER, IT APPEARS TO THE COURT AS FOLLOWS:

i)     An interim hearing on the Motion is being held pursuant to the authorization of Bankruptcy Rule 4001(c)(2) and notice of such interim hearing has been provided by the Debtor (A)

serving on September 10, 2015, by electronic, hand delivery, or overnight mail a copy of the Motion (the "Hearing Notice") on (1) counsel to Lender, (2) the twenty largest unsecured creditors of the Debtor (as set forth on the list of such creditors submitted with the Debtor's petition), (3) the parties that have UCC financing statements of record, and (4) the United States Trustee for the Northern District of California (the "United States Trustee"); and (B) serving on September 10, 2015, the Hearing Notice on each of the foregoing parties by facsimile or other electronic transmission.

      ii)    No creditors' committee, as provided for under section 1102 of the Code, has yet been appointed.

      iii)    Entry of this Order is necessary to prevent the immediate and irreparable harm to the Estate and the Debtor that would otherwise result if the Debtor is prevented, pending a final hearing on the Motion, from obtaining immediate financing for the payment of, inter alia, wages, salaries, operating expenses, the purchase of inventory, equipment and supplies, and to meet other expenses necessary to preserve its assets and continue its operations.

      iv)    The Debtor has made reasonable efforts, under the circumstances, to locate financing of the type contemplated by this Order; the Debtor is unable to obtain, in the ordinary course of business or otherwise, financing of the type contemplated herein, either in the form of unsecured credit allowable under section 503(b)(1) of the Code as an administrative expense pursuant to sections 364(a) or (b) of the Code, or unsecured credit allowable under sections 364(a) and 364(b) of the Code; and the Debtor is unable to obtain financing of the type contemplated herein in the form of secured credit pursuant to section 364(c) or 364(d) of the Code on terms more favorable than those offered by Lender pursuant to the Postpetition Loan Agreement and this Order.

      v)    Pending a final hearing on the Motion, Lender is willing to lend money and provide other financial accommodations to the Debtor only (i) through no later than the Interim Maturity Date, (ii) up to a maximum principal amount of $1.2 million through such date, and (iii) on the terms and conditions and with the protections provided herein and in the Postpetition Loan Agreement and the other Postpetition Loan Documents and is relying on such terms, conditions, and protections in agreeing to lend money and provide financial accommodations to the Debtor hereunder.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 23 of 136

vi)     The terms and conditions of the Postpetition Loan Agreement and the other Postpetition Loan Documents have been negotiated in good faith and at arm's length by all parties involved, and Lender and the Debtor have offered sufficient proof thereof.  Accordingly, it appears to the Court that the terms of the Postpetition Loan Agreement and the other Postpetition Loan Documents have been extended in good faith and that any credit extended, loans to be made, or other financial accommodations granted to the Debtor pursuant to any of the Postpetition Loan Documents shall be deemed to be extended in good faith as that term is used in section 364(e) of the Code.

vii)    The Debtor has requested immediate entry of this Order pursuant to Bankruptcy Rule 4001(c)(2).  Good cause has been shown for the entry of this Order.  Among other things, entry of this Order will minimize disruption of the Debtor and permit the Debtor to meet its operating expenses and is in the best interests of the Debtor, its creditors, and the Estate.  The terms of the borrowings and other financial accommodations authorized hereby reflect the Debtor's exercise of prudent business judgment consistent with its fiduciary duties.

ACCORDINGLY, IT IS HEREBY ORDERED THAT:

1.      <u>Authorization for DIP Financing</u>.  The Motion is approved to the extent provided in this Order.  The Debtor shall be and hereby is authorized to borrow money and seek other financial accommodations from Lender on the terms and conditions contained in this Order and is authorized and directed to enter into the Postpetition Loan Agreement and the other Postpetition Loan Documents.  All loans, extensions of credit, and any other indebtedness (including interest and fees accruing in connection therewith) incurred pursuant to the Postpetition Loan Agreement or the other Postpetition Loan Documents shall hereinafter be referred to as the "<u>Postpetition Indebtedness</u>."  The outstanding principal balance under the Postpetition Loan Agreement shall not exceed at any one time $1.2 million, and the Debtor's authority to obtain loans and other financial accommodations under this Order, the Postpetition Loan Agreement, and the other Postpetition Loan Documents shall expire at 5:00 p.m. (San Francisco time) on the Interim Maturity Date, unless terminated earlier pursuant to the Postpetition Loan Agreement.

2.      <u>Authorization to Execute and Deliver Necessary Documents</u>.  To effectuate and evidence the terms and conditions of the borrowings and extensions of credit and other financial

DOCS_SF:88676.1 59938/001

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 24 of
136

5

INTERIM ORDER APPROVING SECTION 364
FINANCING AND GRANTING, INTER ALIA, ADEQUATE
PROTECTION AND USE OF CASH COLLATERAL

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

accommodations to be made to the Debtor by Lender pursuant to the terms of this Order, the Debtor is hereby authorized to enter into the Postpetition Loan Agreement substantially in the form attached to the Motion and any other Postpetition Loan Documents that may be entered into in connection with the Postpetition Loan Agreement. In addition, the Debtor is authorized to enter into nonmaterial modifications and amendments to the Postpetition Loan Agreement and the other Postpetition Loan Documents as may be agreed upon in writing by the Debtor and Lender. Upon execution and delivery of the Postpetition Loan Agreement and the other Postpetition Loan Documents, such agreements and documents shall constitute valid and binding obligations of the Debtor, enforceable against the Debtor and the Estate in accordance with their terms.

3. <u>No Required Security Agreements/Filings</u>. Lender shall not be required to file financing statements, mortgages, notices of liens, or other documents in any jurisdiction or take any other action in order to validate or perfect the security interests and liens granted to it by this Order or by any of the Postpetition Loan Documents. All security interests and liens granted herein and in the Postpetition Loan Documents to secure repayment of any of the Postpetition Indebtedness are and they hereby are deemed perfected, and no further notice, filing, or other act shall be required to effect such perfection. If Lender shall, in its sole discretion, choose to file financing statements, mortgages, or other documents or otherwise confirm perfection of such security interests and liens, Lender is authorized to effect such filings and recordations, and all such financing statements, mortgages, or similar documents shall be deemed to have been filed or recorded at the time and on the date of entry of this Order. A photocopy of this Order may, in the discretion of the Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, notices of lien or similar instruments, and all filing offices are hereby directed to accept such copy of this Order for filing and recording.

**Lender Liens and Priority Claims**

4. <u>Postpetition Liens</u>. To secure payment of (i) the Postpetition Indebtedness and (ii) the "Adequate Protection Obligation" (as defined herein), Lender is hereby granted, pursuant to section 364(c) and, as to Lender's Prepetition Collateral, section 364(d)(1) of the Code, a valid, perfected, enforceable, and nonavoidable first priority security interest in and lien and on all of the Debtor's

DOCS_SF:88676.1 59938/001
6

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 25 of
136

INTERIM ORDER APPROVING SECTION 364
FINANCING AND GRANTING LIENS, ADEQUATE
PROTECTION AND USE OF CASH COLLATERAL

now existing or hereafter acquired or arising assets and property, and all now existing or hereafter acquired or arising proceeds, rents, products, and profits of each of the foregoing; *provided*, *however*, that, notwithstanding anything to the contrary above, the security interests and liens granted to Lender pursuant to this Order shall not extend to any cause of action of the Estate arising under sections 544, 545, 547, 548 or 549 of the Code ("<u>Avoidance Actions</u>") or the proceeds thereof, and *provided further* that although the Postpetition Liens extend to the proceeds of leased real property, the collateral assignment of leases in the Postpetition Loan Agreement shall not be granted directly in such leases to the extent the applicable lease and applicable law prohibit or restrict the granting of a lien on such lease or otherwise prohibit or restrict hypothecation of the leasehold interest, unless the counterparty to such lease consents thereto. The security interests and liens granted to Lender under this Order shall, subject to the provisions of the Carve-Out (as defined herein), be at all times senior to the rights of the Debtor, the Estate, and all of their creditors, and shall at all times be senior to the rights of any successor trustee, examiner, or responsible person in these or any subsequent proceedings under the Code. The property of the Debtor and the Estate in which Lender is being granted a security interest or lien pursuant to this Order shall hereinafter be referred to collectively as the "<u>Postpetition Collateral</u>," and the Postpetition Collateral together with the Prepetition Collateral shall hereinafter be referred to collectively as the "<u>Collateral</u>." The term "<u>Adequate Protection Obligation</u>" shall mean Prepetition Indebtedness in an amount equal to any diminution in value of Lender's interest in the Prepetition Collateral that occurs during the pendency of the Debtor's bankruptcy case, whether such diminution is a consequence of (i) the Debtor's use of Collateral (including the Debtor's consumption of cash collateral), (ii) depreciation or price fluctuation in the Collateral, (iii) the conversion of Prepetition Collateral into Postpetition Collateral; or (iv) any other action, event, or circumstance, including, without limitation, the priming of the Prepetition Collateral pursuant to section 364(d)(1) of the Code under this Order.

     5.    <u>Priority of Postpetition Liens</u>. The Postpetition Indebtedness shall be deemed to have a security interest and lien upon the Postpetition Collateral senior to the security interest and lien securing the Adequate Protection Obligation. In addition, the Postpetition Indebtedness shall secure all unpaid fees and expenses of Lender pursuant to the Prepetition Agreements, whether incurred

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

prior to or after the Petition Date, and the Debtor is authorized and directed to pay such fees and expenses to the extent provided in the Budget.

6. <u>Superpriority Administrative Claims</u>. The Postpetition Indebtedness, the Adequate Protection Obligation, and the Debtor's use (if any) of cash collateral pursuant to the Carve-Out or otherwise pursuant to this Order shall constitute an administrative expense under section 364(c)(1) of the Code, with priority, subject to the provisions of the Carve-Out, over all other claims or costs or expenses of administration of the kinds specified in, or ordered pursuant to, any provision of the Code (the "<u>Superpriority Claim</u>"), and shall at all times be senior to the rights of the Debtor or any successor trustee, examiner, or responsible person in these or any subsequent proceedings under the Code; provided, however, that the Superpriority Claim shall not be paid from the proceeds of Avoidance Actions. The Postpetition Indebtedness shall be afforded a superpriority claim senior to that afforded the Adequate Protection Obligation. With the exception of the fees permitted by the Carve-Out, no costs or expenses of administration that have been or may be incurred in these cases, any conversion of any of these cases pursuant to sections 105 or 1112 of the Code or otherwise, or in any other future proceedings related hereto, and no priority claims, are or will be prior to or on a parity with any claim of Lender against the Debtor arising out of loans and extensions of credit or other financial accommodations made by Lender to the Debtor. In addition, no costs or expenses of administration incurred while the Debtor is authorized to borrow funds or use cash collateral shall be imposed against Lender, the Postpetition Indebtedness, the Prepetition Indebtedness, or the Collateral under section 506(c) or 552(b) of the Code or otherwise, and no action or inaction on the part of Lender shall be deemed to constitute a consent to such surcharge. Lender shall be entitled to all of the rights and benefits of section 552(b) of the Code with respect to the Prepetition Indebtedness and the Collateral without any limitation pursuant to such section. The Lender shall not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any of the Collateral, either as to the Prepetition Indebtedness or the Postpetition Indebtedness.

7. <u>Carve-Out</u>. Should Lender's obligations to make loans or other financial accommodations pursuant to the Postpetition Loan Agreement terminate as a result of an "Event of Default" or the occurrence of the "Maturity Date" (each as defined in the Postpetition Loan

Agreement) thereunder, subject to the terms of this paragraph, the Lender agrees that, notwithstanding the termination of such obligations, the Debtor may use the Lender's cash collateral and to the extent there is not sufficient cash collateral, the Lender shall advance funds under the Postpetition Loan Agreement, solely to the extent that the Debtor has no other source of payment, to pay, the sum of:

(i)     allowed and unpaid professional fees and disbursements incurred by the Debtor and the Committee on or after the delivery by the Lender of a Carve-Out Trigger Notice (as defined in the Postpetition Loan Agreement), payable under sections 330 and 331 of the Code, in an amount not to exceed $50,000 in the aggregate (subject to allowance by the Court and that remain unpaid after application of any unused retainers in respect of such professional fees) (the "Post-Default Carve-Out Cap"); plus

(ii)     subject to (and solely to the extent included in) the Budget and allowance by the Court, the aggregate amount of any budgeted, accrued but unpaid professional fees and disbursements for each professional identified in the Budget in the line item for such professional under the heading designated "Professional Fees" (less the amount of any unused retainer in respect of such professional fees held by such professional) incurred by the Debtor and the Committee prior to the delivery by the Lender of a Carve-Out Trigger Notice (the "Pre-Default Accrued Fees"); plus

(iii)     the amount of any unpaid fees due to the United States Trustee pursuant to 28 U.S.C. § 1930 or otherwise and any fees due to the Clerk of the Court (whether arising prior to or after the delivery of the Carve-Out Trigger Notice); plus

(iv)     the amount of $25,000 in the aggregate (subject to allowance by the Court) for fees and expenses for a subsequently appointed chapter 7 trustee (the amount of all such permitted uses being defined herein as the "Carve-Out").  The use of cash collateral pursuant to the preceding sentence shall be secured by the Postpetition Collateral.  Notwithstanding anything in this Order to the contrary, (A) the Lender's liens on the Collateral, and any claim or claims arising under sections 364(c), 364(d), 506(b), or 507(b) of the Code, shall be subject and subordinate to the Carve-Out and (B) the terms of this Paragraph 7 shall survive and not be affected by the termination of this Order,

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

any default hereunder, the conversion or dismissal of this chapter 11 case, the confirmation of a plan, or the appointment of any trustee.

8.  <u>Use of Proceeds; Collateral and Budget</u>.  To the extent that the Lender makes advances or extends credit under this Order and the Postpetition Loan Agreement, the Debtor shall use such loans, and shall otherwise use their cash and other assets, solely in accordance with the terms of this Order, the Budget, and the other Postpetition Loan Documents.  So long as (i) there has not been an "Event of Default" under and as defined in the Postpetition Loan Agreement, or (ii) the "Maturity Date" as defined in the Postpetition Loan Agreement shall not have occurred, the Debtor is hereby authorized to use any cash proceeds of the Collateral in accordance, and solely in accordance, with this Order, the Budget, and the other Postpetition Loan Documents.  Nothing in this Order shall be construed to require the Lender to make advances or extensions of credit or other financial accommodations (including consent to use cash collateral) to permit the Debtor to pay any expenses, except to the extent expressly provided for in this Order, the Postpetition Loan Agreement, the Budget, and the other Postpetition Loan Documents.

9.  <u>Limitations on Use of Cash Collateral</u>.  No proceeds of loans or other financial accommodations made by the Lender hereunder, and no cash collateral (including the Carve-Out), may be used to compensate services rendered or expenses incurred in connection with, directly or indirectly, (A) the modification, stay, or amendment of this Order without the consent of the Lender, or (B) a violation, breach or default of this Order or any of the Postpetition Loan Documents, including, without limitation, any claim or action the purpose of which is to seek or the result of which would be to obtain any relief (i) invalidating, setting aside, avoiding, or subordinating, in whole or in part, the Prepetition Indebtedness, the Postpetition Indebtedness, or the Lender's liens or security interests in the Collateral; or (ii) preventing, hindering, or otherwise delaying, whether directly or indirectly, the Lender's assertion, enforcement, or realization upon any Collateral as permitted by this Order or such documents; *provided*, *however*, that nothing contained herein shall prohibit the use of the loan proceeds or cash collateral, in the aggregate amount of no more than $20,000, for payment of professional fees reasonably incurred by the official committee of

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

unsecured creditors of the Debtor (the "Committee") for purposes of determining whether to bring an Avoidance Action (as defined below).

10. **Reservation of Estate and Third-Party Rights and Bar of Challenge Claims.** Notwithstanding the Debtor's stipulations herein and in the Postpetition Loan Documents, the Committee or any party in interest with standing shall have until 4:00 p.m. (San Francisco time) on the 60th day after the Petition Date (the "Avoidance Action Deadline") to file an adversary complaint with this Court (1) with reasonable particularity (i) challenging the validity, enforceability, extent, or priority of the Prepetition Indebtedness or the Lender's liens in the Prepetition Collateral, or (ii) otherwise asserting any claims or causes of action against the Lender arising out of prepetition activities (an "Avoidance Action"). Any Avoidance Action may be filed by the Committee in the name of the Debtor without further leave of Court. To the extent that (1) an Avoidance Action is not filed by the Avoidance Action Deadline by the Committee or such other party that obtains standing, or (2) if an Avoidance Action is so filed, the Lender ultimately prevails thereon (whether initially, on appeal, or otherwise), (i) the Prepetition Indebtedness shall constitute allowed claims in a principal amount as of the Petition Date of no less than set forth in this Order (plus all applicable interest, fees, and expenses as set forth in the Prepetition Loan Agreement) for all purposes in the Debtor's bankruptcy proceeding and any subsequent proceedings under the Code and shall not be subject to avoidance or any other challenge by any party (including any successor trustee, examiner, or responsible person in these or any subsequent proceedings under the Code), and (ii) the Lender's liens and security interests on the Prepetition Collateral shall be deemed legal, valid, binding, perfected, and otherwise unavoidable and shall not be subject to avoidance or any other challenge by any party (including any successor trustee, examiner, or responsible person in these or any subsequent proceedings under the Code).

11. **Distribution of Sale Proceeds.** Any proceeds of an Asset Sale (as such term is defined in and subject to the reserves set forth in the Postpetition Loan Agreement) shall be paid directly to the Lender and applied in payment of the Postpetition Indebtedness and the Prepetition Indebtedness in the manner provided in Paragraph 12 of this Order and the Postpetition Loan Agreement. The Debtor is authorized and directed to deposit all proceeds of such a sale into such account or accounts

as the Lender shall direct in writing (collectively, the "<u>Depository Accounts</u>"), and such proceeds upon such deposit shall become the sole and exclusive property of the Lender and may be applied by the Lender against the Postpetition Indebtedness and Prepetition Indebtedness as provided in Paragraph 12 of this Order and the Postpetition Loan Agreement. In addition, subject to <u>Paragraph 10</u> of this Order, the Lender shall have the right to credit-bid all or any of the Prepetition Indebtedness and the Postpetition Indebtedness in connection with any sale of some or all of the Debtor's assets and property, including, without limitation, any sale occurring pursuant to section 363 of the Code or included as part of any plan of reorganization subject to confirmation under section 1129(b)(2)(A)(iii) of the Code.

12. <u>Application of Payments</u>. The Debtor hereby irrevocably waives any right to direct the manner of application of any payments to the Lender or any other receipts by the Lender of proceeds of any of the Collateral. Unless the Lender otherwise elects or re-elects (in each case in its sole discretion) with respect to the receipt of any funds, the Lender will apply all proceeds received in the Depository Accounts or otherwise to pay the Postpetition Indebtedness and the Prepetition Indebtedness in the following order of priority:

    a.    interest due in respect of the Postpetition Indebtedness;

    b.    the principal of the Postpetition Indebtedness;

    c.    any other Postpetition Indebtedness due to the Lender; and

    d.    the Prepetition Indebtedness.

13. <u>Enforcement Remedies</u>. Upon (1) a violation of this Order, (2) an "Event of Default," or (3) the occurrence of the "Maturity Date" under and as defined in the Postpetition Loan Agreement, the Lender shall have the right to cease providing additional loans or other financial accommodations to the Debtor and to demand immediate payment in full in cash of the Postpetition Indebtedness. In the absence of immediate and full payment in cash of the Postpetition Indebtedness, at 9:00 a.m. (San Francisco time) on the third business day after the date on which the Lender shall have given written notice (by facsimile or otherwise) to the Debtor and their counsel, counsel of record for any Committee, and the United States Trustee of the Lender's intention to exercise and enforce the rights granted the Lender under the Postpetition Loan Documents, this

DOCS_SF:88676.1 59938-001

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:22   Page 31 of 136

12

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

Order, and applicable law, the automatic stay is hereby deemed vacated, and the Lender shall be permitted to exercise such rights and remedies under such agreements, documents, and applicable law as to all or such part of the Collateral as the Lender shall, in its sole discretion, elect and with respect to each of the Postpetition Indebtedness and the Prepetition Indebtedness. Upon such enforcement by the Lender, the Debtor shall cooperate with the Lender in the disposition of the Collateral and shall not otherwise interfere or actively encourage others to interfere with the Lender's enforcement of its rights. If the Debtor contests whether an Event of Default has occurred, the Debtor and any Committee shall be entitled to an emergency hearing before this Court within such three day period; *provided*, *that* the only issue that may be raised at such hearing shall be whether an Event of Default has in fact occurred and is continuing, and such entities hereby waive their right to seek any relief, whether under section 105 of the Code or otherwise, that would in any way impair, limit, restrict or delay the rights and remedies of the Lender. If the Debtor or any Committee do not contest the occurrence of the Event of Default within such three-day period, or if the Debtor or any Committee do timely contest the occurrence of an Event of Default and the Court after notice and a hearing declines to stay the enforcement thereof, the Termination Date shall be deemed to have occurred for all purposes and the automatic stay, as to the Lender, shall automatically terminate in all respects as set forth above. During such three day period, the Debtor shall have the right to use Cash Collateral only pursuant to the Carve-Out or to satisfy obligations to the Lender, unless otherwise consented to in writing by the Lender.

14. <u>Reliance by Lender</u>. The Debtor shall not seek to modify, vacate, or amend this Order without the written consent of the Lender. If any or all of the provisions of this Order are hereafter modified, vacated, or stayed by subsequent order of this or any other Court, such stay, modification, or vacation shall not affect the validity of any debt to the Lender (including the Adequate Protection Obligation) incurred pursuant to this Order prior to the later of (1) the effective date of such stay, modification, or vacation, and (2) receipt of written notice thereof by counsel to the Lender at the address set forth in <u>Exhibit A</u> to this Order (the "<u>Effective Time</u>"), or otherwise affect the validity and enforceability of any lien, security interest, or priority authorized hereby. Notwithstanding any such stay, modification, or vacation, any advances of funds made pursuant to

DOCS_SF:88676.1 59938-001

13

INTERIM ORDER APPROVING SECTION 364
FINANCING AND GRANTING ADEQUATE
PROTECTION AND USE OF CASH COLLATERAL

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 32 of
136

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

this Order by the Lender to or for the benefit of the Debtor prior to the Effective Time shall be governed in all respects by the original provisions of this Order.

15. <u>Good Faith</u>. The Court has considered and determined the matters addressed set forth in this Order pursuant to its power under sections 364(c) and 364(d) of the Code to authorize the Debtor to obtain credit and other financial accommodations on the terms agreed to by and between the Debtor and the Lender and as set forth in this Order, the Postpetition Loan Agreement, and the other Postpetition Loan Documents, and, thus, each of such terms and conditions with respect to the Postpetition Indebtedness, as part of an authorization under such section, is subject to the protections contained in section 364(e) of the Code.

**<u>Miscellaneous</u>**

16. <u>No Further Liens</u>. In consideration of the financing and other accommodations made available pursuant hereto, the Debtor irrevocably waives any right to grant or impose, or request that the Court grant or impose, under section 364 of the Code or otherwise, liens, security interests or mortgages on any property, whether equal, superior, or subordinate, to the Lender's liens or security interests on that property. Such waiver shall be binding upon any successor trustee, examiner, or responsible person in these or any subsequent proceedings under the Code.

17. <u>Modification of Automatic Stay</u>. The automatic stay provisions of section 362 of the Code are hereby modified as to the Lender to the extent necessary to permit the Lender to implement the provisions of this Order and the Postpetition Loan Documents, thereby permitting the Lender, *inter alia*, (i) to receive and apply collections, payments, or proceeds of Collateral, (ii) to file any financing statements or other instruments and documents, if any, evidencing its security interests in and liens on the Collateral, (iii) to charge any fees and interest accruing under the Postpetition Loan Documents, and (iv) to take any or all of the actions permitted by the Postpetition Loan Documents and this Order in the event of a default or termination under any of those documents.

18. <u>No Modification of Rights</u>. The liens, security interests, rights, and remedies granted to the Lender pursuant to this Order, the Postpetition Loan Agreement, and the other Postpetition Loan Documents shall not be modified, altered, or impaired in any manner by any plan of reorganization or order of confirmation for the Debtor, or by any other financings of, extensions of

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:23   Page 33 of
136

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

credit to, or incurring of debt by the Debtor, whether pursuant to sections 363 or 364 of the Code, or otherwise. In connection therewith, no order (i) converting the chapter 11 case of the Debtor under sections 105 or 1112 of the Code or otherwise shall be entered unless such order expressly provides, prior to any other relief set forth therein, for the indefeasible payment in full in cash of all Postpetition Indebtedness under the Postpetition Loan Documents in accordance with the provisions thereof or (ii) confirming any plan of the Debtor shall be entered unless such order provides for the payment in full in cash of all Postpetition Indebtedness under the Postpetition Loan Documents in accordance with the provisions thereof on or before the effective date of such plan.

19. <u>Dismissal</u>. Unless otherwise agreed by the Lender, the Debtor shall not seek dismissal of this case unless and until the Postpetition Indebtedness shall have been paid in full in cash. If an order dismissing the Debtor's case under section 1112 of the Code or otherwise is at any time entered, (1) the priority claims, liens, and security interests granted to the Lender pursuant to this Order and the Postpetition Loan Documents shall continue in full force and effect and shall maintain their priorities as provided in this Order until the Postpetition Indebtedness shall have been paid in full in cash; (2) this Court shall retain jurisdiction, notwithstanding such dismissal, for purposes of interpreting this Order; and (3) such order shall not modify the rights granted to the Lender pursuant to this <u>Paragraph 19</u>.

20. <u>Fees and Expenses</u>. The Lender shall be promptly reimbursed by the Debtor without further motion to, hearing by, or order of this Court for all reasonable costs and expenses (including, without limitation, all filing and recording fees, attorneys' and paralegals' fees and expenses, and out-of-pocket expenses) as provided for in the Postpetition Loan Agreement or otherwise incurred by the Lender in connection with, directly or indirectly, any matters relating to the Debtor's bankruptcy proceeding, the Postpetition Indebtedness, the Postpetition Collateral, or any of the Postpetition Loan Documents. Any such fees, costs and expenses shall be paid within fourteen days of delivery of a summary invoice to the Debtors, with a copy of such invoice to be delivered to the U.S. Trustee and Committee counsel without need for further application to or order of the Court.

21. <u>Release</u>. Subject to <u>Paragraph 10</u> of this Order, the Debtor hereby releases and discharges the Lender and its attorneys, officers, directors, affiliates, and employees from any and all

DOCS_SF:88676.1 59938/001
Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 34 of
136
15
INTERIM ORDER APPROVING SECTION 364
FINANCING AND GRANTING ADEQUATE
PROTECTION AND USE OF CASH COLLATERAL

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

claims and causes of action arising prior to the entry of this Order and hereby waives any and all defenses to the Prepetition Indebtedness and the Lender's security interests in and liens upon the Prepetition Collateral. The release, discharge, and waivers set forth above will be deemed effective as of the date of the entry of this Order.

22. <u>No Third-Party Beneficiaries</u>. No third party is intended to be or shall be deemed to be a third-party beneficiary of the provisions of this Order or any of the Postpetition Loan Documents.

23. <u>Immediate Binding Effect</u>. The subject of this Order is a "core" proceeding as defined in 28 U.S.C. § 157(b)(2)(D). This Order shall be valid and fully effective immediately upon its entry and, upon such entry, shall be binding upon and inure to the benefit of the Lender, the Debtor, its Estate, and their respective successors and assigns (including, without limitation, any trustee, examiner, or responsible person hereinafter appointed as a representative of the Estate in these or any subsequent proceedings under the Code), and the terms and provisions of this Order as well as the liens and security interests under the Postpetition Loan Agreement and the other Postpetition Loan Documents shall continue in these proceedings and any superseding proceedings under the Code, and such liens and security interests shall maintain their priority as provided by this Order, until satisfied and discharged. In the event of any inconsistency between this Order and the Postpetition Loan Agreement, the terms of this Order control.

24. <u>No Adequate Protection Finding</u>. Nothing contained in this Order shall be deemed a finding with respect to adequate protection (as that term is described in section 361 of the Code) of the interest of the Lender in the Prepetition Collateral. In addition, the entry of this Order is without prejudice to, and does not constitute a waiver of, expressly or implicitly, or otherwise impair, any of the rights, claims or privileges of the Lender in the Debtor's bankruptcy proceedings, any subsequent proceedings under the Code, or otherwise, including, without limitation, the right of the Lender to request additional adequate protection of its interests in the Collateral or relief from or modification of the automatic stay under section 362 of the Code.

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 35 of
136

25.    Proofs of Claim.  The Lender shall not be required to file a proof of claim in this or any successor case with respect to the Prepetition Indebtedness notwithstanding the establishment of any bar date with respect to claims against the Debtor.

26.    Milestones.  Other than the September 22, 2015 plan filing deadline, the milestones set forth in section 5.26 of the Postpetition Loan Agreement are subject to the entry of the Final DIP Order.

**Notice**

27.    The Debtor shall, on or before September 14, 2015, serve by mail notice of entry of this Order and of the date and time of the final hearing on the Motion (the "Notice"), a copy of this Order, and (to the extent not previously served) the Motion with all exhibits and attachments on each of the Lender, its counsel at each of the addresses set forth in **Exhibit A** hereto, the twenty largest unsecured creditors of the Debtor (as set forth on the list of such creditors submitted with the Debtor's petition), the United States Trustee, any other persons which the Debtor knows are entitled to notice under Bankruptcy Rule 4001(c) as of such date, and any other party in interest for which counsel to the Debtor has received a written request in this case before 2:00 p.m. (San Francisco time) on such date to receive such pleadings.  Upon appointment by the United States Trustee of any Committee or the Debtor becoming aware that any person or entity is entitled to notice under Bankruptcy Rule 4001(c), the Debtor shall promptly serve such pleadings on such Committee or such party, as applicable.

28.    The Notice shall state that any party in interest objecting to the entry of the Final DIP Order, in form and substance satisfactory to the Lender shall file a written objection with the United States Bankruptcy Court Clerk for the Northern District of California no later than 4:00 p.m. (San Francisco time) on September __, 2015, which objection shall be served so that the same is *received* on or before 4:00 p.m. (San Francisco time) on such date by the United States Trustee and counsel for the Debtor (Debra Grassgreen & John D. Fiero, Pachulski Stang Ziehl & Jones LLP, 150 California Street, 15th Floor, San Francisco, CA 94111, email: dgrassgreen@pszjlaw.com, jfiero@pszjlaw.com) and counsel for the Lender (Brad B. Erens, Jones Day, 77 W. Wacker Drive, Chicago, IL 60601, email: bberens@jonesday.com), set forth at the end of this Order.  If no written

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

objection and request for final hearing on the Motion has been timely filed with this Court, and served upon and timely received by all parties entitled to notice thereof, the Court may enter the Final Order with or without a further hearing, and any objection by any party in interest to the terms of this Order, the Final Order, and the relief requested in the Motion shall be deemed forever waived. If an objection is timely filed, served and received, (i) a written reply thereto shall not be required but may be filed and served so that it is received by the objecting party and the other parties set forth above no later than __:00 p.m. (San Francisco time), on September __, 2015, and (ii) a final hearing shall be held on the Motion and objections thereto before this Court on September ___, 2015 at _____:_____ __ .m.

**\*\*END OF ORDER\*\***

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

# EXHIBIT A

## Counsel for the Debtor

Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, CA 94111
(Fax): 415-263-7010


## Counsel for the Lender

Brad B. Erens
Jones Day
77 W. Wacker Drive
Chicago, IL 60601
(Fax): 312-782-8585

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
SAN FRANCISCO, CA

# EXHIBIT B

**SENIOR SECURED, SUPER-PRIORITY**
**DEBTOR-IN-POSSESSION CREDIT AGREEMENT**

**dated as of**
**September [__], 2015**

**among**

**NewZoom, Inc.,**
*as a Debtor-In-Possession and as Borrower,*

**MIHI LLC,**
*as Lender*

**and**

**Wells Fargo Bank, N.A.,**
*as Administrative Agent*

**$3,700,000 Term Loan Credit Facility**

NAI-1500501901v9

**TABLE OF CONTENTS**

ARTICLE I. DEFINITIONS AND TERMS ..................................................................2

    Section 1.01 Certain Defined Terms ..........................................................2

    Section 1.02 Computation of Time Periods ..............................................19

    Section 1.03 Accounting Terms ...............................................................19

    Section 1.04 Terms Generally ..................................................................19

    Section 1.05 Other Defined Terms ...........................................................20

    Section 1.06 Incorporation of Recitals .....................................................20

ARTICLE II. TERM LOAN COMMITMENT; TERM LOANS; PRINCIPAL AND INTEREST; PAYMENT TERMS ....................................................20

    Section 2.01 Term Loan Commitment; Term Loans; Term Loan Notes .........20

    Section 2.02 Interest; Default Rate; Payment of Interest; Fees........................21

    Section 2.03 Reduction of Term Loan Commitments; Voluntary Prepayments..............22

    Section 2.04 Mandatory Prepayments; Repayments ...................................22

    Section 2.05 Method and Place of Payment...............................................23

    Section 2.06 Increased Costs, Illegality, etc..............................................24

    Section 2.07 Breakage Compensation .......................................................25

    Section 2.08 Effect of Termination ...........................................................25

    Section 2.09 Waivers ...............................................................................25

    Section 2.10 Superpriority Nature of Obligations and Lenders' Liens ...........26

    Section 2.11 No Discharge; Survival of Claims .........................................27

    Section 2.12 Release ...............................................................................27

    Section 2.13 Waiver of any Priming Rights ...............................................28

ARTICLE III. CONDITIONS PRECEDENT ...........................................................28

    Section 3.01 Conditions Precedent at Closing Date....................................28

    Section 3.02 Conditions to Each Credit Extension .....................................32

ARTICLE IV. REPRESENTATIONS AND WARRANTIES ....................................33

    Section 4.01 Corporate Status; Capitalization............................................33

    Section 4.02 Corporate Power and Authority .............................................34

    Section 4.03 No Violation .........................................................................34

    Section 4.04 Governmental Approvals ......................................................34

    Section 4.05 Litigation .............................................................................35

    Section 4.06 Margin Regulations..............................................................35

    Section 4.07 Financial Statements; Approved Budget .................................35

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 41 of 136

| | | | |
|---|---|---|---|
| Section 4.08 | [Reserved] | | 35 |
| Section 4.09 | [Reserved] | | 35 |
| Section 4.10 | Tax Returns and Payments | | 35 |
| Section 4.11 | Customers; Contracts | | 36 |
| Section 4.12 | Suppliers; Contracts | | 36 |
| Section 4.13 | Title to Properties, etc | | 36 |
| Section 4.14 | Equipment | | 36 |
| Section 4.15 | Lawful Operations, etc | | 36 |
| Section 4.16 | Environmental Matters | | 37 |
| Section 4.17 | Compliance with ERISA | | 37 |
| Section 4.18 | Intellectual Property, etc | | 37 |
| Section 4.19 | Investment Company Act, etc | | 38 |
| Section 4.20 | Insurance | | 38 |
| Section 4.21 | Labor Relations | | 38 |
| Section 4.22 | Security Interests | | 38 |
| Section 4.23 | True and Complete Disclosure | | 39 |
| Section 4.24 | Broker's, Finder's or Similar Fees | | 39 |
| Section 4.25 | Defaults | | 39 |
| Section 4.26 | Anti-Terrorism Law Compliance | | 39 |
| Section 4.27 | Real Property | | 39 |
| Section 4.28 | Liens | | 39 |
| Section 4.29 | Locations of Offices, Records and Inventory | | 39 |
| Section 4.30 | No Defaults | | 40 |
| Section 4.31 | No Other Indebtedness | | 40 |
| Section 4.32 | [Reserved] | | 40 |
| Section 4.33 | Burdensome Contracts | | 40 |
| Section 4.34 | Prepetition Obligations; Defenses. | | 40 |
| Section 4.35 | Prepetition Note Purchase Documents. | | 40 |
| Section 4.36 | Reorganization Matters | | 40 |
| ARTICLE V. | AFFIRMATIVE COVENANTS | | 41 |
| Section 5.01 | Reporting Requirements | | 41 |
| Section 5.02 | Books, Records and Inspections | | 45 |

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 42 of 136

Section 5.03      Collateral Records ........................................................................46

Section 5.04      Security Interests ..........................................................................46

Section 5.05      Insurance; Events of Loss ............................................................46

Section 5.06      Payment of Taxes and Claims ......................................................47

Section 5.07      Corporate Franchises ....................................................................47

Section 5.08      Good Repair ..................................................................................48

Section 5.09      Compliance with Laws, etc ..........................................................48

Section 5.10      Employee Benefits ........................................................................48

Section 5.11      Compliance with Environmental Laws ........................................48

Section 5.12      [Reserved] .....................................................................................49

Section 5.13      Additional Security; Real Estate Matters; Further Assurances ...................49

Section 5.14      [Reserved] .....................................................................................50

Section 5.15      [Reserved] .....................................................................................50

Section 5.16      [Reserved] .....................................................................................50

Section 5.17      Register .........................................................................................50

Section 5.18      Use of Proceeds ...........................................................................50

Section 5.19      Board of Directors ........................................................................51

Section 5.20      Chief Restructuring Officer ..........................................................51

Section 5.21      Access ...........................................................................................51

Section 5.22      Approved Budget ..........................................................................51

Section 5.23      13-Week Projections; Variance Reports .......................................52

Section 5.24      Acknowledgment of Lender's Right to Assign Obligations; Borrower Cooperation ...............................................................................53

Section 5.25      Financial Advisor for the Lender ..................................................53

Section 5.26      Plan Milestones; Sale Milestones .................................................53

Section 5.27      Additional Bankruptcy Matters. ...................................................55

Section 5.28      Marketing of Borrower's Assets ...................................................55

ARTICLE VI.      NEGATIVE COVENANTS ...................................................................56

Section 6.01      Changes in Business .....................................................................56

Section 6.02      Consolidation, Merger, Acquisitions, Asset Sales, etc.................56

Section 6.03      Liens .............................................................................................56

Section 6.04      Indebtedness .................................................................................57

Section 6.05      Investments and Guaranty Obligations ........................................57

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 43 of 136

Section 6.06      Restricted Payments ................................................................58

Section 6.07      [Reserved] ...........................................................................58

Section 6.08      [Reserved] ...........................................................................58

Section 6.09      Prepayments of other Indebtedness ........................................58

Section 6.10      Limitation on Certain Restrictive Agreements ........................59

Section 6.11      Transactions with Affiliates ...................................................59

Section 6.12      Accounting Changes ..............................................................59

Section 6.13      Plan Terminations, Minimum Funding, etc. ............................59

Section 6.14      Anti-Terrorism Laws .............................................................59

Section 6.15      Material Amendments of Material Contracts and Certain Other
                  Agreements ..........................................................................59

Section 6.16      No Additional Subsidiaries ....................................................60

Section 6.17      Hedging Agreements ..............................................................60

Section 6.18      Organizational Documents .....................................................60

Section 6.19      Use of Proceeds ....................................................................60

ARTICLE VII.      EVENTS OF DEFAULT ........................................................60

Section 7.01      Events of Default ...................................................................60

Section 7.02      Remedies ..............................................................................64

Section 7.03      Remedies Cumulative; No Waiver ..........................................65

Section 7.04      Application of Certain Payments and Proceeds .......................66

ARTICLE VIII.     THE ADMINISTRATIVE AGENT ..........................................67

Section 8.01      Appointment ..........................................................................67

Section 8.02      Delegation of Duties ..............................................................67

Section 8.03      Exculpatory Provisions ..........................................................67

Section 8.04      Reliance by Administrative Agent ..........................................68

Section 8.05      Notice of Default ...................................................................68

Section 8.06      Non-Reliance on the Administrative Agent .............................69

Section 8.07      Indemnification .....................................................................69

Section 8.08      Administrative Agent in its Individual Capacities ...................70

Section 8.09      Successor Administrative Agent ..............................................70

Section 8.10      Reports and Financial Statements ...........................................70

Section 8.11      Withholding Tax ....................................................................71

Section 8.12      Other Rights of the Administrative Agent ...............................71

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 44 of
136

# TABLE OF CONTENTS
(continued)

ARTICLE IX.    MISCELLANEOUS ................................................................................ 74

    Section 9.01    Payment of Expenses etc ........................................................... 74

    Section 9.02    Indemnification ......................................................................... 75

    Section 9.03    Net Payments ............................................................................ 75

    Section 9.04    Right of Setoff ......................................................................... 76

    Section 9.05    Notices ...................................................................................... 76

    Section 9.06    Successors and Assigns ............................................................ 78

    Section 9.07    Governing Law; Submission to Jurisdiction; Venue; Waiver of Jury Trial ........................................................... 78

    Section 9.08    Counterparts ............................................................................. 79

    Section 9.09    Integration ................................................................................ 79

    Section 9.10    Headings Descriptive ............................................................... 80

    Section 9.11    Amendment or Waiver ............................................................. 80

    Section 9.12    Survival of Indemnities ........................................................... 80

    Section 9.13    Confidentiality ......................................................................... 80

    Section 9.14    Lender Not Fiduciary to Borrower, etc .................................... 81

    Section 9.15    Survival of Representations and Warranties ............................ 81

    Section 9.16    Severability .............................................................................. 81

    Section 9.17    Independence of Covenants ...................................................... 81

    Section 9.18    Interest Rate Limitation ............................................................ 81

    Section 9.19    USA Patriot Act ....................................................................... 82

    Section 9.20    No Additional Perfection Steps Required ................................. 82

    Section 9.21    Parties Including the Trustees; Bankruptcy Court Proceedings ................. 82

    Section 9.22    First Day Motions and Orders .................................................. 83

    Section 9.23    Revival and Reinstatement of Obligations ............................... 83

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 45 of 136

# TABLE OF CONTENTS

<u>SCHEDULES</u>

Provided under Exhibit B

<u>EXHIBITS</u>

Exhibit A         Form of Term Loan Note
Exhibit B         Disclosure Schedule
Exhibit C         Form of Notice of Borrowing
Exhibit D         Initial Approved Budget
Exhibit E         Form of Compliance Certificate

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 46 of 136

SENIOR SECURED, SUPER-PRIORITY
DEBTOR-IN-POSSESSION CREDIT AGREEMENT

THIS SENIOR SECURED, SUPER-PRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (as hereafter amended, restated, supplemented or otherwise modified from time to time, this "Agreement" or the "Postpetition Loan Agreement") dated as of September [__], 2015 between (i) NewZoom, Inc., a California corporation (the "Borrower"), as a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, (ii) MIHI LLC, as the Lender (the "Lender"), and (iii) Wells Fargo Bank, N.A., as Administrative Agent (the "Administrative Agent").

RECITALS:

WHEREAS, on September [__], 2015 (the "Petition Date"), the Borrower (the "Debtor") commenced Chapter 11 Case No. [15-_____] (the "Chapter 11 Case") by filing a voluntary petition for relief under the Bankruptcy Code (as defined below) with the United States Bankruptcy Court for the Northern District of California, San Francisco Division (the "Bankruptcy Court").

WHEREAS, from and after the Petition Date, the Borrower continues to operate its business and manage its property as a debtor and a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

WHEREAS, prior to the Petition Date, the Prepetition Lender (each as defined below) purchased notes, made loans and provided other financial accommodations to the Debtor pursuant to that certain Note Purchase Agreement, dated as of May 26, 2011, among the Borrower, the Prepetition Agent (as defined below) and the Prepetition Lender (as amended, restated, supplemented or otherwise modified through the Petition Date, the "Prepetition Note Purchase Agreement").

WHEREAS, the Borrower requested the Lender provide a senior secured, super-priority debtor-in-possession term loan credit facility to the Borrower in a maximum aggregate commitment amount of up to $3,700,000 to fund the working capital requirements and other financing needs of the Debtor during the pendency of the Chapter 11 Case and to be used solely in accordance with the Approved Budget (as defined below) to the extent permitted hereunder.

WHEREAS, the Lender is willing to extend such Postpetition loans to the Borrower on the terms and subject to the conditions set forth herein.

WHEREAS, the Borrower has agreed to secure all of its Obligations (as defined below) under this Credit Agreement and the other Credit Documents by granting to Administrative Agent, for the benefit of the Secured Parties under and pursuant to the Credit Documents and the Financing Orders (as defined below), a security interest in and lien upon the Collateral (as defined below) having the priority specified herein and in the Financing Orders (as defined below).

NOW, THEREFORE, in consideration of the mutual agreements herein contained, and for other good and valuable consideration the receipt and sufficiency of which are hereby acknowledged, the parties hereto hereby agree as follows:

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 47 of 136

AGREEMENT:

In consideration of the premises and the mutual covenants contained herein, the parties hereto agree as follows:

ARTICLE I.

DEFINITIONS AND TERMS

Section 1.01     Certain Defined Terms.  As used herein, the following terms shall have the meanings herein specified unless the context otherwise requires:

"13-Week Projections" has the meaning provided in Section 5.23.

"1934 Act" means the Securities Exchange Act of 1934, as amended.

"Acceptable Plan of Reorganization" means a Plan of Reorganization that provides for the the Payment in Full in cash of the Obligations and the Prepetition Obligations on the effective date of such Plan of Reorganization or is otherwise acceptable to the Administrative Agent and the Lender.

"Acquisition" means any transaction or series of related transactions for the purpose of or resulting, directly or indirectly, in (i) the acquisition of all or substantially all of the assets of any Person, or any business or division of any Person, (ii) the acquisition or ownership of in excess of 50% of the Capital Stock of any Person, or (iii) the acquisition of another Person by a merger, consolidation, amalgamation or any other combination with such Person.

"Administrative Agent" has the meaning provided in the preamble hereto.

"Affiliate" means, with respect to any Person, (i) any other Person directly or indirectly controlling, controlled by, or under direct or indirect common control with such Person, or, (ii) any fund (or similar investment vehicle) managed or advised by such Person, or, (iii) if the Lender is an investment fund, the investment advisor thereof and any investment fund having the same investment advisor.  A Person shall be deemed to control a second Person if such first Person possesses, directly or indirectly, the power (i) to vote 10% or more of the securities having ordinary voting power for the election of directors or managers of such second Person (provided, however, that the required percentage shall be 50% solely for purposes of Section 9.06) or (ii) to direct or cause the direction of the management and policies of such second Person, whether through the ownership of voting securities, by contract or otherwise. Notwithstanding the foregoing, neither the Lender nor the Administrative Agent shall in any event be considered an Affiliate of the Borrower or any of its Subsidiaries.

"Agreement" has the meaning specified in the first paragraph of this Agreement.

"Anti-Terrorism Law" means the USA Patriot Act or any other United States law pertaining to the prevention of future acts of terrorism, in each case as such law may be amended from time to time.

"Applicable Interest Rate" means, for any day from and after the Closing Date, interest at a per annum rate equal to 12.0%.

"Approved Budget" means the Initial Approved Budget; provided, that upon approval of any revised budget pursuant to Section 5.23, such revised budget shall thereafter constitute the Approved Budget (as such budget shall be modified pursuant to Section 5.23 or with the consent of the Lender).

NAI-1500501901v9

"Approved Sale" shall have the meaning given to such term in Section 5.26(b)(i).

"Approved Sale Order" shall have the meaning given to such term in Section 5.26(b)(iv).

"Asset Sale" means the sale, lease, transfer or other disposition (including by means of Sale and Lease-Back Transactions, and by means of mergers, consolidations, amalgamations and liquidations of a corporation, partnership or limited liability company of the interests therein of the Borrower or any Subsidiary) by the Borrower or any Subsidiary to any Person of any of the Borrower's or such Subsidiary's respective assets (including, the actual or constructive loss of any property or the use thereof resulting from any Event of Loss); *provided* that the term Asset Sale specifically excludes any sales, transfers or other dispositions of inventory in the ordinary course of business.

"Authorized Officer" means (i) with respect to the Borrower, any of the following officers: the Chief Restructuring Officer, the Chairman, the President, the Chief Executive Officer, the Chief Financial Officer, the Treasurer, the Vice President of Finance or the Secretary, and (ii) with respect to any Subsidiary of the Borrower, the President, the Vice President of Finance, the Chief Financial Officer, the Treasurer or the Secretary of such Subsidiary, or, in the case of any of the foregoing, such other Person who is duly authorized in writing to act on behalf of the Borrower or such Subsidiary and is reasonably acceptable to the Lender. Unless otherwise qualified, all references herein to an Authorized Officer shall refer to an Authorized Officer of the Borrower.

"Automated Retail Machine" means an automated retail machine for sale to, or use (whether by lease or otherwise) by, a customer of Borrower or any Subsidiary. Automated Retail Machines shall be considered inventory under this Agreement.

"Avoidance Actions" means any and all claims or causes of action arising under Chapter 5 (other than Section 506(c)) or Section 724(a) of the Bankruptcy Code to avoid transfers, preserve or transfer liens or otherwise recover property of the estate.

"Bankruptcy Code" means shall mean the United States Bankruptcy Code, Title 11 of United States Code (11 U.S.C. § 101, et seq.), together with the rules promulgated thereunder, in each case, as amended.

"Bankruptcy Court" shall have the meaning given to such term in the Recitals hereto.

"Bid Procedures" shall have the meaning given to such term in Section 5.26(b)(i).

"Bid Procedures Motion" shall have the meaning given to such term in Section 5.26(b)(i).

"Bid Procedures Order" shall have the meaning given to such term in Section 5.26(b)(ii).

"Borrower" has the meaning specified in the first paragraph of this Agreement.

"Borrowing" means a borrowing of Term Loans pursuant to Section 2.01.

"Business Day" means (i) any day other than Saturday, Sunday or any other day on which commercial banks in New York, New York, Minneapolis, Minnesota or San Francisco, California are authorized or required by law to close and (ii) any day on which dealings in U.S. Dollars are carried on in the London interbank market.

"Buyer" means the successful bidder at the Auction.

-3-

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 49 of 136

"Capital Distribution" means a payment made, liability incurred or other consideration given for the purchase, acquisition, repurchase, redemption or retirement of any Capital Stock of the Borrower or any of its Subsidiaries or as a dividend, return of capital or other distribution in respect of any of the Borrower's or such Subsidiary's Capital Stock.

"Capital Expenditure" means any expenditure (whether paid in cash or accrued as liabilities) made by the Borrower or any Subsidiary to acquire or lease (pursuant to a Capital Lease) fixed or capital assets, or additions to equipment (including replacements, capitalized repairs and improvements) and for the avoidance of doubt, to include Automated Retail Machines.

"Capital Lease" as applied to any Person means any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, should be accounted for as a capital lease on the balance sheet of that Person.

"Capital Stock" means any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Capitalized Lease Obligations" means all obligations under Capital Leases of the Borrower or any of its Subsidiaries, without duplication, in each case taken at the amount thereof accounted for as liabilities identified as "capital lease obligations" (or any similar words) on a consolidated balance sheet of the Borrower and its Subsidiaries prepared in accordance with GAAP.

"Carve-Out" means, the sum of (i) allowed and unpaid professional fees and disbursements incurred by the Debtor and the Committee in the Chapter 11 Case on or after the delivery by the Administrative Agent of a Carve-Out Trigger Notice, payable under Sections 330 and 331 of the Bankruptcy Code, in an amount not to exceed $50,000 in the aggregate (subject to allowance by the Bankruptcy Court and which remain unpaid after application of any unused retainers in respect of such professional fees) (the "Post-Default Carve-Out Cap") plus, (ii) subject to (and solely to the extent included in) the Approved Budget and allowance by the Bankruptcy Court, the aggregate amount of any budgeted, accrued but unpaid professional fees and disbursements for each professional identified in the Approved Budget in the line item for such professional under the heading designated "Professional Fees" (other than professionals (including, without limitation, legal counsel and financial advisors) not retained by the Debtor or the Committee) (less the amount of any unused retainer in respect of such professional fees held by such professional) incurred by the Debtor and the Committee in the Chapter 11 Cases prior to the delivery by the Administrative Agent of a Carve-Out Trigger Notice measured on a cumulative basis for such pre-notice period (the "Pre-Default Accrued Fees") plus, (iii) the amount of any unpaid US Trustee Fees (whether arising prior to or after the delivery of the Carve-Out Trigger Notice), plus (iv) an amount not to exceed $25,000 in the aggregate (subject to allowance by the Bankruptcy Court) for fees and expenses for a subsequently appointed Chapter 7 trustee; provided that the Carve-Out shall not be reduced by the amount of any compensation and reimbursement of such professional fees paid or incurred (to the extent ultimately allowed by the Bankruptcy Court) prior to the Carve-Out Date; provided, however, that following the Carve-Out Date, any amounts paid to such professionals by any means shall reduce the Carve-Out on a dollar-for-dollar basis.

"Carve-Out Date" shall mean the date which is the earlier to occur of (i) the delivery by the Administrative Agent of a Carve-Out Trigger Notice or (ii) the Maturity Date.

"Carve-Out Trigger Notice" means a written notice issued by the Administrative Agent (pursuant to the written direction of the Lender) to the Borrower, the US Trustee, and to any Committee, which

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 50 of 136

notice may be issued at any time following the occurrence and during the continuation of any Event of Default.

"Cash Collateral" means all "Cash Collateral" as defined by Section 363 of the Bankruptcy Code, all deposits subject to setoff and cash arising from the collection or other conversion to cash of property of the Borrower in which the Administrative Agent has a security interest, Lien or mortgage, whether such security interests, liens or mortgages existed as of the commencement of the Chapter 11 Cases or arose thereafter pursuant to a Financing Order, and whether the property converted to cash existed as of the commencement of the Chapter 11 Cases or arose or was generated thereafter, including, without limitation, (x) all proceeds from the sale or other disposition of the Collateral and (y) all cash and deposit account balances maintained in any deposit or other bank account of the Borrower.

"Cash Collateralize" means to deliver cash collateral to the Agent in an amount equal to 105% of the aggregate amount of an inchoate or contingent obligation, to be held as cash collateral for such obligation pursuant to documentation reasonably satisfactory to the Agent. Derivatives of such term have corresponding meanings.

"Cash Equivalents" means "cash equivalents" as defined by GAAP, including, but not limited to, any of the following:

(i) securities issued or directly and fully guaranteed or insured by the United States of America or any agency or instrumentality thereof (*provided* that the full faith and credit of the United States of America is pledged in support thereof) having maturities of not more than one year from the date of acquisition;

(ii) U.S. dollar denominated time deposits, certificates of deposit and bankers' acceptances of (x) the Lender, (y) any domestic commercial bank of recognized standing having capital and surplus in excess of $500,000,000 or (z) any bank (or the parent company of such bank) whose short-term commercial paper rating from S&P is at least A-1, A-2 or the equivalent thereof or from Moody's is at least P-1, P-2 or the equivalent thereof (any such bank, an "Approved Bank"), in each case with maturities of not more than 180 days from the date of acquisition;

(iii) commercial paper issued by the Lender or Approved Bank or by the parent company of the Lender or Approved Bank and commercial paper issued by, or guaranteed by, any industrial or financial company with a short-term commercial paper rating of at least A-1 or the equivalent thereof by S&P or at least P-1 the equivalent thereof by Moody's, or guaranteed by any industrial company with a long-term unsecured debt rating of at least A or A2, or the equivalent of each thereof, from S&P or Moody's, as the case may be, and in each case maturing within 180 days after the date of acquisition;

(iv) investments in money market funds substantially all the assets of which are comprised of securities of the types described in clauses (i) through (iv) above including such money market funds maintained by the Administrative Agent;

(v) investments in money market funds access to which is provided as part of "sweep" accounts maintained with the Lender or an Approved Bank; and

(vi) investments in pooled funds or investment accounts consisting of investments of the nature described in the foregoing clauses (i) through (v) above.

NAI-1500501901v9

"Cash Management Order" shall have the meaning given to such term in Section 3.01(v).

"Cash Proceeds" means, with respect to (i) any Asset Sale, the aggregate cash payments (including any cash received by way of deferred payment pursuant to a note receivable issued in connection with such Asset Sale, other than the portion of such deferred payment constituting interest, but only as and when so received) received by the Borrower or any Subsidiary from such Asset Sale, and (ii) any Event of Loss, the aggregate cash payments, including all insurance proceeds and proceeds of any award for condemnation or taking, received in connection with such Event of Loss.

"CERCLA" means the Comprehensive Environmental Response, Compensation, and Liability Act of 1980, as the same may be amended from time to time, 42 U.S.C. § 9601 *et seq.*

"Change of Control" means, with respect to the Borrower, other than in connection with an Approved Sale or an Acceptable Plan of Reorganization, (i) the acquisition of ownership or voting control, directly or indirectly, beneficially or of record, on or after the Closing Date, by any Person or group (within the meaning of Rule 13d-3 of the SEC under the 1934 Act, as then in effect) that is not a Permitted Holder, of shares representing more than 50% of the aggregate ordinary Voting Power represented by the issued and outstanding Capital Stock of the Borrower; (ii) any initial public offering with respect to the Capital Stock of the Borrower; (iii) the sale of all or substantially all of the assets of the Borrower and its Subsidiaries; or (iv) the occurrence of a change in control, or other similar provision, under or with respect to any agreement or condition relating to any Indebtedness (other than the Obligations) in an outstanding amount in excess of $500,000.

"Charges" has the meaning provided in Section 9.18.

"Chapter 11 Case" shall have the meaning given to such term in the Recitals hereto.

"Chief Restructuring Officer" means Andrew Hinkelman of FTI Consulting, Inc. (or a successor thereto acceptable to the Lender), which Chief Restructuring Officer shall report directly to the board of directors of the Borrower.

"Claims" has the meaning set forth in the definition of "Environmental Claims."

"Closing Date" shall have the meaning given to such term in Section 3.01.

"Closing Document List" means the Closing Document List attached as Schedule 1.01(i).

"Code" means the Internal Revenue Code of 1986, as amended from time to time, and the regulations promulgated and the rulings issued thereunder. Section references to the Code are to the Code as in effect at the Closing Date and any subsequent provisions of the Code, amendatory thereof, supplemental thereto or substituted therefor.

"Collateral" means the Borrower's and any other Person's now owned and hereafter acquired property in which Liens have been, purported to have been or are required to be granted to the Administrative Agent and/or the Lender from time to time pursuant to the Security Agreement, any of the other Security Documents, the Financing Orders, and/or any other order of the Bankruptcy Court in the Chapter 11 Cases or otherwise as collateral security for the Obligations.

"Collateral Assignment Agreements" has the meaning specified in the Security Agreement.

"Committee" means the official committee of unsecured creditors formed in the Chapter 11 Case.

NAI-1500501901v9

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 52 of 136

"Commodities Hedge Agreement" means a commodities contract purchased by the Borrower or any of its Subsidiaries in the ordinary course of business, and not for speculative purposes, with respect to raw materials necessary to the manufacturing or production of goods in connection with the business of the Borrower and its Subsidiaries.

"Compliance Certificate" has the meaning provided in Section 5.01(c).

"Confidential Information" has the meaning provided in Section 9.13(b).

"Control Agreements" has the meaning set forth in the Security Agreement.

"Credit Documents" means the Agreement, the Term Loan Note, the Security Documents, the Initial Approved Budget, the Approved Budget, all Variance Reports, and all other financial statements, reports, documents, agreements, instruments, opinions and certificates executed and delivered by, on behalf of, or for the benefit of the Borrower or any of its Affiliates, or by which any of them may be bound, in connection with this Agreement or with any such other document, agreement or instrument, in each case, as the same may be modified, amended, extended, restated or supplemented from time to time; provided that, the Credit Documents shall not include any Prepetition Note Purchase Document, other than any "Security Document" as used and defined in the Prepetition Note Purchase Agreement of which the Lender or the Administrative Agent receives the benefit of pursuant to the Financing Orders.

"Default" means any event, act or condition that with notice or lapse of time, or both, would constitute an Event of Default.

"Default Rate" means, for any day, (i) with respect to the Term Loans, a rate per annum equal to 2% per annum above the interest rate that is or would be applicable from time to time to the Term Loans pursuant to Section 2.02(a) and (ii) with respect to any other amount, a rate per annum equal to 2% per annum above the rate that would otherwise be applicable hereunder.

"Disclosure Schedule" means the disclosure schedule attached hereto as Exhibit B. All references herein to "Schedule" shall refer to the applicable schedule of the Disclosure Schedule.

"Disclosure Statement" shall have the meaning given to such term in Section 5.26(a)(i).

"Dollars," "U.S. Dollars" and the sign "$" each means lawful money of the United States.

"Domestic Subsidiary" means any Subsidiary organized under the laws of the United States of America, any State thereof, or the District of Columbia.

"Effect of Bankruptcy" means, with respect to any contractual obligation, contract or agreement to which the Borrower is a party, any default, unenforceability or other legal consequences arising solely on account of the commencement of the Chapter 11 Cases (including by the implementation of the automatic stay) or, as a result of any order of the Bankruptcy Court, the rejection of any such contractual obligation, contract or agreement.

"Environmental Claims" means any and all global, regulatory or judicial actions, suits, demands, demand letters, claims, liens, notices of non-compliance or violation, investigations or proceedings relating in any way to any Environmental Law or any permit issued under any such law (hereafter "Claims"), including, without limitation, (i) any and all Claims by any Governmental Authority for enforcement, cleanup, removal, response, remedial or other actions or damages pursuant to any applicable Environmental Law, and (ii) any and all Claims by any third party seeking damages, contribution,

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 53 of 136

indemnification, cost recovery, compensation or injunctive relief resulting from the storage, treatment or Release (as defined in CERCLA) of any Hazardous Materials or arising from alleged injury or threat of injury to health, safety or the environment.

"Environmental Law" means any applicable Federal, state, foreign or local statute, law, rule, regulation, ordinance, code, binding and enforceable guideline, binding and enforceable written policy and rule of common law now or hereafter in effect and in each case as amended, and any binding and enforceable judicial or global interpretation thereof, including any judicial or global order, consent, decree or judgment issued to or rendered against the Borrower or any of its Subsidiaries relating to the environment, employee health and safety or Hazardous Materials, including, without limitation, CERCLA; RCRA; the Federal Water Pollution Control Act, 33 U.S.C. § 1251 *et seq.*; the Clean Air Act, 42 U.S.C. § 7401 *et seq.*; the Safe Drinking Water Act, 42 U.S.C. § 300f *et seq.*; the Oil Pollution Act of 1990, 33 U.S.C. § 2701 *et seq.*; the Emergency Planning and the Community Right-to-Know Act of 1986, 42 U.S.C. § 11001 *et seq.*, the Hazardous Material Transportation Act, 49 U.S.C. § 5101 *et seq.* and the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.* (to the extent it regulates occupational exposure to Hazardous Materials); and any state and local or foreign counterparts or equivalents, in each case as amended from time to time.

"ERISA" means the Employee Retirement Income Security Act of 1974, as amended from time to time, and the regulations promulgated and rulings issued thereunder. Section references to ERISA are to ERISA, as in effect at the Closing Date and any subsequent provisions of ERISA, amendatory thereof, supplemental thereto or substituted therefor.

"ERISA Affiliate" means each Person (as defined in Section 3(9) of ERISA), which together with the Borrower or a Subsidiary of the Borrower, would be deemed to be a "single employer" (i) within the meaning of Section 414(b), (c), (m) or (o) of the Code or Section 4001(a)(14) or 4001(b)(i) of ERISA or (ii) as a result of the Borrower or a Subsidiary of the Borrower being or having been a general partner of such Person..

"Event of Default" has the meaning provided in Section 7.01.

"Event of Loss" means, with respect to any property, (i) the actual or constructive total loss of such property or the use thereof, resulting from destruction, damage beyond repair, or the rendition of such property permanently unfit for normal use from any casualty or similar occurrence whatsoever, (ii) the destruction or damage of a portion of such property from any casualty or similar occurrence whatsoever, (iii) the condemnation, confiscation or seizure of, or requisition of title to or use of, any property, or (iv) in the case of any property located upon a leasehold, the termination or expiration of such leasehold.

"Extraordinary Receipts" means any proceeds received by the Borrower outside the ordinary course of business (but excluding any insurance or condemnation proceeds relating to an Event of Loss), including, without limitation, (i) foreign, United States, state or local tax refunds, (ii) pension plan reversions, (iii) proceeds of insurance (other than insurance or condemnation proceeds relating to an Event of Loss), (iv) judgments, proceeds of settlements or other consideration of any kind in connection with any cause of action, (v) indemnity payments or funds released from escrow, (vi) any purchase price adjustment received in connection with any purchase agreement and (vii) any settlements with customers; provided that in the case of a settlement with a customer of Borrower, there shall be a deduction for (A) any amounts of fees anticipated to be received from the applicable customer as set forth in the Approved Budget and (B) any amounts incurred in terminating such customer which are not anticipated in the Approved Budget (including but not limited to machine removal costs) offset by any costs anticipated for such customer in the Approved Budget which are avoided as a result of the termination of such customer

-8-

Case: 15-31141     Doc# 10     Filed: 09/10/15     Entered: 09/10/15 06:48:32     Page 54 of 136

"<u>Final Order</u>" means, collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after a final hearing under Bankruptcy Rule 4001(c)(2) or such other procedures as approved by the Bankruptcy Court which order shall be satisfactory in form and substance to the Administrative Agent and the Lender, shall be in full force and effect and shall not have been vacated, stayed, terminated, rescinded, revoked, or declared null and void, together with all extensions, modifications and amendments thereto, which, among other matters but not by way of limitation, authorizes the Borrower to obtain credit, incur (or guaranty) Indebtedness, and grants first priority Liens in favor of the Administrative Agent and the Lender in the Collateral under this Agreement and the other Credit Documents, provides for the superpriority of the Administrative Agent's and the Lender's claim and authorizes the use by the Borrower of its Cash Collateral in accordance with the terms of this Agreement.

"<u>Financial Statements</u>" means any of the Approved Budget, the consolidated balance sheets, statements of operations, statements of cash flows and statements of changes in shareholder's equity of the Borrower and/or its Subsidiaries for the period specified prepared (except with respect to monthly financial statements) in accordance with GAAP consistently applied and, in each case (including, monthly financial statements and consolidating financial statements) consistent with prior practices.

"<u>Financing Orders</u>" means the Interim Order or the Final Order, whichever is in effect at the time of any determination made hereunder, including, without limitation, any amendment, modification or supplement thereto, in each case, in form and substance acceptable to the Administrative Agent and the Lender.

"<u>First Day Motions and Orders</u>" means the "First Day Motions" and "First Day Orders" set forth on <u>Schedule 1.01(ii)</u>, which shall be in form and substance reasonably satisfactory to the Administrative Agent and the Lender.

"<u>Foreign Subsidiary</u>" means any Subsidiary that is not a Domestic Subsidiary.

"<u>Full Payment</u>" or "<u>Payment in Full</u>" or "<u>Pay in Full</u>" or "<u>Paid in Full</u>" means, (a) the termination or expiration of this Agreement, the Term Loan Commitments and all obligations of the Lender to make Term Loans or other extensions of credit hereunder; (b) the full and indefeasible cash payment of all such Obligations, including any and all principal, interest, fees, expenses, reimbursements, indemnities and other charges including those accruing during any Insolvency Proceeding (including, without limitation, the Chapter 11 Cases) (whether or not allowed in the proceeding), other than unasserted contingent obligations; (c) if such Obligations are inchoate or contingent in nature, Cash Collateralization thereof (or delivery of a standby letter of credit acceptable to the Agent in its reasonable discretion, in an amount sufficient to Cash Collateralize such Obligations); and (d) the full and irrevocable release by the Borrower of the Agent and the Lender (and all of their respective officers, directors, agent, attorneys and affiliates) under the Credit Documents.

"<u>GAAP</u>" means generally accepted accounting principles in the United States of America as in effect from time to time and consistently applied.

"<u>Governmental Authority</u>" means any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, global tribunal, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or global powers or functions of or pertaining to government.

"<u>Guaranty Obligations</u>" means as to any Person (without duplication) any obligation of such Person guaranteeing any Indebtedness ("<u>Primary Indebtedness</u>") of any other Person (the "<u>Primary Obligor</u>") in any manner, whether directly or indirectly, including, without limitation, any obligation of

NAI-1500501901v9

such Person, whether or not contingent, (i) to purchase any such Primary Indebtedness or any property constituting direct or indirect security therefor, (ii) to advance or supply funds for the purchase or payment of any such Primary Indebtedness or to maintain working capital or equity capital of the Primary Obligor or otherwise to maintain the net worth or solvency of the Primary Obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such Primary Indebtedness of the ability of the Primary Obligor to make payment of such Primary Indebtedness, or (iv) otherwise to assure or hold harmless the owner of such Primary Indebtedness against loss in respect thereof; *provided, however*, that the definition of Guaranty Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guaranty Obligation shall be deemed to be an amount equal to the stated or determinable amount of the Primary Indebtedness in respect of which such Guaranty Obligation is made or, if not stated or determinable, the maximum reasonably anticipated liability in respect thereof (assuming such Person is required to perform thereunder).

"Hazardous Materials"  means (i) any petrochemical or petroleum products, radioactive materials, asbestos in any form that is or could become friable, urea formaldehyde foam insulation, transformers or other equipment that contain dielectric fluid containing levels of polychlorinated biphenyls, and radon gas; and (ii) any chemicals, materials or substances defined as or included in the definition of "hazardous substances," "hazardous wastes," "hazardous materials," "restricted hazardous materials," "extremely hazardous wastes," "restrictive hazardous wastes," "toxic substances," "toxic pollutants," "contaminants" or "pollutants," or words of similar meaning and regulatory effect, under any applicable Environmental Law.

"Hedge Agreement" means (i) any interest rate swap agreement, any interest rate cap agreement, any interest rate collar agreement or other similar interest rate management agreement or arrangement, (ii) any currency swap or option agreement, foreign exchange contract, forward currency purchase agreement or similar currency management agreement or arrangement or (iii) any Commodities Hedge Agreement.

"Indebtedness" of any Person means without duplication (i) all indebtedness of such Person for borrowed money; (ii) all bonds, notes, debentures and similar debt securities of such Person; (iii) the deferred purchase price of capital assets or services that in accordance with GAAP would be shown on the liability side of the balance sheet of such Person; (iv) the face amount of all letters of credit issued for the account of such Person and, without duplication, all drafts drawn thereunder and not repaid; (v) all obligations, contingent or otherwise, of such Person in respect of bankers' acceptances; (vi) all indebtedness of a second Person secured by any Lien on any property owned by such first Person, whether or not such indebtedness has been assumed; (vii) all Capitalized Lease Obligations of such Person; (viii) the present value, determined on the basis of the implicit interest rate, of all basic rental obligations under all Synthetic Leases of such Person; (ix) all obligations of such Person with respect to asset securitization financing; (x) all obligations of such Person to pay a specified purchase price for goods or services whether or not delivered or accepted, i.e., take-or-pay and similar obligations; (xi) all net obligations of such Person under Hedge Agreements; (xii) the full outstanding balance of trade receivables, notes or other instruments sold with full recourse (and the portion thereof subject to potential recourse, if sold with limited recourse), other than in any such case any thereof sold solely for purposes of collection of delinquent accounts; and (xiii) all Guaranty Obligations of such Person; *provided, however,* that (y) neither trade payables, deferred revenue, taxes nor other similar accrued expenses, in each case arising in the ordinary course of business, shall constitute Indebtedness; and (z) the Indebtedness of any Person shall in any event include (without duplication) the Indebtedness of any other entity (including any general partnership in which such Person is a general partner) to the extent such Person is liable thereon as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness provide expressly that such Person is not liable thereon.

NAI-1500501901v9

"Indemnified Person" has the meaning provided in Section 8.07.

"Indemnitees" has the meaning provided in Section 9.02.

"Initial Approved Budget" shall have the meaning given to such term in Section 3.01(iii).

"Insolvency Proceeding" means any case or proceeding commenced by or against a Person under any state, federal or foreign law for, or any agreement of such Person to, (a) the entry of an order for relief under the Bankruptcy Code, or any other insolvency, debtor relief or debt adjustment law; (b) the appointment of a receiver, trustee, liquidator, administrator, conservator or other custodian for such Person or any part of its property; or (c) an assignment or trust mortgage for the benefit of creditors. For all purposes hereof, the term Insolvency Proceeding shall include, without limitation, the Chapter 11 Case.

"Interim Advance Amount" means a Borrowing or series of Borrowings, during the Interim Period, so long as and solely to the extent that the aggregate principal amount of all Term Loans do not exceed during such Interim Period, in aggregate at any one time outstanding, the lesser of (i) $1,200,000, and (ii) such lesser amount approved by the Bankruptcy Court, in either case, as approved by the Bankruptcy Court pursuant to the Interim Order.

"Interim Order" means collectively, the order of the Bankruptcy Court entered in the Chapter 11 Cases after an interim hearing (assuming satisfaction of the standards prescribed in Section 364 of the Bankruptcy Code and Bankruptcy Rule 4001 and other Applicable Law), together with all extensions, modifications and amendments thereto, in each case, in form and substance satisfactory to the Administrative Agent and the Lender, which, among other matters but not by way of limitation, provides for the superpriority of the Administrative Agent's and the Lender's claim and grants first priority Liens in favor of the Administrative Agent and the Lender in the Collateral under this Agreement and the other Credit Documents and, on an interim basis, authorizes the Borrower to execute and perform under the terms of this Agreement and to use Cash Collateral in accordance with the terms of this Agreement.

"Interim Period" means the period commencing on the date of entry of the Interim Order and ending on the date of entry of the Final Order.

"Investment" means (i) any direct or indirect purchase or other acquisition by a Person of any Capital Stock of any other Person; (ii) any loan, advance (other than deposits with financial institutions available for withdrawal on demand) or extension of credit to, guarantee or assumption of debt or purchase or other acquisition of any other Indebtedness of, any Person by any other Person; or (iii) the purchase, acquisition or investment of or in any stocks, bonds, mutual funds, notes, debentures or other securities, or any deposit account, certificate of deposit or other investment of any kind.

"Knowledge of the Borrower" means, at any time, the actual knowledge of any of the directors or members of the senior management (meaning any president, vice president, treasurer, secretary, chairman, chief executive officer, chief operating officer, chief financial officer or chief restructuring officer) at such time.

"Landlord's Agreement" means a landlord's waiver or mortgagee's waiver, each in form and substance reasonably satisfactory to the Lender, and providing, among other things, for waiver or subordination of Lien, certain notices and opportunity to cure and access to Collateral, delivered by the Borrower in connection with this Agreement, as the same may from time to time be amended, restated or otherwise modified. Subject to the entry of the Financing Orders by the Bankruptcy Court, and pursuant to their terms, (i) the Administrative Agent and the Lender shall have the full benefit of all Landlord

-11-

Agreements delivered by the Borrower in connection with the Prepetition Note Purchase Documents as if such documents were delivered in connection herewith, (ii) the Administrative Agent shall be entitled to receive all notices or other documents to which the Prepetition Agent is entitled thereunder and (iii) such Landlord Agreements shall be deemed to be Landlord Agreements under this Credit Agreement and the other Credit Documents for all purposes.

"<u>Leaseholds</u>" of any Person means all the right, title and interest of such Person as lessee or licensee in, to and under leases or licenses of land, improvements and/or fixtures.

"<u>Lender</u>" and "<u>Lenders</u>" see the Preamble; provided, that the term Lender shall include (i) any Lender that has a Term Loan Commitment, (ii) the Administrative Agent to the extent it has made or shall make any loans, advances or any other financial accommodations hereunder, under this Agreement or under any other Credit Documents, and (iii) any other Person who hereafter becomes a "Lender" pursuant to an assignment and assumption agreement, in form and substance acceptable to the Administrative Agent and the Lender.

"<u>Lien</u>" means, with respect to any Person, any interest granted by such Person in any real or personal property, asset or other right owned or being purchased or acquired by such Person (including an interest in respect of a Capital Lease) which secures payment or performance of any obligation or provides any Person any right in or right to effect the use of any property whether such interest or right is based on common law, statute, contract, judicial process or otherwise, including liens, security interests, pledges, hypothecations, statutory trusts, reservations, exceptions, encroachments, easements, rights-of-way, covenants, conditions, restrictions, leases, mortgages, deeds of trust, and other title exceptions and encumbrances affecting property.

"<u>Margin Stock</u>" has the meaning provided in Regulation U.

"<u>Material Adverse Effect</u>" means any or all of the following: (i) any material adverse effect on the business, operations, property, assets, liabilities or financial condition of the Borrower and its Subsidiaries taken as a whole; (ii) any material adverse effect on the ability of the Borrower to perform its obligations under any of the Credit Documents to which it is a party as and when required; or (iii) any material adverse effect on the validity, effectiveness or enforceability, as against the Borrower, of any of the Credit Documents to which it is a party. The filing of the Chapter 11 Case or any Effect of Bankruptcy as a result thereof or the effect of any action required to be taken hereunder or under the Financing Orders shall not constitute a Material Adverse Effect.

"<u>Material Contract</u>" means any written contract or other written arrangement (other than any of the Credit Documents), to which the Borrower or any of its Subsidiaries is a party and as to which the breach, nonperformance, cancellation or failure to renew by any party thereto has or is reasonably likely to have a Material Adverse Effect.

"<u>Maturity Date</u>" means the earliest to occur of (a) the December 10, 2015, (b) the date on which all of the Obligations have been Paid in Full, (c) the date on which the Obligations are accelerated and/or the Term Loan Commitments have terminated pursuant to Section 7.02 or the Term Loan Commitments are reduced to zero pursuant to Section 2.03(a), (d) the first business day on which the Interim Order expires by its terms or is terminated, unless the Final Order has been entered and become effective prior thereto, (e) conversion of any of the Chapter 11 Cases to a case under Chapter 7 of the Bankruptcy Code unless otherwise consented to in writing by the Administrative Agent and the Lender, (f) dismissal of the Chapter 11 Case, unless otherwise consented to in writing by the Administrative Agent and the Lender, (g) the date of consummation of an Approved Sale, (h) the effective date of an Acceptable Plan of Reorganization, (i) the Final Order is vacated, terminated, rescinded, revoked, declared null and void or

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 58 of 136

otherwise ceases to be in full force and effect, (j) the occurrence of a "Material Adverse Effect" under and as defined in the Approved Sale definitive documentation, (k) the failure of the Borrower to deliver an Approved Budget, in form and substance acceptable to the Lender, following the delivery of a Sale Trigger Notice pursuant to and in accordance with clause (ii) of the proviso to <u>Section 5.26(a)</u>.

"<u>Maximum Rate</u>" has the meaning provided in <u>Section 9.18</u>.

"<u>Moody's</u>" means Moody's Investors Service, Inc. and its successors.

"<u>Mortgage</u>" means a Mortgage, Deed of Trust or other instrument, in form and substance reasonably satisfactory to the Administrative Agent and the Lender, executed by the Borrower with respect to a Mortgaged Real Property, as the same may from time to time be amended, restated, supplemented or otherwise modified.

"<u>Mortgaged Real Property</u>" means each of the parcels of real property set forth on <u>Schedule 4.27</u> hereto, or interests therein, owned by the Borrower , together with each other parcel of Real Property hereinafter owned by the Borrower that shall become subject to a Mortgage after the Closing Date, in each case together with all of the Borrower's right, title and interest in the improvements and buildings thereon and all appurtenances, easements or other rights belonging thereto.

"<u>Multi-Employer Plan</u>" means a multi-employer plan, as defined in Section 4001(a)(3) of ERISA to which the Borrower or any Subsidiary of the Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions or has within any of the preceding five plan years made or accrued an obligation to make contributions.

"<u>Multiple Employer Plan</u>" means an employee benefit plan, other than a Multi-Employer Plan, to which the Borrower or any Subsidiary of the Borrower or any ERISA Affiliate, and one or more employers other than the Borrower or a Subsidiary of the Borrower or an ERISA Affiliate, is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which the Borrower or a Subsidiary of the Borrower or an ERISA Affiliate made or accrued an obligation to make contributions during any of the five plan years preceding the date of termination of such plan.

"<u>Net Cash Flow</u>" means, with respect to any period for purposes of any 13-Week Projections, Variance Report or Approved Budget, cash receipts from operations for such period minus disbursements for such period.

"<u>Net Cash Proceeds</u>" means, with respect to (i) any Asset Sale, the Cash Proceeds resulting therefrom net of (A) reasonable and customary expenses of sale incurred in connection with such Asset Sale, and other reasonable and customary fees and expenses incurred, and all state and local taxes paid or reasonably estimated to be payable by such person as a consequence of such Asset Sale and the payment of principal, premium and interest of Indebtedness (other than the Obligations) secured by the asset which is the subject of the Asset Sale and required to be, and which is, repaid under the terms thereof as a result of such Asset Sale, and (B) incremental federal, state and local income taxes paid or payable as a result thereof; (ii) any Event of Loss, the Cash Proceeds resulting therefrom net of (A) reasonable and customary expenses incurred in connection with such Event of Loss, and local taxes paid or reasonably estimated to be payable by such person as a consequence of such Event of Loss and the payment of principal, premium and interest of Indebtedness (other than the Obligations) secured by the asset which is the subject of the Event of Loss and required to be, and which is, repaid under the terms thereof as a result of such Event of Loss, and (B) incremental federal, state and local income taxes paid or payable as a result thereof, and (iii) any Extraordinary Receipts, the Cash Proceeds resulting therefrom net of (A) reasonable and customary expenses incurred in connection with such Extraordinary Receipts, and local

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 59 of 136

taxes paid or reasonably estimated to be payable by such person as a consequence of such Extraordinary Receipts, and (B) incremental federal, state and local income taxes paid or payable as a result thereof, in each case of clauses (A)(i), A(ii), B(i), B(ii), C(i) and C(ii), as set forth in the Approved Budget.

"Obligations" means all principal, interest and other amounts, indemnities and reimbursement obligations, direct or indirect, contingent or absolute, of every type or description, and at any time existing, owing by the Borrower to the Lender or the Administrative Agent pursuant to the terms of this Agreement or any other Credit Document (including, but not limited to, interest and fees that accrue after the commencement by or against the Borrower of any Insolvency Proceeding (including, without limitation, the Chapter 11 Cases), regardless of whether allowed or allowable in such proceeding or subject to an automatic stay under Section 362(a) of the Bankruptcy Code), in each case, whether incurred before or after the commencement of an Insolvency Proceeding and whether or not allowed or allowable in an Insolvency Proceeding.

"Operating Lease" as applied to any Person means any lease of any property (whether real, personal or mixed) by that Person as lessee that, in conformity with GAAP, is not accounted for as a Capital Lease on the balance sheet of that Person.

"Organizational Documents" means, with respect to any Person (other than an individual), such Person's Articles (Certificate) of Incorporation, or equivalent formation documents, and Regulations (Bylaws), or equivalent governing documents, and, in the case of any partnership, includes any partnership agreement and any amendments to any of the foregoing.

"Payment Office" means the office of the Administrative Agent at 45 Broadway, 14th Floor, New York, New York 10006, Attention: CMES – NewZoom Inc., or such other office(s), as the Administrative Agent may designate to the Borrower and Lender in writing from time to time.

"PBGC" means the Pension Benefit Guaranty Corporation established pursuant to Section 4002 of ERISA, or any successor thereto.

"Perfection Certificate" has the meaning provided in the Security Agreement.

"Permitted Holder" means any of (i) Sierra Ventures, NeoCarta Ventures, Goldman Sachs, Google, Inc., Starfish Ventures, (ii) Gower Smith, (iii) Michael Gill and GFT PTY LTD ATF Gill Family Trust No 2, (iv) any affiliated fund of the Persons described in clause (i) and (v) in the case of the Persons described in clauses (ii) and (iii), any affiliated trust or entity formed for bona-fide estate planning purposes so long as Michael Gill or Gower Smith, as applicable, retains the respective Voting Power with respect to the Capital Stock of the Borrower.

"Permitted Lien" means any Lien permitted by Section 6.03.

"Person" means any individual, partnership, joint venture, firm, corporation, limited liability company, association, trust or other enterprise or any government or political subdivision or any agency, department or instrumentality thereof.

"Petition Date" shall have the meaning given to such term in the Recitals hereto.

"Plan" means any Multi-Employer Plan or Single-Employer Plan.

"Plan Milestones" shall have the meaning given to such term in Section 5.26(a).

NAI-1500501901v9

"Plan of Reorganization" means a plan of reorganization filed in the Chapter 11 Case pursuant to Chapter 11 of the Bankruptcy Code.

"Post-Default Carve-Out Cap" shall have the meaning given to such term in clause (i) of the definition of "Carve-Out."

"Postpetition" means the time period commencing immediately after the filing of the Chapter 11 Cases.

"Pre-Default Accrued Fees" shall have the meaning given to such term in clause (ii) of the definition of "Carve-Out."

"Prepetition" means the time period ending immediately prior to the filing of the Chapter 11 Case.

"Prepetition Agent" means the "Administrative Agent" as used and defined under the Prepetition Note Purchase Agreement.

"Prepetition Lenders" means the "Purchaser" as used and defined under the Prepetition Note Purchase Agreement.

"Prepetition Note Purchase Agreement" shall have the meaning given to such term in the Recitals hereto.

"Prepetition Note Purchase Documents" shall mean the "Purchase Documents" as used and defined under the Prepetition Note Purchase Agreement.

"Prepetition Obligations" shall mean the "Obligations" as used and defined under the Prepetition Note Purchase Agreement.

"Primary Indebtedness" has the meaning provided in the definition of "Guaranty Obligations."

"Primary Obligor" has the meaning provided in the definition of "Guaranty Obligations."

"Prohibited Transaction" means a transaction with respect to a Plan that is prohibited under Section 4975 of the Code or Section 406 of ERISA and not exempt under Section 4975 of the Code or Section 408 of ERISA.

"Projections" means a projection of the expected financial condition and results of operations of the Borrower and its Subsidiaries, on a consolidated basis (including, but not limited to, a projected consolidated balance sheet, statement of operations, and statement of cash flows), for the periods covered by such projection, which Projections shall be in form, scope, detail and substance acceptable to the Agent and the Lender and, in any event, shall include the 13-Week Projections.

"RCRA" means the Resource Conservation and Recovery Act, as the same may be amended from time to time, 42 U.S.C. § 6901 *et seq.*

"Real Property" of any Person shall mean all of the right, title and interest of such Person in and to land, improvements and fixtures, including Leaseholds.

"Regulation D" means Regulation D of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing reserve requirements.

NAI-1500501901v9

"Regulation U" means Regulation U of the Board of Governors of the Federal Reserve System as from time to time in effect and any successor to all or a portion thereof establishing margin requirements.

"Related Parties" means, with respect to any Person, such Person's Affiliates and the directors, officers, employees, agents and advisors of such Person and of such Person's Affiliates.

"Reportable Event" means an event described in Section 4043 of ERISA or the regulations thereunder with respect to a Plan, other than those events as to which the notice requirement is waived under subsection .22, .23, .25, .27, .28, .29, .30, .31, .32, .34, .35, .62, .63, .64, .65 or .67 of PBGC Regulation Section 4043.

"Reports" has the meaning provided in Section 8.10.

"Requirement of Law" means, with respect to any Person, the common law and all federal, state, local and foreign laws, treaties, rules and regulations, orders, judgments, decrees of, concessions, grants, franchises and licenses with, any Governmental Authority or arbitrator, applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Restricted Payment" means (i) any Capital Distribution; or (ii) any amount paid by the Borrower or any of its Subsidiaries in repayment, redemption, retirement, repurchase, direct or indirect, of any Subordinated Indebtedness.

"Restrictive Agreement" means an agreement (other than a Credit Document) that conditions or restricts the right of the Borrower or any of its Subsidiaries to incur or repay borrowed money, to grant Liens on any assets, to declare or make distributions, to modify, extend or renew any agreement evidencing borrowed money, or to repay any intercompany Indebtedness, in each case, other than (i) restrictions or conditions imposed by any agreement relating to purchase money Indebtedness or Capital Leases so long as such restrictions or conditions apply only to the property or assets securing such Indebtedness, (ii) customary provisions in leases and other contracts restricting the assignment thereof or (iii) restrictions or conditions existing under and by reason of the Prepetition Note Purchase Documents to the extent no more restrictive than those set forth in the Credit Documents.

"Revised Current Customer" has the meaning provided in Section 4.11.

"Revised Current Customer Contract" has the meaning provided in Section 4.11.

"Revised Material Supplier" has the meaning provided in Section 4.12.

"Revised Material Supplier Contract" has the meaning provided in Section 4.12.

"S&P" means Standard & Poor's Ratings Group, a division of McGraw Hill, Inc., and its successors.

"Sale and Lease-Back Transaction" means any arrangement with any Person providing for the leasing by the Borrower or any Subsidiary of the Borrower of any property (except for temporary leases for a term, including any renewal thereof, of not more than one year and except for leases between the Borrower and a Subsidiary or between Subsidiaries), which property has been or is to be sold or transferred by the Borrower or such Subsidiary to such Person.

-16-

"Sale Milestones" shall have the meaning given to such term in Section 5.26(b).

"Sale Trigger Date" shall have the meaning give to such term in Section 5.26(b).

"Sale Trigger Notice" has the meaning provided being Section 5.26(a).

"SEC" means the United States Securities and Exchange Commission.

"Security Agreement" means the Pledge and Security Agreement, dated as of the Closing Date among the Agent, the Lender and the Borrower, as the same may be amended, restated, supplemented or otherwise modified from time to time..

"Security Documents" means the Security Agreement, the Interim Order, the Final Order, each Mortgage, each Landlord's Agreement, any UCC financing statement, any Control Agreement, any Collateral Assignment, any Perfection Certificate and any document pursuant to which any Lien is granted or perfected (or executed with the intent to grant or perfect) by the Borrower to Administrative Agent for the benefit of itself and the Lender as security for any of the Obligations.

"Single Employer Plan" means a single employer plan, as defined in Section 4001(a)(15) of ERISA, to which the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate is making or accruing an obligation to make contributions or, in the event that any such plan has been terminated, to which the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate made or accrued an obligation to make contributions during any of the five plan years preceding the date of termination of such plan.

"Standard Permitted Lien" means any of the following: (i) Liens for taxes not yet delinquent or Liens for taxes, assessments or governmental charges being contested in good faith and by appropriate proceedings for which adequate reserves in accordance with GAAP have been established, in each case, the payment of which is not required by the Bankruptcy Code; (ii) Liens in respect of property or assets imposed by law that were incurred in the ordinary course of business, such as carriers', suppliers', warehousemen's, materialmen's and mechanics' Liens and other similar Liens arising in the ordinary course of business, for amounts that are not yet due and payable or which are being diligently contested in good faith by the Debtor by appropriate proceedings or which do not materially impair the value or use of the Borrower's assets or materially impair operation of the business of the Borrower or any Subsidiary and, in any case, do not secure any Indebtedness; (iii) Liens arising from judgments, decrees or attachments in circumstances not constituting an Event of Default under Section 7.01(g); (iv) Liens (other than any Lien imposed by ERISA or permitted in clause (i) above) incurred or deposits made in the ordinary course of business in connection with workers compensation, unemployment insurance and other types of social security, in each case, only if (x) not yet due and payable, (y) which are being diligently contested in good faith by the Borrower by appropriate proceedings, provided that in any such case an adequate reserve is being maintained by the Parent and its consolidated Subsidiaries on its books and records for the payment of same, or (z) such Liens do not materially impair the value or use of the Borrower's assets or materially impair operation of the business of the Borrower or any Subsidiary; (v) deposits or pledges to secure the performance of tenders, statutory obligations, contract bids, government contracts, surety, appeal, customs, performance and return-of-money bonds and other similar obligations, incurred in the ordinary course of business (exclusive of obligations in respect of the payment for borrowed money), whether pursuant to statutory requirements, common law or consensual arrangements; (vi) leases or subleases granted in the ordinary course of business to others that do not interfere in any material respect with the business of the Borrower or any of its Subsidiaries and any interest or title of a lessor under any lease not in violation of this Agreement; (vii) easements, rights-of-way, zoning or other restrictions, charges, encumbrances, defects in title, prior rights of other persons, and obligations

contained in similar instruments, in each case that do not secure Indebtedness and do not involve, and are not likely to involve at any future time, either individually or in the aggregate, substantial amount and which do not materially detract from the value of the property subject thereto or materially interfere with the ordinary conduct of the business of the Borrower and its Subsidiaries; (viii) Liens arising from the rights of lessors under leases (including financing statements regarding property subject to lease) not in violation of the requirements of this Agreement; *provided* that such Liens are only in respect of the property subject to, and secure only, the respective lease (and any other lease with the same or an affiliated lessor); and (ix) rights of consignors of goods, whether or not perfected by the filing of a financing statement under the UCC

"Subordinated Indebtedness" means Indebtedness for borrowed money of the Borrower which by its terms is junior and subordinate to (i) Full Payment of all Obligations and (i) the Liens granted to the Administrative Agent under the Credit Documents and the Financing Orders to secure the Obligations.

"Subsidiary" of any Person means (i) any corporation more than 50% of whose stock of any class or classes having by the terms thereof ordinary Voting Power to elect a majority of the directors of such corporation (irrespective of whether or not at the time stock of any class or classes of such corporation shall have or might have Voting Power by reason of the happening of any contingency) is at the time owned by such Person directly or indirectly through Subsidiaries, and (ii) any partnership, limited liability company, association, joint venture or other entity in which such Person directly or indirectly through Subsidiaries, owns more than 50% of the Capital Stock of such Person at the time or in which such Person, one or more other Subsidiaries of such Person or such Person and one or more Subsidiaries of such Person, directly or indirectly, has the power to direct the policies, management and affairs thereof. Unless otherwise expressly provided, all references herein to "Subsidiary" shall mean a Subsidiary of the Borrower.

"Synthetic Lease" means any lease (i) that is accounted for by the lessee as an Operating Lease, and (ii) under which the lessee is intended to be the "owner" of the leased property for federal income tax purposes.

"Term Loan" means any Term Loan made by a Lender to the Borrower pursuant to Section 2.01 and Term Loans shall mean all of the Term Loans made by the Lender to the Borrower pursuant to Section 2.01.

"Term Loan Commitment" means the amount set forth opposite such Lender's name on Annex I and Term Loan Commitments shall mean the sum of all Commitments of such Lender to make Term Loans pursuant to Section 2.01, which amount is $3,700,000 as of the Closing Date. For purposes of this Agreement, the portion of the Term Loan Commitment so funded by the Lender pursuant to Section 2.01 shall terminate on the date of such Borrowing.

"Term Loan Note" shall have the meanings given to such terms in Section 2.01(b) and, if applicable, shall be in the form of Exhibit A.

"UCC" means the Uniform Commercial Code as in effect from time to time. Unless otherwise specified, the UCC shall refer to the UCC as in effect in the State of New York.

"Unfunded Benefit Liabilities" of any Plan means the amount, if any, of its unfunded benefit liabilities, as defined in Section 4001(a)(18) of ERISA.

"United States" and "U.S." each means United States of America.

NAI-1500501901v9

"Unused Line" means, at any time, the Term Loan Commitment at such time minus the aggregate principal amount of all outstanding Term Loans at such time.

"Unused Line Fee" shall have the meaning given to such term in Section 2.02(f).

"USA Patriot Act" means the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT Act) Act of 2001.

"Variance Report" shall have the meaning given to such term in Section 5.23(ii).

"Voting Power" means, with respect to any Person, the exclusive ability to control, through the ownership of shares of capital stock, partnership interests, membership interests or otherwise, the election of members of the board of directors or other similar governing body of such Person, and the holding of a designated percentage of Voting Power of a Person means the ownership of shares of capital stock, partnership interests, membership interests or other interests of such Person sufficient to control exclusively the election of that percentage of the members of the board of directors or similar governing body of such Person.

"US Trustee" shall have the meaning given to such term in Section 5.01(j).

"US Trustee Fees" means any fees required to be paid in the Chapter 11 Case to the Clerk of the Bankruptcy Court and to the office of the US Trustee under 28 U.S.C. §1930.

Section 1.02    Computation of Time Periods.  In this Agreement in the computation of periods of time from a specified date to a later specified date, the word "from" means "from and including," the words "to" and "until" each means "to but excluding" and the word "through" means "through and including."

Section 1.03    Accounting Terms.  Except as otherwise specifically provided herein, all terms of an accounting or financial nature shall be construed in accordance with GAAP, as in effect from time to time; provided that, if GAAP shall change from the basis used in preparing the audited Financial Statements delivered to the Agent on or before the Closing Date, the Compliance Certificates required to be delivered pursuant to Section 5.01(c) demonstrating compliance with the covenants contained herein shall include calculations setting forth the adjustments necessary to demonstrate how the Borrower is in compliance with the financial covenants based upon GAAP as in effect on the Closing Date.

Section 1.04    Terms Generally.  The definitions of terms herein shall apply equally to the singular and plural forms of the terms defined. Whenever the context may require, any pronoun shall include the corresponding masculine, feminine and neuter forms. The words "include," "includes" and "including" shall be deemed to be followed by the phrase "without limitation." The word "will" shall be construed to have the same meaning and effect as the word "shall." Unless the context requires otherwise, (a) any definition of or reference to any agreement, instrument or other document herein shall be construed as referring to such agreement, instrument or other document as from time to time amended, restated, supplemented or otherwise modified (subject to any restrictions on such amendments, supplements or modifications set forth herein), (b) any reference herein to any Person shall be construed to include such Person's successors and assigns, (c) the words "herein," "hereof" and "hereunder," and words of similar import, shall be construed to refer to this Agreement in its entirety and not to any particular provision hereof, (d) all references herein to Sections, Schedules and Exhibits shall be construed to refer to Sections of, and Schedules and Exhibits to, this Agreement, (e) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all Real Property, tangible and intangible assets and properties, including cash, securities, accounts and contract

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 65 of 136

rights, and interests in any of the foregoing, and (f) any reference to a statute, rule or regulation is to that statute, rule or regulation as now enacted or as the same may from time to time be amended, re-enacted or expressly replaced.

Section 1.05    Other Defined Terms.  Terms not otherwise defined herein which are defined in the Uniform Commercial Code as in effect in the State of New York (the "UCC") shall have the meanings given them in the UCC; provided that no change in the UCC after the date hereof shall have the effect of expanding the types of Collateral granted to the Administrative Agent and the Lender under the Security Agreement and the other Security Documents.

Section 1.06    Incorporation of Recitals.  The Recitals to this Agreement shall be deemed incorporated herein by this reference thereto with the same effect as if the terms thereof were expressly set forth in the body of this Agreement.

ARTICLE II.

TERM LOAN COMMITMENT; TERM LOANS; PRINCIPAL AND INTEREST; PAYMENT TERMS

Section 2.01    Term Loan Commitment; Term Loans; Term Loan Notes.

(a)    Term Loans.  On and subject to the terms and conditions set forth in this Agreement and in the Financing Orders, the Lender agrees to make to the Borrower at any time or from time to time on or after the Closing Date, upon entry of the Interim Order for purposes of the Interim Period and thereafter, upon entry of the Final Order, in each case, before the Maturity Date, such Term Loans as may be requested or deemed requested by the Borrower, in accordance with the terms hereof; provided that, (i) during the Interim Period, in no event shall the aggregate outstanding principal amount of Term Loans exceed the Interim Advance Amount and (ii) the aggregate outstanding principal amount of Term Loans shall not at any time exceed the Term Loan Commitment. The portion of the Term Loan Commitment so funded by the Lender shall terminate on the date of such Borrowing.  In addition, the Term Loan Commitments will terminate in full on the Maturity Date.  Once repaid, whether such repayment is voluntary or required, the Term Loans may not be re-borrowed.

(b)    Term Loan Notes.  The Borrower hereby agrees to execute and deliver to the Lender a note (a "Term Loan Note"), in the form of Exhibit A, to evidence the Lender's Term Loan Commitment which may be extended to the Borrower by the Lender.  The actual principal amount outstanding under the Term Loan Note at any time shall equal and be determined in accordance with the Register relating to the Term Loans, absent manifest error.

(c)    Use of Proceeds.  Cash Collateral and the proceeds of the Term Loans made hereunder shall only be used for the purposes set forth in Section 5.18.

(d)    Term Loan Procedures.

(i)    Borrowings of Term Loans shall be made on notice from the Borrower to the Lender and the Administrative Agent, given not later than 10:00 A.M. (New York City time) on the third Business Day prior to the date of any proposed Borrowing is requested to be made (except for the initial Borrowing on the Closing Date, with respect to which the three day prior notice period shall not apply).

(1)    Each Notice of Borrowing shall be given by either telephone or electronic mail, and, if by telephone, promptly confirmed in writing, in the form attached as Exhibit C (the

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 66 of 136

"Notice of Borrowing"). Each Notice of Borrowing shall be irrevocable by and binding on the Borrower.

(2) In the Notice of Borrowing, each Borrowing shall be in a minimum amount of $400,000 or an integral multiple of $100,000 in excess thereof.

(3) Subject to the satisfaction of the conditions to funding set forth herein, including, without limitation, the conditions set forth in Article III and this Article II, the Lender will then make the amount of such requested Borrowing available to the Borrower on the requested date of such Borrowing at the account specified by the Borrower in such Notice of Borrowing.

(5) Notwithstanding the obligation of the Borrower to send written confirmation of a Notice of Borrowing made by telephone if and when requested by the Lender, in the event that the Lender agrees to accept a Notice of Borrowing made by telephone, such telephonic Notice of Borrowing shall be binding on the Borrower whether or not written confirmation is sent by the Borrower or requested by the Lender. The Lender may act prior to the receipt of any requested written confirmation, without any liability whatsoever, based upon telephonic notice believed by the Lender in good faith to be from the Borrower or its agents. The Lender's records of the terms of any telephonic Notices of Borrowing shall be conclusive on the Borrower in the absence of gross negligence or willful misconduct on the part of the Lender in connection therewith.

Section 2.02        Interest; Default Rate; Payment of Interest; Fees.

(a)        Interest on Term Loans.   Subject to Section 2.02(b), the outstanding principal amount of the Term Loans shall bear interest at the Applicable Interest Rate.

(b)        Default Interest.   Notwithstanding anything to the contrary, if an Event of Default has occurred and is continuing, upon written notice by the Administrative Agent, acting at the sole written direction of the Lender, the Obligations (including interest on interest) shall bear interest, payable on written demand, at a rate per annum equal to the Default Rate. Notwithstanding the foregoing, upon the occurrence of an Event of Default under Section 7.01(a), such increase shall occur automatically.

(c)        Accrual and Payment of Interest.   Interest on the Term Loans shall accrue from and including the Closing Date but excluding the date of any prepayment or repayment thereof and shall be payable, in cash, by the Borrower monthly in arrears on the last Business Day of each calendar month, and on the Maturity Date (each such date as it relates to the payment of interest being an "Interest Payment Date"). Any payment of interest due and payable on an Interest Payment Date that is not a Business Day shall be due and payable on the first Business Day occurring after such Interest Payment Date and interest shall continue to accrue on the principal amount of the Term Loans until, and shall be due and payable on, such Business Day.

(d)        Computations of Interest.   All computations of interest hereunder shall be made on the actual number of days elapsed over a year of 360 days.

(e)        Unused Line Fee.   The Borrower shall pay to the Administrative Agent, for the benefit of the Lender, a non-refundable fee (the "Unused Line Fee") on the daily amount of the Unused Line at a rate equal to 0.50% per annum. Such accrued and unpaid Unused Line Fee shall be payable on the first day of each month, in arrears, commencing after the Closing Date and on the Maturity Date.

(f)        Commitment Fee.   Upon the entry of the Final Order, the Borrower shall pay to the Administrative Agent, for the benefit of the Lender, a non-refundable fee (the "Commitment Fee") equal

-21-

NAI-1500501901v9

to 3.0% of the aggregate Term Loan Commitments as in effect on the Closing Date. The Commitment Fee shall be deemed fully earned and payable on the Closing Date.

Section 2.03    Reduction of Term Loan Commitments; Voluntary Prepayments.

(a)    Voluntary Reduction or Termination of Term Loan Commitments. Any portion of the Term Loan Commitments funded pursuant to Section 2.01(a) shall terminate on the date of such Borrowing. In addition, the Term Loan Commitments shall automatically terminate without notice or demand on the Maturity Date. So long as no Default or Event of Default then exists or would result therefrom, the Borrower, may from time to time on at least three (3) Business Days' prior written notice received by the Administrative Agent and the Lender, and without any premium or penalty, permanently reduce, in whole but not in part, the Term Loan Commitment to an amount not less than the outstanding principal amount of the Term Loans. On the Maturity Date, the Borrower shall make Full Payment of all Obligations.

(b)    Voluntary Prepayments. The Borrower may prepay the Term Loans at any time without premium or penalty. Any such amounts prepaid may not be reborrowed. Any such prepayment shall be applied in accordance with Section 7.04 hereof.

Section 2.04    Mandatory Prepayments; Repayments.

(a)    Prepayment Events. The Obligations shall be subject to mandatory repayment or prepayment in accordance with the following provisions:

(i)    [Reserved].

(ii)    Proceeds of Equity Sales. Concurrently with the receipt by the Borrower or any of its Subsidiaries of the cash proceeds (net of underwriting discounts and commissions, placement agent fees and other customary fees and costs associated therewith) from any sale or issuance by the Borrower or any of its Subsidiaries of its own equity securities after the Closing Date, the Borrower will make a prepayment of the Obligations in an amount equal to 100% of such Net Cash Proceeds in accordance with Section 2.04(c).

(iii)    Proceeds of Asset Sales. Concurrently with the receipt by the Borrower or any of its Subsidiaries of any Cash Proceeds from any Asset Sale, an amount equal to 100% of the Net Cash Proceeds then received from any Asset Sale shall be applied as a mandatory prepayment of the Obligations in accordance with Section 2.04(c).

(iv)    Proceeds of Indebtedness. Concurrently with the receipt by the Borrower or any of its Subsidiaries of the cash proceeds (net of underwriting discounts and commissions, placement agent fees and other customary fees and costs associated therewith) from any sale or issuance of any Indebtedness (other than any Indebtedness incurred pursuant to Sections 6.04) after the Closing Date, the Borrower will make a prepayment of the Obligations in an amount equal to 100% of such Net Cash Proceeds in accordance with Section 2.04(c).

(v)    Proceeds of an Event of Loss. Concurrently with the receipt by the Borrower or any of its Subsidiaries of any Cash Proceeds from any Events of Loss, the Borrower will make a prepayment of the Obligations with an amount equal to 100% of the Net Cash Proceeds then received in accordance with Section 2.04(c).

NAI-1500501901v9

(vi)　　Extraordinary Receipts.  Concurrently with the receipt by the Borrower or any of its Subsidiaries of any Cash Proceeds from any Extraordinary Receipts, the Borrower will make a prepayment of the Obligations with an amount equal to 100% of the Net Cash Proceeds then received in accordance with Section 2.04(c).

(b)　　Notice of Mandatory Prepayment.  The Borrower shall give the Administrative Agent and the Lender one (1) Business Day prior written notice of any mandatory prepayments to be made under this Section 2.04.

(c)　　Applications of Prepayment Proceeds.  Each prepayment made or required to be made hereunder shall be applied in accordance with Section 7.04.

(d)　　Other Compensation.  Any prepayment made pursuant to this Section 2.04 shall be accompanied by any amounts payable in respect thereof under Sections 2.06 and 2.07.

(e)　　Repayments.

(i)　　All Obligations.  NOTWITHSTANDING ANYTHING CONTAINED HEREIN TO THE CONTRARY, ALL OBLIGATIONS (OTHER THAN UNASSERTED CONTINGENT AND INDEMNIFICATION OBLIGATIONS) SHALL BE AND BECOME IMMEDIATELY DUE AND PAYABLE IN FULL WITHOUT NOTICE OR DEMAND UPON THE OCCURRENCE OF THE MATURITY DATE FOR ANY REASON WHATSOEVER.

(ii)　　Term Loans.  Unless required to be repaid earlier in accordance with Section 2.04, the Term Loans shall be due and payable in full and the Term Loan Commitment shall be reduced to zero and terminate on the Maturity Date.

Section 2.05　　　　Method and Place of Payment.

(a)　　Generally.  All payments made by the Borrower hereunder or any other Credit Document, shall be made in immediately available funds, without setoff, recoupment, counterclaim or other defense.

(b)　　Payment of Obligations.  Except as specifically set forth elsewhere in this Agreement, all payments under this Agreement with respect to any of the Obligations shall be made to the Administrative Agent (for the account of itself and/or the Lender, as applicable) on the date when due and shall be made at the Payment Office in immediately available funds and shall be made in Dollars.

(c)　　Timing of Payments.  The Borrower shall make each payment hereunder (including, without limitation, fees and expenses) not later than 1:00 p.m. (New York time) on the day when due to the Administrative Agent at the Payment Office in immediately available funds.  The Administrative Agent shall promptly thereafter cause to be distributed immediately available funds relating to the payment of principal, interest or fees to the parties entitled thereto, in accordance with the application of payments set forth in Section 7.04.  Payments received by the Administrative Agent after 1:00 p.m. (New York time) shall be deemed to be received on the next Business Day.  Whenever any payment to be made hereunder shall be stated to be due on a day that is not a Business Day, the due date thereof shall be extended to the next succeeding Business Day and, with respect to payments of principal, interest shall be payable during such extension at the applicable rate in effect immediately prior to such extension.

Section 2.06　　　　Increased Costs, Illegality, etc.

NAI-1500501901v9

(a)     In the event that the Lender shall have determined on a reasonable basis (which determination shall, absent manifest error, be final and conclusive and binding upon all parties hereto):

(i)     at any time, that the Lender shall incur increased costs or reductions in the amounts received or receivable by it hereunder in an amount that the such Person deems material with respect to the Term Loans (other than any increased cost or reduction in the amount received or receivable resulting from the imposition of or a change in the rate of taxes or similar charges) because of (x) any change since the Closing Date in any applicable law, governmental rule, regulation, guideline, order or request (whether or not having the force of law and including, without limitation, the Dodd-Frank Wall Street Reform and Consumer Protection Act and any policy, request, guideline and directive, whether now or hereafter effected, in connection therewith), or in the interpretation or administration thereof and including the introduction of any new law or governmental rule, regulation, guideline, order or request (such as, for example, but not limited to, a change in official reserve requirements, but, in all events, excluding reserves already includable in the interest rate applicable to the Term Loans pursuant to this Agreement) or (y) other circumstances adversely affecting the London interbank market or the position of the Lender in any such market; or

(ii)     at any time, that the making of the Term Loans or any related transaction hereunder has become unlawful by compliance by the Lender in good faith with any change since the Closing Date in any law, governmental rule, regulation, guideline or order, or the interpretation or application thereof, or would conflict with any thereof not having the force of law but with which the Lender customarily complies, or has become impracticable as a result of a contingency occurring after the Closing Date that materially adversely affects the London interbank market;

then, and in each such event, the Lender shall (1) on or promptly following such date or time and (2) within ten (10) Business Days of the date on which such event no longer exists give notice to the Borrower (with a copy to the Administrative Agent) of such determination.  Thereafter, the Borrower shall pay to the Administrative Agent (for the account of the Lender), upon written demand therefor, such additional amounts (in the form of an increased rate of, or a different method of calculating, interest or otherwise as the Lender shall determine) as shall be required to compensate the Lender for such increased costs or reductions in amounts receivable hereunder (a written notice as to the additional amounts owed to the Lender submitted to the Borrower (with a copy to the Administrative Agent) by the Lender shall, absent manifest error, be final and conclusive and binding upon all parties hereto) as promptly as possible and, in any event, within the time period required by law.

(b)     If the Lender shall have determined that after the Closing Date, the adoption of any applicable law, rule or regulation regarding capital adequacy, or any change therein, or any change in the interpretation or administration thereof by any Governmental Authority, central bank or comparable agency charged by law with the interpretation or administration thereof, or compliance by the Lender or its parent corporation with any request or directive regarding capital adequacy (whether or not having the force of law) of any such authority, central bank, or comparable agency, in each case made subsequent to the Closing Date, has or would have the effect of reducing by an amount reasonably deemed by the Lender to be material to the rate of return on the Lender's or its parent corporation's capital or assets as a consequence of the Lender's obligations hereunder to a level below that which the Lender or its parent corporation's could have achieved but for such adoption, effectiveness, change or compliance (taking into consideration the Lender's or its parent corporation's policies with respect to capital adequacy), then from time to time, within 15 days after demand (with a copy to the Administrative Agent) by the Lender, the Borrower shall pay to the Administrative Agent (for the account of the Lender) such additional amount or amounts as will compensate the Lender or its parent corporation's for such reduction.  The Lender, upon

NAI-1500501901v9

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 70 of 136

determining in good faith that any additional amounts will be payable pursuant to this Section 2.06(b), will give prompt written notice thereof to the Borrower (with a copy to the Administrative Agent), although the failure to give any such notice shall not release or diminish any of the Borrower's obligations to pay additional amounts pursuant to this Section 2.06(b) upon the subsequent receipt of such notice.

Section 2.07    Breakage Compensation.  The Borrower shall compensate the Lender by payment to the Administrative Agent (for the account of the Lender), upon Lender's written request (with a copy to the Administrative Agent), for all reasonable losses, costs, expenses and liabilities (including, without limitation, any loss, cost, expense or liability incurred by reason of the liquidation or reemployment of deposits or other funds required by the Lender to make any Term Loan and costs associated with foreign currency hedging obligations incurred by the Lender in connection with its funding of any Term Loan) which the Lender may sustain in connection with any of the following: (i) if any repayment or prepayment occurs on a date that is not the last day of an interest period applicable thereto; (ii) if any prepayment of any Term Loan is not made on any date specified in a notice of prepayment given by the Borrower; or (iii) as a consequence of any other default by the Borrower to repay or prepay the Term Loans when required by the terms of this Agreement.  The written request of the Lender (with a copy to the Administrative Agent) setting forth any amount or amounts that the Lender is entitled to receive pursuant to this Section 2.07 shall be delivered to the Borrower and shall be conclusive absent manifest error.  The Borrower shall pay the Administrative Agent (for the account of the Lender) the amount shown as due on any such request within 5 days after receipt thereof.

Section 2.08    Effect of Termination.  On the Maturity Date, the Obligations shall be immediately due and payable.  Until Full Payment of the Obligations, all undertakings of the Borrower contained in the Credit Documents shall continue, and Administrative Agent shall retain its Liens in the Collateral and all of its rights and remedies under the Credit Documents and the Financing Orders.

Section 2.09    Waivers.

(a)    The Borrower expressly waives all rights that it may have now or in the future under any statute, at common law, in equity or otherwise, to compel the Administrative Agent or the Lender to marshal any assets in favor of the Borrower or any other Person or against or in payment of any or all of the Obligations.

(b)    The Administrative Agent and the Lenders may, in their discretion, pursue such rights and remedies as they deem appropriate, including realization upon Collateral or any Real Property by judicial foreclosure or nonjudicial sale or enforcement, without affecting any rights and remedies under the Credit Documents.  If, in taking any action in connection with the exercise of any rights or remedies, the Administrative Agent or any Lender shall forfeit any other rights or remedies, including the right to enter a deficiency judgment against the Borrower or other Person, whether because of any Requirement of Law pertaining to "election of remedies" or otherwise, the Borrower consents to such action and waives any claim based upon it, even if the action may result in loss of any rights of subrogation that the Borrower might otherwise have had.  The Borrower waives all rights and defenses arising out of an election of remedies, such as nonjudicial foreclosure with respect to any security for the Obligations, even though that election of remedies destroys such the Borrower's rights of subrogation against any other Person.  The Administrative Agent may bid all or a portion of the Obligations at any foreclosure, trustee or other sale, including any private sale, and the amount of such bid need not be paid in cash by Administrative Agent but shall be credited against the Obligations.  The amount of the successful bid at any such sale, whether the Administrative Agent or any other Person is the successful bidder, shall be conclusively deemed to be the fair market value of the Collateral, and the difference between such bid amount and the remaining balance of the Obligations shall be conclusively deemed to be the amount of

NAI-1500501901v9

the Obligations owing by the Borrower, notwithstanding that any present or future law or court decision may have the effect of reducing the amount of any deficiency claim to which the Administrative Agent or any Lender might otherwise be entitled but for such bidding at any such sale.

Section 2.10      Superpriority Nature of Obligations and Lenders' Liens.   The Borrower represents, warrants, covenants and agrees that:

(a)      The priority of the Administrative Agent's and Lenders' Liens on the Collateral shall be as set forth in the Financing Orders.

(b)      In accordance with Section 364(c)(1) of the Bankruptcy Code, the Obligations shall (i) constitute claims with priority in payment over any and all administrative expenses, unsecured claims and all other claims against the Debtor, now existing or hereafter arising, of any kind whatsoever, including, without limitation, (1) all administrative expenses of the kind specified in Sections 503(b) and 507(b), (2) any and all administrative expenses and other claims of the kinds specified or ordered pursuant to any provision of the Bankruptcy Code, including, but not limited to, Sections 105, 326, 328, 330, 331, 364(c), 503(a), 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code, including those resulting from the conversion of any of the Chapter 11 Case pursuant to Section 1112 of the Bankruptcy Code, whether or not such expenses or claims may become secured by a Lien, levy or attachment, and (3) the Prepetition claims and adequate protection claims of the Prepetition Agent on behalf of the Prepetition Lenders, subject only to the Carve-Out, and (ii) be payable from and have recourse to all Collateral, including all pre- and Postpetition property of the Debtor and all proceeds thereof (other than Avoidance Actions).

(c)      Upon entry of the Interim Order, the Administrative Agent, for the benefit of itself and the Lender, will be granted valid and perfected security interests and Liens on the Collateral, subject only to the Carve-Out, as follows (i) pursuant to Section 364(c)(2) of the Bankruptcy Code, a first priority perfected Lien on and security interest in all of the Debtor's right, title and interest in, to and under all Collateral, excluding Avoidance Actions, that is not otherwise subject to or encumbered by a validly perfected unavoidable security interest or Lien on the Petition Date, (ii) pursuant to Section 364(c)(3) of the Bankruptcy Code, a second priority perfected Lien on and security interest in all of the Debtors' right, title and interest in, to and under all Collateral that is subject to or encumbered by a Permitted Lien that was perfected prior to the Petition Date or subject to a Lien or security interest in existence on the Petition Date that is perfected subsequent thereto as permitted by Section 546(b) of the Bankruptcy Code (other than the priming Liens and security interests granted pursuant to clause (iii) below) (in each case, only to the extent any such Lien is approved in writing by the Administrative Agent and the Lender) and (iii) pursuant to Section 364(d)(1) of the Bankruptcy Code, a first priority, senior, priming, perfected Lien on and security interest in all of the Debtor's right, title and interest in, to and under the Collateral (whether existing as of the Petition Date or acquired Postpetition, other than Avoidance Actions) that is not subject to or encumbered by a Permitted Lien that was perfected prior to the Petition Date or not subject to a Lien or security interest in existence on the Petition Date that is perfected subsequent thereto (in each case, only to the extent any such Lien is approved in writing by the Administrative Agent and the Lender); for the avoidance of doubt, pursuant to Section 364(d) of the Bankruptcy Code, the security interests and liens granted to the Administrative Agent, for the benefit of the Lender, shall have priority over any and all liens and security interests securing the Prepetition Obligations.

Section 2.11      No Discharge; Survival of Claims.   The Debtor agrees that (a) the Obligations hereunder shall not be discharged by the entry of an order confirming a Plan of Reorganization in the Chapter 11 Case (and the Debtor pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (b) the superpriority administrative claim granted to the Administrative Agent, for the benefit of the Lender, pursuant to the Financing Orders and described in

NAI-1500501901v9

this Section 2.11 and the Liens granted to the Administrative Agent pursuant to the Financing Orders and described in this Section 2.11 shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization in the Chapter 11 Case.

Section 2.12 **Release**. The Borrower hereby acknowledges effective upon the entry of each Financing Order, that the Borrower has no defense, counterclaim, offset, recoupment, cross-complaint, claim or demand of any kind or nature whatsoever that can be asserted to reduce or eliminate all or any part of the Borrower's liability to pay or repay the Administrative Agent, or the Lender as provided in this Agreement or the other Credit Documents, the Prepetition Agent, or the Prepetition Lender as provided in the Prepetition Note Purchase Agreement or the other Prepetition Note Purchase Documents or to seek affirmative relief or damages of any kind or nature from the Administrative Agent or the Lender or the Prepetition Agent or the Prepetition Lender. The Debtor, on behalf of itself and its bankruptcy estate, and on behalf of all their successors, assigns, Subsidiaries, guarantors and any Affiliates and any Person acting for and on behalf of, or claiming through them, (collectively, the "Releasing Parties"), hereby, effective upon the entry of the Final Order, fully, finally and forever release and discharge the Administrative Agent, the Lender, the Prepetition Agent, and the Prepetition Lender, and all of the Administrative Agent's, the Lender's, the Prepetition Agent's and the Prepetition Lender's past and present officers, directors, agents, attorneys, assigns, heirs, parents, subsidiaries, and each person acting for or on behalf of any of them (collectively, the "Released Parties") of and from any and all past and present actions, causes of action, demands, suits, claims, liabilities, Liens, lawsuits, adverse consequences, amounts paid in settlement, costs, damages, debts, deficiencies, diminution in value, disbursements, expenses, losses and other obligations of any kind or nature whatsoever, whether in law, equity or otherwise (including, without limitation, those arising under Sections 541 through 550 of the Bankruptcy Code and interest or other carrying costs, penalties, legal, accounting and other professional fees and expenses, and incidental, consequential and punitive damages payable to third parties), whether known or unknown, fixed or contingent, direct, indirect, or derivative, asserted or unasserted, foreseen or unforeseen, suspected or unsuspected, now existing, heretofore existing or which may heretofore accrue against any of the Released Parties, whether held in a personal or representative capacity, and which are based on any act, fact, event or omission or other matter, cause or thing occurring at or from any time prior to and including the date hereof in any way, directly or indirectly arising out of, connected with or relating to this Agreement, the Credit Documents, the Prepetition Note Purchase Agreement, the Prepetition Note Purchase Documents, the Financing Orders and the transactions contemplated hereby and thereby, and all other agreements, certificates, instruments and other documents and statements (whether written or oral) related to any of the foregoing; provided, that nothing contained herein shall be deemed to limit or modify the rights granted to third parties under the Financing Orders.

Section 2.13 Waiver of any Priming Rights. Upon the Closing Date, and on behalf of itself and its estate, and for so long as any Obligations shall be outstanding, the Borrower hereby irrevocably waives any right, pursuant to Sections 364(c) or 364(d) of the Bankruptcy Code or otherwise, to grant any Lien of equal or greater priority than the Obligations (or the adequate protection claims and Liens, if any, granted to the Prepetition Agent and/or the Prepetition Lender, in the Financing Orders), unless effective upon the granting of any such Lien or claim, the Obligations and adequate protection obligations shall be paid in full in cash and the Term Loan Commitments are terminated.

ARTICLE III.

CONDITIONS PRECEDENT

Section 3.01 Conditions Precedent at Closing Date. In addition to the conditions set forth in Section 3.02, this Agreement shall not be deemed to be of any force or effect and the Lender shall not be required to fund any requested Term Loan or otherwise extend credit to the Borrower hereunder and

NAI-1500501901v9

Case: 15-31141 Doc# 10 Filed: 09/10/15 Entered: 09/10/15 06:48:32 Page 73 of 136

the Debtor shall not be permitted to use any Cash Collateral, until the date (the "Closing Date") that each of the following conditions has been satisfied (or waived in accordance with Section 9.11) (it being acknowledged that all deliveries to the Administrative Agent and Lender need to be in form and substance and in quantities acceptable to the Administrative Agent and the Lender):

       (i)     Credit Documents. Each Credit Document and all other instruments, documents, certificates and agreements as identified in the Closing Documents List shall have been duly executed and delivered to the Lender by each of the signatories thereto, and the Borrower shall be in compliance with all terms thereof. The Term Loan Note shall have been executed by the Borrower and delivered to the Lender.

       (ii)    First Day Motions and Orders. The Chapter 11 Case shall have commenced in the Bankruptcy Court and (i) all First Day Motions and Orders set forth in Part A of Schedule 1.01(ii) are filed in the Chapter 11 Case and (ii) all First Day Orders set forth in Part B of Schedule 1.01(ii) shall have been entered by the Bankruptcy Court, in each case, in form and substance reasonably satisfactory to the Lender.

       (iii)   Budget. The Lender shall have received a cash forecast for the three (3) week period commencing on, and immediately following, the Petition Date setting forth projected receipts, cash flows, disbursements and sales, to be in form, scope and substance acceptable to the Lender and attached hereto as Exhibit D (the "Initial Approved Budget").

       (iv)   Interim Order. (i) The Bankruptcy Court shall have entered the Interim Order not later than three (3) Business Days after the Petition Date, which order: (1) shall be satisfactory in form and substance to the Lender and the Administrative Agent, (2) shall have been entered upon an application or motion of the Debtor reasonably satisfactory in form and substance to the Lender and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by the Lender and the Administrative Agent, (3) shall authorize Term Loans in an aggregate principal amount not to exceed the Interim Advance Amount during the Interim Period, and (4) shall be in full force and effect and shall not have been amended, supplemented, altered, stayed, vacated, rescinded or otherwise modified without the prior written consent of the Lender and the Administrative Agent; and, if the Interim Order is the subject of a pending appeal in any respect, neither the making of such Term Loans nor the performance by the Borrower of any of its obligations hereunder, under the Credit Documents or under the Interim Order shall be the subject of a presently effective stay pending appeal, and (ii) the Debtor shall be in compliance in all respects with the Interim Order.

       (v)    Cash Management Order. (i) The Bankruptcy Court shall have entered an order seeking approval and maintenance of the Prepetition cash management arrangements (the "Cash Management Order"), which order, when entered upon an application or motion of the Debtor, (1) shall be reasonably satisfactory in form and substance to the Lender and upon prior notice to such parties required to receive such notice and such other parties as may be reasonably requested by the Lender, and (2) shall be in full force and effect and shall not have been amended, supplemented, altered, stayed, vacated, rescinded or otherwise modified without the prior written consent the Lender, and (ii) the Debtor shall be in compliance in all respects with the Cash Management Order.

       (vi)   Real Property; Landlord's Agreements. The Interim Order shall have been entered pursuant to Section 3.01(iv) and, among other things, (i) shall grant first priority, perfected Liens on and security interests in all existing and hereafter acquired Real Property of the Debtor without any need or requirement that the Administrative Agent enter into or file a

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 74 of 136

Mortgage or similar document to obtain such first priority Lien on or security interest in such Real Property, (ii) shall provide that the Administrative Agent and the Lender shall have the full benefit of all Landlord's Agreements delivered by the Borrower in connection with the Prepetition Note Purchase Documents as if such documents were delivered in connection with this Agreement, (iii) shall provide that the Administrative Agent shall be entitled to receive all notices or other documents to which the Prepetition Agent is entitled thereunder and (iv) such Landlord's Agreements shall be deemed to be Landlord's Agreements under this Credit Agreement and the other Credit Documents for all purposes.

(vii)    Control Agreements.  The Interim Order shall have been entered pursuant to Section 3.01(iv) and, among other things, shall (1) grant first priority, perfected Liens on and security interests in all dominion accounts, deposit accounts, securities accounts, commodity accounts and other accounts of the Debtor, (2) provide that for all purposes of this Agreement, the other Credit Documents and the Financing Orders, that the neither the Administrative Agent nor the Lender shall be required to enter into or obtain any Control Agreements to obtain such first priority, perfected Lien or security interest in any such accounts and (3) provide that for all purposes of this Credit Agreement, the other Credit Documents and the Financing Orders, the administrative Agent shall have the full benefit of the Control Agreements delivered to the Prepetition Agent in connection with the Prepetition Note Purchase Documents as if such documents were delivered in connection herewith.

(viii)    Indebtedness.  Immediately after giving effect to the transactions contemplated by this Agreement and the other Credit Documents, the Borrower shall have no Indebtedness other than the Obligations, the Prepetition Obligations and such other Indebtedness permitted pursuant to Section 6.04.

(ix)    Closing Certificate.  The Lender shall have received certificates, in form and substance satisfactory to it, from the Chief Executive Officer of the Borrower certifying that, at and as of the Closing Date, both before and after giving effect to the initial Term Loans (and the application of the proceeds thereof) and the transactions hereunder, (i) subject to the Effect of Bankruptcy, no Default or Event of Default under this Agreement or any other Credit Document exists and no default or event of default under any other material Indebtedness (including the Prepetition Note Purchase Documents), agreement or contract of the Borrower or any of its Subsidiaries would result from the execution and performance of this Agreement and any other Credit Document; (ii) all representations and warranties of the Borrower set forth in each Credit Document (including, without limitation, the representations and warranties set forth in Article IV) are true and correct; and (iii) the Borrower has complied with all agreements and conditions to be satisfied by it under the Credit Documents and each such condition has been satisfied.

(x)    Corporate Documents. The Lender shall have received a certificate of the Secretary of the Borrower, certifying (i) that attached copies of the Borrower's organizational documents, which with respect to the articles or certificate of incorporation, articles of organization or certificate of formation, are certified by the appropriate governmental official of the Borrower's jurisdiction or organization or formation, are true and complete, and in full force and effect, without amendment except as shown; (ii) that an attached copy of resolutions authorizing execution and delivery of the Credit Documents is true and complete, and that such resolutions are in full force and effect, were duly adopted, have not been amended, modified or revoked, and constitute all resolutions adopted with respect to this credit facility; and (iii) to the title, name and signature of each Person authorized to sign the Credit Documents.  The Administrative Agent and the Lender may conclusively rely on this certificate until it is otherwise notified by the Borrower in writing.

NAI-1500501901v9

(xi)     Good Standing.  The Lender shall have received good standing certificates for the Borrower, issued by the Secretary of State or other appropriate official of the Borrower's jurisdiction of organization.

(xii)     [Reserved].

(xiii)     [Reserved].

(xiv)     Fees and Expenses.  The Administrative Agent and the Lender shall have received payment from the Borrower of all fees due and payable to the Administrative Agent and/or the Lender on or prior to the Closing Date, together with all expenses (including reasonable legal fees and expenses of Jones Day, and any other legal counsel to the Administrative Agent and/or the Lender and the reasonable fees and expenses of any consultants and other advisors to the Administrative Agent and/or the Lender) required to be reimbursed or paid by the Borrower hereunder, under any other Credit Document or under the Prepetition Note Purchase Documents, plus such additional amounts of such expenses as shall constitute the Administrative Agent's or the Lender's reasonable estimate of such expenses incurred or to be incurred by the Administrative Agent and the Lender  through the closing proceedings (provided, that such estimate shall not thereafter preclude final settling of accounts between the Borrower, the Administrative Agent and the Lender).

(xv)     [Reserved].

(xvi)     Litigation.  Other than the commencement of the Chapter 11 Case and the Effect of Bankruptcy and for litigation that is stayed by the commencement and continuation of the Chapter 11 Case, the Lender shall have received evidence satisfactory to it that no any action, suit, investigation, proceeding or litigation (including derivative actions) pending or threatened in any court or before any arbitrator or governmental authority that, in the sole judgment of the Lender, (a) has caused or could reasonably be expected to cause a Material Adverse Effect or (b) challenges the validity, permissibility or legality of the transactions contemplated by the Credit Documents or otherwise could reasonably be expected to impair the ability of the Borrower to perform its obligations, or consummate the financings, under the Credit Documents, including repayment of any Obligations.

(xvii)     Security Interest; Filings, Registrations and Recordings.  The Administrative Agent shall have received each document (including Uniform Commercial Code financing statements) required by the Security Documents or under law or reasonably requested by the Administrative Agent to be filed, registered or recorded in order to create or reaffirm in favor of the Administrative Agent, for the benefit of the Lender, a perfected Lien on the Collateral described therein, prior to any other Liens and the only liens on the Collateral, other than Permitted Liens and any other Liens in respect of which the Administrative Agent shall have received fully-executed copies of all payoff letters, lien release and lien modifications, in each case, in form and substance reasonably satisfactory to it, to ensure to its reasonable satisfaction the release of any and all such Liens, and in proper form for filing, registration or recording, including without limitation, UCC financing statements, the Security Agreement, the Collateral Assignment Agreements and Control Agreements.

(xviii)     Insurance.  The Lender shall be reasonably satisfied with the insurance program to be maintained by the Borrower and it and the Administrative Agent shall have (i) received copies of all insurance policies carried by the Borrower, (ii) received certificates of insurance and other evidence reasonably satisfactory to it of compliance with the insurance requirements of this

NAI-1500501901v9

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 76 of 136

Agreement and the Collateral Documents and (iii) been named as a lender loss payee on the property insurance policies of the Borrower.

(xix)    <u>Search Reports</u>.  The Lender shall have received and be satisfied with the results of all lien search reports relating to the Borrower from the relevant jurisdictions relating thereto, and such searches shall reveal no Liens on the assets of the Borrower, other than Permitted Liens and such other Liens to be released on or prior to the Closing Date in accordance with clause (xvii) above.

(xx)    <u>Use of Cash Collateral Prior to Closing Date</u>.  During the period commencing on the Petition Date through the Closing Date, the Debtor shall not have used Cash Collateral except in accordance with the Approved Budget.

(xxi)    <u>Patriot Act</u>.  The Administrative Agent and the Lenders shall have received, and be reasonably satisfied in form and substance with, all documentation and other information required by bank regulatory authorities under applicable anti-money laundering rules and regulations, including without limitation the Patriot Act.

(xxii)    <u>No Default; Representations and Warranties</u>.  At and as of the Closing Date, both before and after giving effect to the initial Term Loans (and the application of the proceeds thereof) and the transactions hereunder, (i) subject to the Effect of Bankruptcy, no Default or Event of Default under this Agreement or any other Credit Document exists and no default or event of default under any other material Indebtedness (including the Prepetition Note Purchase Documents), agreement or contract of the Borrower would result from the execution and performance of this Agreement and any other Credit Document; and (ii) all representations and warranties of the Borrower set for forth in each Credit Document (including, without limitation, the representations and warranties set forth in Article IV) are true and correct in all respects, except to the extent that such representations and warranties expressly relate to an earlier specified date, in which case such representations and warranties shall have been true and correct in all respects as of the date when made.

(xxiii)    <u>Other</u>.  Such other documents, instruments, certificates or agreements as the Administrative Agent or the Lender may reasonably request.

The acceptance of the benefits of the initial Term Loans and other transactions contemplated hereunder shall constitute a representation and warranty by the Borrower to the Administrative Agent and the Lender that all of the applicable conditions specified in this <u>Section 3.01</u> have been satisfied as of the times referred to in this <u>Section 3.01</u>.

Section 3.02    <u>Conditions to Each Credit Extension</u>.  In addition to the conditions set forth in <u>Section 3.01</u> and without in any way limiting Lender's sole and absolute discretion to make or refuse to make any Term Loans, the Borrower, the Lender and the Administrative Agent hereby agree that no funding of Term Loans (including the initial Term Loans on the Closing Date) shall be requested or be made (or the proceeds thereof accepted by the Borrower) unless the following conditions are satisfied at the time thereof:

(a)    <u>Notice of Borrowing</u>.  With respect to the funding of any Term Loan, the Administrative Agent and the Lender shall have received a fully executed Notice of Borrowing as required by Section 2.01(d), which Notice of Borrowing shall specify (i) the amount and proposed date of such Borrowing and (y) the proposed use of the proceeds of such Borrowing and the conformance thereof with the Approved Budget.

NAI-1500501901v9

(b)    Compliance with Warranties, No Default, etc.  Both before and after giving effect to such funding of a Term Loan:

(i)    No Default or Event of Default shall exist at the time of, or result from, such request or funding;

(ii)    The representations and warranties of the Borrower in this Agreement and each of the other Credit Documents shall be true and correct in all material respects on the dates of, and upon giving effect to, such request and funding with the same effect as though such representations and warranties had been made on and as of such dates, except for representations and warranties that expressly relate to an earlier date) in which case such representation or warranty shall be true and correct in all material respects (or in all respects, as applicable) as of such earlier date *provided* that any representation and warranty that is qualified as to "materiality", "Material Adverse Effect" or similar language shall be true and correct (after giving effect to any qualification therein) in all respects on such respective dates;

(iii)    No Material Adverse Effect shall have occurred and be continuing or would result therefrom;

(iv)    After giving effect thereto, any such funding, will not cause the aggregate principal amount of all outstanding Term Loans to exceed (i) during the Interim Period, the Interim Advance Amount, (ii) the Term Loan Commitment and (iii) the maximum amount thereof set forth in the Approved Budget for the week then ended;

(v)    The Cash Management Order shall be in full force and effect and shall not have been amended, supplemented, altered, stayed, vacated, rescinded or otherwise modified without the prior written consent of the Lender;

(vi)    (1) If such Borrowing is to be made after the date twenty-one (21) days after the Petition Date, the Bankruptcy Court shall have entered the Final Order on or prior to such date, (2) the Interim Order or the Final Order, as the case may be, shall not have been vacated, reversed, modified or amended without the Lender's written consent, (3) a motion for reconsideration of any such order shall not have been filed or (4) an appeal of any such order shall not have been filed and the making of any Term Loans, the use of Cash Collateral in accordance with this Agreement and the Financing Orders, the granting of superpriority claim status with respect to the Obligations, the granting of the Liens described herein and in the Financing Orders or the performance by the Borrower of its obligations under this Agreement and/or the Financing Orders shall not be the subject of a presently effective stay pending appeal; and

(vii)    the Maturity Date shall not have occurred or result therefrom.

(e)    Payment of Fees.  The Administrative Agent and the Lender shall have received payment of any fees and expenses due and owing by the Borrower with respect to the making of any such funding.

Each request for the making of a Term Loan and the acceptance by the Borrower of the benefits of each funding pursuant hereto shall constitute a representation and warranty by the Borrower to the Administrative Agent and the Lender that all of the applicable conditions in this Section 3.02 have been satisfied at such time (both immediately before and after giving effect thereto).  As an additional condition to any making of a Term Loan, the Administrative Agent and the Lender shall have received

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 78 of 136

such other information, documents, instruments and agreements as it deems appropriate in connection therewith. For the purpose of determining compliance with the conditions specified in this Article III, Lender shall be deemed to have accepted, and to be satisfied with, each document or other matter required under this Article III unless the Administrative Agent shall have received written notice from Lender prior to the proposed Borrowing specifying its objection thereto. Notwithstanding anything contained herein to the contrary, in no event shall the Administrative Agent be responsible or liable for determining whether any conditions precedent set forth in this Article III have been satisfied.

ARTICLE IV.

REPRESENTATIONS AND WARRANTIES

In order to induce the Administrative Agent and the Lender to enter into this Agreement and to make available the Term Loans and other financial accommodations contemplated hereby, the Borrower makes and remakes as provided in this Agreement the following representations and warranties to, and agreements with, the Lender and the Administrative Agent, all of which shall survive the execution and delivery of this Agreement and the making of any Term Loan:

Section 4.01    Corporate Status; Capitalization.

(a)    Schedule 4.01(a) hereto sets forth, as of the Closing Date, a true, correct and complete list of the current jurisdiction of organization of the Borrower and its Subsidiaries, all jurisdictions in which such Persons are qualified to do business as foreign corporations as of the Closing Date and the organizational identification numbers of each of such Person (and the direct and indirect ownership of the Borrower therein). Each of the Borrower and its Subsidiaries (i) is a corporation or limited liability company duly organized, validly existing and in good standing under the laws of the state of its incorporation or organization, (ii) has the power and authority to own its properties and assets and to transact the businesses in which it is presently, or proposes to be, engaged and (iii) is duly qualified and is authorized to do business and is in good standing in every jurisdiction in which the failure to be so qualified does not have or could reasonably be expected to have a Material Adverse Effect.

(b)    All of the Capital Stock of the Borrower and its Subsidiaries is validly issued, fully paid, non-assessable and free of any liens or encumbrances, subject only to the Administrative Agent's Lien and the Lien in favor of the Prepetition Agent securing the Prepetition Obligations. Schedule 4.01(b) sets forth a summary of all the issued and outstanding Capital Stock of the Borrower and each of its Subsidiaries, as of the Closing Date. Other than as set forth on Schedule 4.01(b), as of the Closing Date there are no outstanding subscriptions, options, rights, calls, rights of conversion, redemption, purchase or repurchase, rights of first refusal, commitments or other agreements (other than stock options, warrants and the like granted to current or former employees, consultants, directors and directors' qualifying shares and the like) of any nature relating to such Capital Stock, except as created by the Prepetition Note Purchase Documents.

(c)    Upon entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, and subject to the terms thereof, no consent of any Person including any other general or limited partner, any other member of a limited liability company, any other shareholder or any other trust beneficiary is necessary or desirable in connection with the creation, perfection or first priority status of the security interest of the Administrative Agent in any Capital Stock pledged to the Administrative Agent for the benefit of the Lender under the Security Agreement or the exercise by the Administrative Agent of the voting or other rights provided for in the Security Agreement or the exercise of remedies in respect thereof.

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 79 of 136

Section 4.02        Corporate Power and Authority.  Subject to the entry of the Interim Order (or the Final Order, when applicable) by the Bankruptcy Court, the Borrower has the corporate or other organizational power and authority to execute, deliver and carry out the terms and provisions of the Credit Documents to which it is party and has taken all necessary corporate or other organizational action to authorize the execution, delivery and performance of the Credit Documents to which it is party.  Subject to the entry of the Interim Order (or the Final Order, when  applicable) by the Bankruptcy Court, the Borrower has duly executed and delivered each Credit Document to which it is party and each Credit Document to which it is party constitutes the legal, valid and binding agreement and obligation of the Borrower enforceable in accordance with its terms, except to the extent that the enforceability thereof may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or other similar laws generally affecting creditors' rights and by equitable principles (regardless of whether enforcement is sought in equity or at law).

Section 4.03        No Violation.  Subject to the entry of the Interim Order (or the Final Order, when  applicable) by the Bankruptcy Court, neither the execution, delivery and performance by the Borrower of the Credit Documents to which it is party nor compliance with the terms and provisions thereof (i) will contravene any provision of any law, statute, rule, regulation, order, writ, injunction or decree of any Governmental Authority applicable to the Borrower or its properties and assets, (ii) will conflict with or result in any breach of, any of the terms, covenants, conditions or provisions of, or constitute a default under, or result in the creation or imposition of (or the obligation to create or impose) any Lien upon any of the property or assets of the Borrower, except for Permitted Liens (including pursuant to the Financing Orders), or (iii) will violate any provision of the Organizational Documents of the Borrower.

Section 4.04        Governmental Approvals.  Subject to the entry of the Interim Order (or the Final Order, when  applicable) by the Bankruptcy Court, the Borrower and each Subsidiary has, and is in compliance with, and is in good standing with respect to, all governmental approvals necessary to conduct its business and to own, lease and operate its properties, and no order, consent, approval, license, authorization, or validation of, or filing, recording or registration with, or exemption by, any Governmental Authority is required to authorize or is required as a condition to (i) the execution, delivery and performance by the Borrower of any Credit Document to which it is a party or any of its obligations thereunder, or (ii) the legality, validity, binding effect or enforceability of any Credit Document to which the Borrower is a party. The Borrower and its Subsidiaries each has obtained and holds in full force and effect, all material franchises, licenses, leases, permits, certificates, authorizations, qualifications, easements, rights of way and other rights and approvals which are necessary for the operation of the Borrower's business as presently conducted and as proposed to be conducted.  Neither the Borrower nor any of its Subsidiaries is in violation of the terms of any such franchise, license, lease, permit, certificate, authorization, qualification, easement, right of way, right or approval in any such case.

Section 4.05        Litigation.  Except for the Chapter 11 Case and as otherwise set forth on Schedule 4.05, no judgments, orders, writs or decrees are outstanding against the Borrower or any of its Subsidiaries nor is there now pending or, to the Knowledge of the Borrower, threatened any action, suit, proceeding, litigation, contested claim, investigation, arbitration, or governmental proceeding by or against the Borrower or any of its Subsidiaries, or that question the validity or enforceability of any of the Credit Documents, or of any action to be taken by the Borrower pursuant to any of the Credit Documents. Neither the Borrower nor any Subsidiary is in default with respect to any order, injunction or judgment of any Governmental Authority.

Section 4.06        Margin Regulations. No part of the proceeds of the Term Loans will be used directly or indirectly to purchase or carry Margin Stock, or to extend credit to others for the purpose of purchasing or carrying any Margin Stock, in violation of any of the provisions of Regulations T, U or X

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 80 of 136

of the Board of Governors of the Federal Reserve System. Neither the Borrower nor any of its Subsidiaries is engaged in the business of extending credit for the purpose of purchasing or carrying any Margin Stock. At no time would more than 25% of the value of the assets of the Borrower or of the Borrower and its consolidated Subsidiaries that are subject to any "arrangement" (as such term is used in Section 221.2(g) of such Regulation U) hereunder be represented by Margin Stock.

Section 4.07    Financial Statements; Approved Budget.

(a)    The consolidated balance sheets, and related statements of income, cash flow and shareholder's equity, of the Borrower and its Subsidiaries that have been and/or which are hereafter delivered to the Administrative Agent and/or the Lender, are prepared in accordance with GAAP and fairly present the financial positions and results of operations of the Borrower and its Subsidiaries at the dates and for the periods indicated. All Projections delivered from time to time to the Administrative Agent and/or the Lender (including, without limitation, the Approved Budget) have been prepared in good faith, based on reasonable assumptions in light of the circumstances at such time; provided, however, that no representation or warranty is made as to the impact of future general economic conditions or as to whether the Borrower's projected consolidated results as set forth in the Projections will actually be realized, it being recognized by the Lender that such projections as to future events are not to be viewed as facts and that actual results for the periods covered by the Projections my differ materially from the Projections.

(b)    The Approved Budget reasonably presents, in all material respects, on a pro forma basis, the projected financial operations and disbursements of the Borrower for the period specified therein and such projections in the view of the management of the Borrower, are reasonably achievable based upon reasonable assumptions and other information available to the Borrower as of the first day of such period.

Section 4.08    [Reserved].

Section 4.09    [Reserved].

Section 4.10    Tax Returns and Payments. Other than as set forth on Schedule 4.10, the Borrower and each of its Subsidiaries has timely filed all federal income tax returns and all other tax returns, domestic and foreign, required to be filed by it and has paid all taxes and assessments payable by it (including all sales and use taxes) that have become due, other than those not yet delinquent and except for those contested in good faith, and all such tax returns are true and correct in all material respects. The Borrower and each of its Subsidiaries has established on its books such charges, accruals and reserves in respect of taxes, assessments, fees and other governmental charges for all fiscal periods as are required by GAAP. The amount which has been reserved for on its books and records for all tax liabilities is (x) sufficient in accordance with GAAP and (y) is in an amount sufficient to satisfy all known or reasonably estimable potential sums owing in respect thereof (together with all penalties and interest). Other than as set forth on Schedule 4.10, and as to which scheduled items, the Borrower represents that no such individual item or in the aggregate would have or could reasonably be expected to have a Material Adverse Effect, as of the Closing Date, no such tax return is under audit or examination by any Governmental Authority and no notice of such an audit or examination or any assertion of any claim for taxes has been given or made by any Governmental Authority. All taxes, assessments, fees and other governmental charges have been paid, or are being contested in good faith an in connection therewith are being fully reserved therefor on such Person's books and records, and neither the Borrower nor any of its Subsidiaries has any liability for taxes in excess of the amounts so paid or so reserved.

Section 4.11    Customers; Contracts. Schedule 4.11 of the Prepetition Note Purchase Agreement (as in effect immediately prior to the Petition Date) sets forth a complete list of all customers

of the Borrower and each Subsidiary as of the Closing Date (each, a "<u>Revised Current Customer</u>") along with the commercial contract associated with each such Current Customer ("<u>Revised Current Customer Contract</u>"). Other than (i) as an Effect of Bankruptcy and (ii) as set forth on such <u>Schedule 4.11</u>, to the Knowledge of the Borrower, no Revised Current Customer intends to do any of the following: (a) terminate its Revised Current Customer Contract, (b) not renew its Revised Current Customer Contract at the end of the current term of such contract or (c) seek a material reduction in the fees that would otherwise be due under its Revised Current Customer Contract based on its terms.

Section 4.12    <u>Suppliers; Contracts</u>. Schedule 4.12 of the Prepetition Note Purchase Agreement (as in effect immediately prior to the Petition Date) sets forth a complete list of all suppliers of the Borrower and each Subsidiary to which the Borrower or a Subsidiary paid fees exceeding one hundred thousand dollars ($100,000) in its most recent fiscal year ending prior to the Closing Date or expects to pay fees exceeding one hundred thousand dollars ($100,000) in its current fiscal year (each, a "<u>Revised Material Supplier</u>") along with the commercial contract associated with each such Material Supplier ("<u>Revised Material Supplier Contract</u>"). Other than (i) as an Effect of Bankruptcy and (ii) as otherwise described in such <u>Schedule 4.12</u>, to the Knowledge of the Borrower, no Revised Material Supplier intends to do any of the following: (a) terminate its Revised Material Supplier Contract, (ii) not renew its Revised Material Supplier Contract at the end of the current term of such contract or (iii) seek a material reduction in the nature or volume of products or services that it currently provides or is anticipated to provide under the Revised Material Supplier Contract..

Section 4.13    <u>Title to Properties, etc</u>. The Borrower and each of its Subsidiaries has good and marketable title, in the case of Real Property, and good title (or valid Leaseholds, in the case of any leased property), in the case of all other property, to all of its properties and assets free and clear of Liens other than Permitted Liens (including pursuant to the Financing Orders).

Section 4.14    <u>Equipment</u>. The Borrower and each of its Subsidiaries possesses and maintains equipment sufficient for its current operations in good working order and commercially, mechanically and otherwise suitable for the intended purposes thereof.

Section 4.15    <u>Lawful Operations, etc</u>. Except as an Effect of Bankruptcy, the Borrower and each of its Subsidiaries: (i) holds all material foreign, federal, state, local and other governmental licenses, registrations, certifications, permits and authorizations necessary to conduct its business; and (ii) is in full compliance with all material requirements imposed by law, regulation or rule, whether foreign, federal, state or local, that are applicable to it, its operations, or its properties and assets, including, without limitation, applicable requirements of Environmental Laws.

Section 4.16    <u>Environmental Matters</u>.

(a)    The Borrower and each of its Subsidiaries is in material compliance with all applicable Environmental Laws. All material licenses, permits, registrations or approvals required for the conduct of the business of the Borrower and its Subsidiaries under any Environmental Law have been secured and the Borrower and its Subsidiaries is in compliance therewith. Neither the Borrower nor any of its Subsidiaries has received written notice, or otherwise knows, that it is in any respect in material noncompliance with, breach of or default under any applicable writ, order, judgment, injunction, or decree to which the Borrower or such Subsidiary is a party or that would affect the ability of the Borrower or such Subsidiary to operate any Real Property and no event has occurred and is continuing that, with the passage of time or the giving of notice or both, would constitute noncompliance, breach of or default thereunder. There are no material Environmental Claims pending or, to the best Knowledge of the Borrower, threatened. There are no facts, circumstances, conditions or occurrences on any Real Property now or at any time owned, leased or operated by the Borrower or any of its Subsidiaries or on any

-36-

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 82 of 136

property adjacent to any such Real Property, that are known by the Borrower or any of its Subsidiaries or as to which the Borrower has received written notice, that could reasonably be expected: (i) to form the basis of a material Environmental Claim against the Borrower or any Real Property of the Borrower or any of its Subsidiaries; or (ii) to cause such Real Property to be subject to any material restrictions on the ownership, occupancy, use or transferability of such Real Property under any Environmental Law.

(b)     Notwithstanding <u>Section 4.16(a)</u>, Hazardous Materials have not at any time been (i) generated, used, treated or stored on, or transported to or from, any Real Property of the Borrower or any of its Subsidiaries or (ii) released on any such Real Property, in each case where such occurrence or event is not in compliance with Environmental Laws.

Section 4.17     <u>Compliance with ERISA</u>.   Compliance by the Borrower with the provisions hereof and the receipt by the Borrower of the proceeds of the Term Loans and other transactions contemplated hereby will not involve any prohibited transaction within the meaning of ERISA or Section 4975 of the Code.  The Borrower and each of its Subsidiaries and each ERISA Affiliate (i) has fulfilled all obligations under the minimum funding standards of ERISA and the Code with respect to each Plan that is not a Multi-Employer Plan or a Multiple Employer Plan, (ii) has satisfied all contribution obligations in respect of each Multi-Employer Plan and each Multiple Employer Plan, (iii) is in compliance in all material respects with all other applicable provisions of ERISA and the Code with respect to each Plan, each Multi-Employer Plan and each Multiple Employer Plan, and (iv) has not incurred any liability under Title IV of ERISA to the PBGC with respect to any Plan, any Multi-Employer Plan, any Multiple Employer Plan, or any trust established thereunder.   No Plan or trust created thereunder has been terminated, and there have been no Reportable Events (other than the commencement of the Chapter 11 Case), with respect to any Plan or trust created thereunder or with respect to any Multi-Employer Plan or Multiple Employer Plan, which termination or Reportable Event will or could give rise to a material liability of the Borrower or any ERISA Affiliate in respect thereof.   Neither the Borrower nor any Subsidiary of the Borrower nor any ERISA Affiliate is at the date hereof, or has been at any time within the five years preceding the date hereof, an employer required to contribute to any Multi-Employer Plan or Multiple Employer Plan, or a "contributing sponsor" (as such term is defined in Section 4001 of ERISA) in any Multi-Employer Plan or Multiple Employer Plan.   Neither the Borrower nor any Subsidiary of the Borrower nor any ERISA Affiliate has any contingent liability with respect to any post-retirement "welfare benefit plan" (as such term is defined in ERISA) except as has been disclosed to the Lender in writing.

Section 4.18     <u>Intellectual Property, etc</u>.   The Borrower and each of its Subsidiaries has obtained or has the right to use all material patents, trademarks, service marks, trade names, copyrights, licenses and other rights with respect to the foregoing necessary for the present and planned future conduct of its business, without any conflict with the rights of others. Except as disclosed on Schedule 4.18, neither the Borrower nor any Subsidiary pays or owes any royalty or other compensation to any Person with respect to any intellectual property.  All intellectual property owned, used or licensed by, or otherwise subject to any interests of, the Borrower or any Subsidiary is shown on <u>Schedule 4.18</u>, other than generally commercially available off-the-shelf software that is licensed in the ordinary course of business.

Section 4.19     <u>Investment Company Act, etc</u>.   Neither the Borrower nor any of its Subsidiaries is subject to regulation with respect to the creation or incurrence of Indebtedness under the Investment Company Act of 1940, as amended, the Interstate Commerce Act, as amended, the Federal Power Act, as amended, or any applicable state public utility law.    Neither the Borrower nor any of its Subsidiaries is an "investment company" or a company "controlled by an investment company" within the meaning of the Investment Company Act of 1940, as amended.

NAI-1500501901v9

Section 4.20    Insurance.  Set forth on Schedule 4.20 is a complete and accurate summary of the property and casualty insurance program of the Borrower as of the Closing Date (including the names of all insurers, policy numbers, expiration dates, amounts and types of coverage, deductibles, self-insured retention, and a description in reasonable detail of any self-insurance program involving the Borrower).  The Borrower and each of its Subsidiaries maintains insurance coverage by such insurers and in such forms and amounts and against such risks as are generally consistent with industry standards and in each case in compliance with the terms of Section 5.05.  Further, the Borrower and each of its Subsidiaries maintains insurance policies that comply with all of their customer contracts and requirements.

Section 4.21    Labor Relations.  Neither the Borrower nor any of its Subsidiaries is (a) subject to any burdensome labor or employment contract, agreement, corporate restriction, judgment, decree or order, (b) a party to any labor dispute affecting any bargaining unit or other group of employees generally, (c) subject to any material strike, slowdown, workout or other concerted interruptions of operations by employees of the Borrower or any Subsidiary, whether or not relating to any labor contracts, (d) subject to any pending or, to the Knowledge of the Borrower, threatened, unfair labor practice complaint, before the National Labor Relations Board, (e) subject to any pending or, to the Knowledge of the Borrower, threatened grievance or significant arbitration proceeding arising out of or under any collective bargaining agreement, (f) subject to any pending or, to the Knowledge of the Borrower, threatened significant strike, labor dispute, slowdown or stoppage, or (g) to the Knowledge of the Borrower, involved or subject to any union representation organizing or certification matter with respect to the employees of the Borrower or any of its Subsidiaries.

Section 4.22    Security Interests.  Upon the entry of the Financing Orders by the Bankruptcy Court, once executed and delivered, the Security Documents and the Financing Orders are effective to create in favor of the Administrative Agent, for the benefit of itself and the Lender, as security for the Obligations, a legal, valid and enforceable perfected first priority security interest in and Lien on, and hypothecation of, all right, title and interest of the Borrower in all Collateral, in each case, (i) encumbered by no Liens other than Permitted Liens and (ii) prior and superior in right to any other Person or Lien, other than the Carve-Out, and no further recording, filing or other action of any kind will be required in connection with the creation, perfection or enforcement of such security interests and Liens.  No other claims having a priority superior or pari passu to that granted to or on behalf of the Administrative Agent or the Lender shall be granted or approved until the Obligations have been Paid in Full.  All recording, stamp, intangible or other similar taxes required to be paid by any Person under applicable legal requirements or other laws applicable to the property encumbered by the Security Documents and the Financing Orders in connection with the execution, delivery, recordation, filing, registration, perfection or enforcement thereof have been paid.

Section 4.23    True and Complete Disclosure.  No Credit Document, report, financial statement, certificate or other information furnished (whether in writing or orally) by or on behalf of the Borrower or any of its Subsidiaries to the Administrative Agent or the Lender in connection with the transactions contemplated hereby and the negotiation of this Agreement or delivered hereunder or under any other Credit Document (in each case as modified or supplemented by other information so furnished) (other than the Projections and the Approved Budget, as to which representations are only made as provided in Section 4.07(a) and (b)) contains any untrue statement of material fact, or fails to disclose any material fact necessary to make the statements contained therein not materially misleading as of the date such information is dated or certified in light of the circumstances under which such information was provided,   There is no fact or circumstance that the Borrower or any of its Subsidiaries has failed to disclose to the Administrative Agent or the Lender in writing that has had or could reasonably be expected to have a Material Adverse Effect.

-38-

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 84 of 136

Section 4.24    Broker's, Finder's or Similar Fees.    Except as otherwise set forth on Schedule 4.24, , there are no brokerage commissions, finder's fees or similar fees or commissions payable in connection with any transactions contemplated by the Credit Documents.  .

Section 4.25    Defaults.    No Default or Event of Default exists as of the Closing Date hereunder, nor will any Default or Event of Default begin to exist immediately after giving effect to the transactions contemplated hereby and the execution and delivery hereof.

Section 4.26    Anti-Terrorism Law Compliance.    Neither the Borrower nor any of its Subsidiaries is subject to or in violation of any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list, Executive Order No. 13224 or the USA Patriot Act) that prohibits or limits the conduct of business with or the receiving of funds, goods or services to or for the benefit of certain Persons specified therein or that prohibits or limits the Lender from making the Term Loans to the Borrower or from otherwise conducting business with the Borrower.

Section 4.27    Real Property.    Schedule 4.27 lists, as of the Closing Date, each parcel of owned real property and each leasehold interest in real property located in the United States and held by the Borrower or any Subsidiary.

Section 4.28    Liens.    There are no Liens in favor of third parties with respect to any of the Collateral, except Permitted Liens (including pursuant to the Financing Orders).  To the best Knowledge of the Borrower, no lessor, warehouseman or bailee of the Borrower or any of its Subsidiaries has granted any Lien with respect to the Inventory maintained by the Borrower at the property of any such lessor, warehouseman or bailee.  The Borrower is the absolute owner of the Collateral with full right to pledge, sell, consign, transfer and create a Lien therein, free and clear of any and all Liens in favor of third parties, other than Permitted Liens.  The Borrower has paid and discharged all lawful claims that, if unpaid, could become a Lien on its properties, other than Permitted Liens.  Subject to the entry of the Interim Order (or the Final Order, when  applicable) by the Bankruptcy Court, all Liens of Administrative Agent in the Collateral are duly perfected and unavoidable first priority Liens, in each case, (i) encumbered by no Liens other than Permitted Liens and (ii) prior and superior in right to any other Person or Lien, other than the Carve-Out.

Section 4.29    Locations of Offices, Records and Inventory.    Each the Borrower's and each Subsidiary's principal place of business and chief executive office is located at address set forth on Schedule 4.29, or if any such Person changes such principal place of business and chief executive office, then at the location as to which the Borrower has notified the Administrative Agent and the Lender in writing, as provided under Section 6.02(b).  There are no jurisdictions in which the Borrower or its Subsidiaries have any Inventory (except for Inventory in transit) other than those jurisdictions listed on Schedule 4.29, and those jurisdictions as to which the Borrower has notified the Administrative Agent and the Lender in writing, as provided under Section 5.02(b).  Schedule 4.29 also contains, as of the Closing Date, a true, correct and complete list of (i) the legal names and addresses of each warehouseman and/or bailee at which Inventory is stored, and (ii) the address of all offices where chattel paper, records of Accounts and books of account and other Collateral of the Borrower are kept.  None of the receipts received by the Borrower from any warehouseman or other bailee states that the Inventory covered thereby is to be delivered to bearer or to the order of a named person or to a named person and such named person's assigns.

Section 4.30    No Defaults.    Except as set forth on Schedule 4.30 and as an Effect of Bankruptcy, after giving effect to the execution and delivery of this Agreement and the other Credit Documents and the consummation of the transactions contemplated herein and in the Financing Orders,

-39-

(i) neither the Borrower nor any of its Subsidiaries is in default under any term of any Material Contract and (ii) to the Borrower's Knowledge, there is no basis upon which any party (other than the Borrower or Subsidiary) could terminate any such Material Contract prior to its scheduled termination date.

Section 4.31    No Other Indebtedness.  Neither the Borrower nor any of its Subsidiaries has any Indebtedness other than the Indebtedness that is permitted by Section 6.04; provided that no such permitted Indebtedness includes any Subordinated Indebtedness.

Section 4.32    [Reserved].

Section 4.33    Burdensome Contracts.  Neither the Borrower nor  any Subsidiary is party or subject to any Restrictive Agreement, except as shown on Schedule 4.33.  No such Restrictive Agreement prohibits the execution, delivery or performance of any Credit Document by the Borrower.

Section 4.34    Prepetition Obligations; Defenses. As of the Petition Date, the aggregate outstanding principal balance of the Prepetition Obligations, all accrued and unpaid interest, fees and expenses constituting Prepetition Obligations, are approximately as set forth in Schedule 4.34, and the Borrower and its Subsidiaries party thereto are truly and justly indebted (as an allowed secured claim) to the Prepetition Agent and the Prepetition Lender with respect to the Prepetition Obligations without setoff, defense or counterclaim.

Section 4.35    Prepetition Note Purchase Documents. The Borrower acknowledges and agrees (i) that the Prepetition Note Purchase Documents are valid and enforceable, (ii) that the Prepetition Agent for the benefit of the Prepetition Lender has a valid, enforceable and fully perfected Lien in all of the Prepetition Collateral, including Cash Collateral, and all proceeds thereof, and (iii) that the Collateral is declining in value.

Section 4.36    Reorganization Matters.

(ii)    The Chapter 11 Cases were commenced on the Petition Date in accordance with the Requirements of Law and proper notice thereof and proper notice for (x) the motion seeking approval of the Interim Order and (y) the hearing for the approval of the Interim Order and (z) the hearing for the approval of the Final Order has been given.  The Debtors shall give, on a timely basis as specified in the Financing Orders, all notices required to be given to all parties specified in the Financing Orders.

(iii)    After entry of the Interim Order, and pursuant to and to the extent permitted in the Interim Order and the Final Order, the Obligations will constitute allowed administrative expense claims in the Chapter 11 Case having priority over all administrative expense claims and unsecured claims against the Borrower now existing or hereafter arising of any kind whatsoever, including, without limitation, all administrative expense claims of the kind specified in Sections 105, 326, 328, 330, 331, 503(b), 506(c), 507(a), 507(b), 546(c), 546(d), 726, 1113, 1114 or any other provision of the Bankruptcy Code or otherwise, as provided under Section 364(c)(1) of the Bankruptcy Code, subject only to the Carve-Out.

(iv)    After entry of the Interim Order (and the Final Order when applicable) and pursuant to and to the extent provided in the Interim Order and the Final Order, as applicable, the Obligations will be secured by a valid and perfected first priority Lien on all of the Collateral, (i) encumbered by no Liens other than Permitted Liens and (ii) prior and superior to any other Person or Lien, other than the Carve-Out.

NAI-1500501901v9

(v)     The Interim Order (with respect to the period prior to the entry of the Final Order) or the Final Order (with respect to the period on and after the entry of the Final Order), as the case may be, is in full force and effect and has not been reversed, stayed, modified or amended.

(vi)    Notwithstanding the provisions of Section 362 of the Bankruptcy Code and subject to the applicable provisions of the Interim Order or the Final Order, as the case may be, upon the Maturity Date (whether by acceleration or otherwise), the Administrative Agent and the Lender shall be entitled to immediate payment of such Obligations in cash and to enforce the remedies provided for hereunder or under applicable law, without further application to or order by the Bankruptcy Court, subject to the terms of the Credit Documents and the Financing Orders.

ARTICLE V.

AFFIRMATIVE COVENANTS

The Borrower hereby covenants and agrees that on the Closing Date and thereafter for so long as this Agreement is in effect and until such time as this Agreement has been terminated in accordance with the terms hereof and all Obligations, have been irrevocably and indefeasibly satisfied and paid in full:

Section 5.01     Reporting Requirements.  The Borrower will furnish to the Administrative Agent and the Lender:

(a)     [Reserved].

(b)     Monthly Financial Statements.  As soon as available and in any event within 20 days following the end of each fiscal month of the Borrower, (i) monthly unaudited consolidated balance sheets of the Borrower and its consolidated Subsidiaries and the related unaudited consolidated statements of income and of cash flows for such period and (ii) monthly management reports with respect to the Borrower and its Subsidiaries in form and substance reasonably satisfactory to the Lender.

(c)     Officer's Compliance Certificates.  At the time of the delivery of the financial statements provided for in Section 5.01(b), or more frequently if requested by the Lender, a certificate (a "Compliance Certificate"), substantially in the form of Exhibit E, signed by the Chief Restructuring Officer of the Borrower, including, among other things, a computation in reasonable detail of the variances and amounts set forth in Section 5.22 and certifying that (1) the Borrower is in compliance with Sections 5.22, and Articles V and VI and (2) no Default or Event of Default that has occurred and is continuing which has not previously been disclosed to the Administrative Agent and the Lender in writing (including a description of the event and the steps to be taken with respect thereto) or, if there is any such event, describing it and the steps, if any, taken or being taken to cure such Default or Event of Default.

(d)     [Reserved].

(e)     [Reserved].

(f)     Other Reports.  Promptly upon delivery or receipt thereof, such other reports provided to or received by  the holders of Capital Stock of the Borrower and its Subsidiaries or any governmental authority, and copies of any press releases or other statements made available by the Borrower or Subsidiary to the public concerning material changes to or developments in the business of  the Borrower or Subsidiary.

NAI-1500501901v9

(g)    Notices.  Promptly, and in any event within three (3) Business Days, following the occurrence thereof, notice of:

(i)    the occurrence of any event that constitutes a Default or Event of Default, which notice shall specify the nature thereof, the period of existence thereof and what action the Borrower proposes to take with respect thereto;

(ii)    the commencement of, or any other material adverse development concerning, any litigation or governmental or regulatory proceeding pending against the Borrower or any of its Subsidiaries;

(iii)    the receipt of any notice by the Borrower in connection with any cancellation, any material change or increase in the deductible of any insurance policy maintained by the Borrower or any Subsidiary.

(iv)    the occurrence of any other event if the same would be reasonably likely to have a Material Adverse Effect; or

(v)    the Borrower becoming aware of the intent of, (A) any customer (or related group of customers) representing more than 5% of the Borrower's consolidated revenues during its most recent fiscal year, or (B) any supplier which is material to the operations of the Borrower and its Subsidiaries considered as an entirety, in each case, to terminate, not renew or seek a material reduction in its obligations under its then-current contract with the Borrower or any of its Subsidiaries.

(h)    Material Contracts, Etc:  Promptly upon the giving or receipt thereof, copies of all material reports, certifications, correspondence, requests, or written notices, notices of default, amendments, modifications or supplements given or received by the Borrower or Subsidiary under or with respect to any Material Contract or any Approved Sale, including pursuant to any documentation relating to such transactions.

(i)    Meetings with Lender:  On a bi-weekly basis from the Petition Date through the Maturity Date (or more frequently at the reasonable request of the Lender), if requested by the Lender, hold a meeting (at a mutually agreeable location and time or telephonically) with the Lender and management of the Borrower regarding the financial results and operations of the Borrower and monitoring any developments in the Chapter 11 Case.

(j)    Bankruptcy Matters:  Promptly, upon there being filed with the Bankruptcy Court, copies of all monthly operating reports, projections or other information respecting the Debtor's business or financial condition or prospects as well as all pleadings, motions, applications, judicial information or other information filed by or on behalf of the Borrower with the Bankruptcy Court or provided or served by the Borrower to or upon the United States Trustee (the "US Trustee") (or any monitor or interim receiver, if any, appointed in the Chapter 11 Case) or any Committee, at the time such document is filed with the Bankruptcy Court, or provided or served by the Borrower to or upon the US Trustee (or any monitor or interim receiver, if any, appointed in the Chapter 11 Case) or any Committee, to the extent such document has not otherwise been provided pursuant to an order of the Bankruptcy Court establishing notice procedures in the Chapter 11 Case or otherwise.

(k)    ERISA.  Promptly, and in any event within three (3) Business Days after the Borrower or any Subsidiary of the Borrower or any ERISA Affiliate knows of the occurrence of any of the following, the Borrower will deliver to the Administrative Agent and the Lender a certificate of the Chief

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 88 of 136

Restructuring Officer of the Borrower setting forth the full details as to such occurrence and the action, if any, that the Borrower or such Subsidiary of the Borrower or such ERISA Affiliate is required or proposes to take, together with any notices required or proposed to be given by the Borrower or such Subsidiary of the Borrower or the ERISA Affiliate to or filed with the PBGC, a Plan participant or the Plan administrator with respect thereto: (i) that a Reportable Event has occurred with respect to any Plan; (ii) the institution of any steps by the Borrower, any Subsidiary of the Borrower, any ERISA Affiliate, the PBGC or any other Person to terminate any Plan or the occurrence of any event or condition described in Section 4042 of ERISA that constitutes grounds for the termination of, or the appointment of a trustee to administer, a Plan; (iii) the institution of any steps by the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate to withdraw from any Multi-Employer Plan or Multiple Employer Plan, if such withdrawal could result in withdrawal liability (as described in Part 1 of Subtitle E of Title IV of ERISA or in Section 4063 of ERISA) in excess of $100,000; (iv) a non-exempt "prohibited transaction" within the meaning of Section 406 of ERISA in connection with any Plan; (v) that a Plan has Unfunded Benefit Liabilities exceeding $100,000; (vi) the cessation of operations at a facility of the Borrower, any Subsidiary of the Borrower or any ERISA Affiliate in the circumstances described in Section 4062(e) of ERISA; (vii) the conditions for imposition of a lien under Section 302(f) of ERISA shall have been met with respect to a Plan; (viii) the adoption of an amendment to a Plan requiring the provision of security to such Plan pursuant to Section 307 of ERISA; (ix) the insolvency of or commencement of reorganization proceedings with respect to a Multi-Employer Plan; (x) any material increase in the contingent liability of the Borrower or any Subsidiary with respect to any post-retirement welfare liability; or (xi) the taking of any action by, or the threatening of the taking of any action by, the Internal Revenue Service, the Department of Labor or the PBGC with respect to any of the foregoing.

(l)     Environmental Matters.  Promptly upon, and in any event within three (3) Business Days after, an officer of the Borrower or any of its Subsidiaries obtaining knowledge thereof, notice of one or more of the following environmental matters: (i) any material Environmental Claim against the Borrower or any of its Subsidiaries or any Real Property owned or operated by the Borrower or any of its Subsidiaries that is pending or threatened in writing; (ii) any condition or occurrence on or arising from any Real Property owned or operated by the Borrower or any of its Subsidiaries that (A) results in material noncompliance by the Borrower or any of its Subsidiaries with any applicable Environmental Law or (B) would reasonably be expected to form the basis of a material Environmental Claim against the Borrower or any of its Subsidiaries or any such Real Property; (iii) any condition or occurrence on any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries that could reasonably be expected to cause such Real Property to be subject to any material restrictions on the ownership, occupancy, use or transferability by the Borrower or any of its Subsidiaries of such Real Property under any Environmental Law; and (iv) the taking of any removal or remedial action in response to the actual or alleged presence of any Hazardous Material on any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries as required by any Environmental Law or any governmental or other Global agency.  All such notices shall describe in reasonable detail the nature of the Environmental Claim, the Borrower's or such Subsidiary's response thereto and the potential exposure in Dollars of the Borrower and its Subsidiaries with respect thereto.

(m)     Annual, Quarterly and Other Reports.  Promptly after transmission thereof to its stockholders, copies of all annual, quarterly and other reports and all proxy statements that the Borrower furnishes to its stockholders generally.

(n)     Auditors' Internal Control Comment Letters, etc.  Promptly upon receipt thereof, a copy of each letter or memorandum commenting on internal accounting controls and/or accounting or financial reporting policies followed by the Borrower and/or any of its Subsidiaries which is submitted to the Borrower by its independent accountants in connection with any annual or interim audit made by them of the books of the Borrower or any of its Subsidiaries.

-43-

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 89 of 136

(o)    Information Relating to Collateral.  At the time of the delivery of the annual financial statements provided for in 5.01(b), a certificate of the Chief Restructuring Officer of the Borrower (i) setting forth any changes to the information required pursuant to the Perfection Certificate that would result in the Administrative Agent not having a first priority Lien for the benefit of the Lender with respect to any of the Collateral as required under the Security Documents or confirming that there has been no such change in such information since the date of the most recently delivered or updated Perfection Certificate and (ii) certifying that neither the Borrower nor any of its Subsidiaries has taken any actions (and is not aware of any actions so taken) to terminate any UCC financing statements or any other filings, recordings or registrations, including any refilings, rerecordings and reregistrations, with respect to the Administrative Agent's security interests in and Liens on the Collateral.

(p)    Other Notices.  The Borrower shall, and shall cause its respective Subsidiaries to, promptly after any such Person learns of the following, give written notice to the Administrative Agent and the Lender of the occurrence of any of the following events:

(i)    any proceeding(s) being instituted or threatened in writing to be instituted against the Borrower or its Subsidiaries in any federal, state, local or foreign court or before any commission or other regulatory body (federal, state, local or foreign) with respect to any Credit Document;

(ii)    any dispute or default under or termination or amendment of any Material Contract or any new Material Contract is entered into (in which event the Borrower shall provide the Administrative Agent and the Lender with a copy of such Material Contract);

(iii)    any order, judgment or decree in excess of $100,000, individually or in the aggregate, shall have been entered against the Borrower or its Subsidiaries or any of the foregoing's respective properties or assets;

(iv)    any violation or asserted violation of any law or regulation or any inquiry shall have been received by the Borrowers or its Subsidiaries from any local, state, federal or foreign governmental authority or agency;

(v)    any dispute, default or event of default arises under any material indenture, contract, lease, agreement, instrument or other commitment to which the Borrower or its Subsidiaries is a party or by which it is bound;

(vi)    any pending or threatened labor dispute, strike or walkout, or the expiration of any labor contract;

(vii)    the occurrence of an ERISA Termination Event;

(viii)    any casualty loss or condemnation that affects, in aggregate, Collateral with a book value in excess of $100,000;

(ix)    the incurrence of any Lien (other than Permitted Liens) on, or claim asserted against any of the Collateral or the occurrence of any other event which could adversely affect the value of a material portion of the Collateral;

(x)    copies of all notices received or sent by the Borrower or any of its Subsidiaries to or from the holders of any Indebtedness in a minimum amount of at least $100,000 or any trustee with respect thereto;

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 90 of 136

(xi) any change in accounting policies or financial reporting practices by the Borrower; and

(e) the filing of any Lien for unpaid Taxes against the Borrower or its Subsidiaries.

Each notice delivered under this Section shall be accompanied by a statement of the Chief Restructuring Officer of the Borrower setting forth the details of the event or development requiring such notice and, if applicable, any action taken or proposed to be taken with respect thereto.

(q)　　Other Information.　As soon as practicable but in any event within three (3) Business Days after a request therefor, such other information or documents (financial or otherwise) relating to the Borrower or any of its Subsidiaries as the Administrative Agent or the Lender may reasonably request from time to time.

Section 5.02　　Books, Records and Inspections.

(a)　　The Borrower will, and will cause each of its Subsidiaries to, (i) keep proper books of record and account, in which full and correct entries shall be made of all financial transactions and the assets and business of the Borrower or such Subsidiary, as the case may be, in accordance with GAAP (subject to the absence of footnotes and accounting relating to the Chapter 11 Case); and (ii) permit, upon at least three (3) Business Days' notice to the Borrower so long as no Default or Event of Default shall have occurred and be continuing, and at any time at all on and after the occurrence and during the continuance of a Default or Event of Default, and at the Borrower's sole expense, officers and designated representatives of the Administrative Agent or the Lender to visit and inspect, audit and/or appraise any of the Collateral in whomsoever's possession, to examine the books of account of the Borrower and any of its Subsidiaries, and make copies thereof and take extracts therefrom, and to discuss the affairs, finances and accounts of the Borrower and of its Subsidiaries with, and be advised as to the same by, its officers and independent accountants and independent actuaries, if any, all at such reasonable times and intervals and to such reasonable extent as the Administrative Agent or the Lender may request. This Section shall not be construed to limit the Administrative Agent's or the Lender's rights to conduct examinations or to obtain appraisals at any time in its discretion, nor to use third parties for such purposes. The Credit Borrower agrees to pay the Administrative Agent's and the Lender's then standard charges for examination activities, including the standard charges of Administrative Agent's and the Lender's internal examination and appraisal groups, as well as the charges of any third party used for such purposes.

(b)　　The Borrower shall, and shall cause its Subsidiaries to, provide the Administrative Agent and the Lender thirty (30) days prior written notice of any change in the location of any Collateral or in the location of its or any of their Subsidiaries' chief executive office or place of business or state of organization from the locations specified in Schedule 4.01(a) and Schedule 4.29, and to execute in advance of such change, cause to be filed and/or delivered to the Administrative Agent any financing statements, Landlord Agreements or other documents and take any other action required by the Administrative Agent, all in form and substance satisfactory to the Administrative Agent and the Lender, to ensure that the Agent has a perfected and continuing first priority Lien on and security interest in all Collateral, in each case, (i) encumbered by no Liens other than Permitted Liens and (ii) prior and superior in right to any other Person or Lien, other than the Carve-Out.

Section 5.03　　Collateral Records.　The Borrower shall execute and deliver to the Administrative Agent and the Lender, from time to time, such written statements and schedules as the Administrative Agent or the Lender may reasonably require, including without limitation those described in Section 5.01 of this Agreement, designating, identifying or describing the Collateral. The Borrower's failure, however, to promptly give the Administrative Agent or the Lender such statements or schedules

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 91 of
136

shall not affect, diminish, modify or otherwise limit the Administrative Agent's security interests in or Liens on the Collateral.

Section 5.04    Security Interests.    Without limiting Section 9.20, the Borrower shall, and shall cause its Subsidiaries to, comply with the Financing Orders and the requirements of all state and federal laws in order to grant to and maintain for the Administrative Agent, for the benefit of the Lender, a perfected and continuing first priority Lien on and security interest in all Collateral, in each case, (i) encumbered by no Liens other than Permitted Liens and (ii) prior and superior in right to any other Person or Lien, other than the Carve-Out. The Administrative Agent is hereby authorized by the Borrower (without obligation) to file any financing statements covering the Collateral whether or not the Borrower's signature appear thereon.  The Borrower agrees to, and to cause its Subsidiaries to, do whatever the Administrative Agent or the Lender may reasonably request, from time to time, by way of: filing notices of liens, financing statements, and amendments, renewals and continuations thereof; cooperating with the Administrative Agent's and the Lender's respective representatives; keeping stock records; and performing such further acts as the Administrative Agent and the Lender may require in order to effect the purposes of this Agreement, the other Credit Documents and the Financing Orders.

Section 5.05    Insurance; Events of Loss.

(a)    The Borrower will, and will cause each of its Subsidiaries to, (i) maintain insurance coverage by such insurers and in such forms and amounts and against such risks as was in effect as of the Petition Date, and (ii) furnish to the Lender such information about such insurance as the Lender may from time to time reasonably request, which information shall be prepared in form and detail reasonably satisfactory to the Lender and certified by the Chief Restructuring Officer of the Borrower.

(b)    The Borrower will, and will cause each Subsidiary to, at all times keep its and their property that is subject to the Lien of any Security Document insured in favor of the Lender and all policies or certificates (or certified copies thereof) with respect to such insurance (and any other insurance maintained by the Borrower or any such Subsidiary) (i) shall be endorsed to the Lender's satisfaction for the benefit of the Lender (including, without limitation, by naming the Lender as loss payee on behalf of the Lender (with respect to Collateral) or, to the extent permitted by applicable law, as an additional insured), (ii) shall state that such insurance policies shall not be canceled without 30 days' prior written notice thereof by the respective insurer to the Borrower, (iii) shall provide that the respective insurers irrevocably waive any and all rights of subrogation with respect to the Lender, and (iv) shall in the case of any such certificates or endorsements in favor of the Lender, be delivered to or deposited with the Administrative Agent.

(c)    If the Borrower or any Subsidiary shall fail to maintain any insurance in accordance with this Section 5.05(c), or if the Borrower or any such Subsidiary shall fail to so endorse and deliver or deposit all endorsements or certificates with respect thereto, the Lender shall have the right (but shall be under no obligation) to procure such insurance and the Borrower agrees to reimburse the Lender by payment to the Administrative Agent (for the account of the Lender) after written demand for all reasonable costs and expenses of procuring such insurance.

(d)    The Borrower shall, and shall cause its Subsidiaries to, provide prompt written notice, but in any event within three (3) Business Days, to the Administrative Agent and the Lender of the occurrence of any of the following events:  any asset or property owned or leased by the Borrower or its Subsidiaries is (i) damaged or destroyed, or suffers any other loss, or (ii) condemned, confiscated or otherwise taken, in whole or in part, or the use thereof is otherwise diminished so as to render impracticable or unreasonable the use of such asset or property for the purposes to which such asset or property were used immediately prior to such condemnation, confiscation or taking, by exercise of the

-46-

powers of condemnation or eminent domain or otherwise (collectively a "Event of Loss"). The Borrower shall, and shall cause its Subsidiaries to, diligently file and prosecute its claim or claims for any award or payment in connection with an Event of Loss. In the event of an Event of Loss, the Borrower shall, and shall cause its Subsidiaries to, pay to the Administrative Agent, promptly upon receipt thereof, any and all insurance proceeds and payments received by such Person on account of damage, destruction, loss, condemnation or eminent domain proceedings. The Administrative Agent, upon its receipt thereof, at the written direction of the Lender, either (a) apply the proceeds realized from Events of Loss to the payment of Obligations as set forth in Sections 2.04 and 7.04, as applicable or (b) with respect to proceeds from a Event of Loss of Inventory only, at the Lender's election, at any time that no Event of Default then exists, turn over such proceeds to the Borrower to be used to replace the Inventory that was the subject of such Event of Loss. Only the Administrative Agent, at the written direction of the Lender, or the Lender shall be authorized to settle, adjust and compromise such claims. The Borrower, for itself an on behalf of its Subsidiaries, hereby irrevocably authorizes and appoints the Administrative Agent its attorney-in-fact to collect and receive for any such award or payment relating to a Event of Loss and to file and prosecute such claim or claims relating to an Event of Loss, which power of attorney shall be irrevocable and shall be deemed to be coupled with an interest, and the Borrower shall, and shall cause its Subsidiaries to, upon demand of the Administrative Agent, at the written direction of the Lender, make, execute and deliver any and all assignments and other instruments sufficient to the Administrative Agent for the purpose of assigning any such award or payment to the Administrative Agent for the benefit of the Lender, free and clear of any Liens of any kind or nature whatsoever.

Section 5.06    Payment of Taxes and Claims.  Subject to the approval of the Bankruptcy Court in the Chapter 11 Case and the Approved Budget (subject to the applicable permitted variances set forth herein in Section 5.22), the Borrower will pay and discharge, and will cause each of its Subsidiaries to pay and discharge, all taxes, assessments and governmental charges (including all sales and use taxes) or levies imposed upon it or upon its income or profits, or upon any properties belonging to it, prior to the date on which penalties attach thereto, and all lawful claims that, if unpaid, might reasonably become a Lien or charge upon any properties of the Borrower or any of its Subsidiaries; *provided, however,* that neither the Borrower nor any of its Subsidiaries shall not be required to pay any such tax, assessment, charge, levy or claim that is being contested in good faith and by proper proceedings if it has maintained adequate reserves with respect thereto in accordance with GAAP; provided that the amount which has been reserved for on its books and records for all tax liabilities shall be in an amount sufficient to satisfy all known or reasonably estimatable potential sums owing in respect thereof (together with all penalties and interest). Without limiting the generality of the foregoing, subject to the approval of the Bankruptcy Court in the Chapter 11 Case and the Approved Budget (subject to the applicable permitted variances set forth herein in Section 5.22), the Borrower will, and will cause each of its Subsidiaries to, pay in full all of its wage obligations to its employees in accordance with the Fair Labor Standards Act (29 U.S.C. Sections 206-207) and any comparable provisions of applicable law.

Section 5.07    Corporate Franchises.  The Borrower will do, and will cause each of its Subsidiaries to do, or cause to be done, all things necessary to (i) preserve and keep in full force and effect its corporate existence, good standing, rights and authority in the jurisdiction of organization, (ii) maintain and preserve in full force and effect all material licenses, bonds, franchises, leases and qualifications to do business, and all patents, trademarks, contracts, licenses, leases, and other rights necessary or desirable to the conduct of its business, and (iii) continue in, and limit their operations to, lines of business to its current business and/or businesses that are directly related to and are intended to benefit the Borrower's primary business.

Section 5.08    Good Repair.  The Borrower will, and will cause each of its Subsidiaries to, ensure that its material properties and equipment used or useful in its business in whomsoever's possession they may be, are kept in good repair, working order and condition, normal wear and tear

NAI-1500501901v9

excepted, and that from time to time there are made in such properties and equipment all needful and proper repairs, renewals, replacements, extensions, additions, betterments and improvements thereto, to the extent and in the manner customary for companies in similar businesses.

Section 5.09    Compliance with Laws, etc.  The Borrower will, and will cause each of its Subsidiaries to, comply in all material respects with all applicable laws, rules, regulations, decrees, orders, judgments, licenses, permits of, and all applicable restrictions imposed by, all Governmental Authorities in respect of the conduct of its business and the ownership of its property.

Section 5.10    Employee Benefits.  Without limitation of the covenants contained in Section 5.09, the Borrower will comply, and will cause each of its Subsidiaries to comply, in all material respects with all applicable legal requirements, including the applicable provisions of ERISA and the Code, with respect to all Plans.

Section 5.11    Compliance with Environmental Laws.  Without limitation of the covenants contained in Section 5.09:

(a)    The Borrower will comply, and will cause each of its Subsidiaries to comply, in all material respects, with all Environmental Laws applicable to the ownership, lease or use of all Real Property now or hereafter owned, leased or operated by the Borrower or any of its Subsidiaries and will promptly pay or cause to be paid all costs and expenses incurred in connection with such compliance, *except* to the extent that such compliance with Environmental Laws is being contested in good faith and by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP.

(b)    The Borrower will keep or cause to be kept, and will cause each of its Subsidiaries to keep or cause to be kept, all such Real Property free and clear of any Liens imposed pursuant to such Environmental Laws other than Permitted Liens.

(c)    Neither the Borrower nor any of its Subsidiaries will generate, use, treat, store, release or dispose of, or permit the generation, use, treatment, storage, release or disposal of, Hazardous Materials on any Real Property now or hereafter owned, leased or operated by the Borrower or any of its Subsidiaries or transport or permit the transportation of Hazardous Materials to or from any such Real Property other than in compliance with applicable Environmental Laws and in the ordinary course of business.

(d)    If required to do so under any applicable order of any Governmental Authority, the Borrower will undertake, and cause each of its Subsidiaries to undertake, any clean up, removal, remedial or other action necessary to remove and clean up any Hazardous Materials from any Real Property owned, leased or operated by the Borrower or any of its Subsidiaries in accordance with, in all material respects, the requirements of all applicable Environmental Laws and in accordance with, in all material respects, such orders of all Governmental Authorities, except to the extent that the Borrower or such Subsidiary is contesting such order in good faith and by appropriate proceedings and for which adequate reserves have been established to the extent required by GAAP.

Section 5.12    [Reserved].

Section 5.13    Additional Security; Real Estate Matters; Further Assurances.

(a)    [Reserved].

-48-

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 94 of 136

(b)     [Reserved].

(c)     [Reserved].

(d)     Real Property Collateral.

(i)     Lien on Real Property.  Upon entry of the Interim Order and pursuant to its terms, (i) the Administrative Agent, for the benefit of the Lender, shall have a valid, binding, enforceable and perfected first priority Lien in all Real Property of the Borrower senior in priority to all other Liens (subject only to the Carve-Out), and (ii) the Administrative Agent shall not be required to file any Mortgages or similar instruments in any jurisdiction or filing office, or to take any other action in order to validate or perfect the Mortgages granted by the Borrower to the Administrative Agent pursuant to the Credit Documents or the Financing Orders.  Without in any way suggesting that the entry of the Interim Order is not sufficient for such purpose, at the request of the Administrative Agent (at the written direction of the Lender), the Borrower shall deliver to the Administrative Agent Mortgages and any related documents requested by the Administrative Agent for all Real Property of the Borrower, and such other instruments and agreements as the Administrative Agent, at the written direction of the Lender, deems appropriate to evidence or perfect its Lien on any Real Estate.

(ii)     Collateral Assignment of Leases.  To further secure the prompt payment and performance of all Obligations, the Borrower hereby transfers and assigns to Administrative Agent, for the benefit of the Lender, all of Borrower's right, title and interest in, to and under all now or hereafter existing leases of Real Property to which the Borrower is a party, whether as lessor or lessee, and all extensions, renewals, modifications and proceeds thereof.

(iii)     Taxes.  Subject to the approval of the Bankruptcy Court in the Chapter 11 Case and the Approved Budget (subject to the applicable permitted variances set forth herein in Section 5.22), the Borrower shall have paid or caused to be paid all costs and expenses payable in connection with all of the actions set forth in this Section 5.11(d), including but not limited to (A) all mortgage, intangibles or similar taxes or fees, however characterized, payable in respect of this Agreement, the execution and delivery of the Credit Documents, any of the Mortgages or any of the other Credit Documents or the recording of any of the same or any other documents related thereto; and (B) all expenses and premiums of the title company in connection with the issuance of such policy or policies of title insurance and to all costs and expenses required for the recording of the Mortgages or any other Credit Documents or any other related documents in the appropriate public records.

(e)     Landlord/Mortgagee Waivers.  The Borrower will maintain in full force and effect each Landlord's Agreement delivered to the Prepetition Agent in connection with the Prepetition Note Purchase Documents.

(f)     Further Assurances.  The Borrower shall, and shall cause its Subsidiaries to, take, all such further actions and execute all such further documents and instruments as the Administrative Agent and/or the Lender may at any time determine in their respective sole discretion to be necessary or advisable to further carry out and consummate the transactions contemplated by the Credit Documents and the Financing Orders, to cause the execution, delivery and performance of the Credit Documents to be duly authorized and to perfect or protect the Liens of the Administrative Agent on the Collateral to ensure that the Administrative Agent has a perfected and continuing first priority Lien on and security interest in all Collateral, in each case, (i) encumbered by no Liens other than Permitted Liens and (ii) prior and superior in right to any other Person or Lien, other than the Carve-Out.

Section 5.14     [Reserved].

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 95 of 136

Section 5.15    [Reserved].

Section 5.16    [Reserved].

Section 5.17    Register.  The Administrative Agent, acting as agent of the Borrower solely for this purpose, shall maintain, or cause to be maintained, a register on which it shall enter all (i) loans and advances made by the Lender to the Borrower and (ii) the name or names of any Person which becomes a Lender hereunder pursuant to Section 9.06.

Section 5.18    Use of Proceeds.  The Borrower shall use Cash Collateral, the proceeds of the Term Loans made hereunder solely (a) to provide adequate protection on account of the Prepetition Obligations, (b) to pay principal, interest, costs, fees and transaction expenses owing to the Administrative Agent and the Lenders pursuant to this Agreement and the other Credit Documents and/or to the Prepetition Agent and the Prepetition Lender pursuant to the Prepetition Note Purchase Documents, (c) to pay the fees and expenses of legal counsel and other professionals retained by the Administrative Agent and the Lender, (d) for post-petition operating expenses and other working capital, financing requirements and other general corporate purposes of the Borrower, (e) to pay certain Prepetition claims that are approved by the Bankruptcy Court and consented to by the Lender, (f) to pay certain allowed administrative costs and expenses of the Chapter 11 Case, (g) for the Carve-Out, and (h) to pay certain transaction fees, costs and expenses (other than transaction fees, costs and expenses owing to the Administrative Agent and the Lender), in each case of clauses (d) through (h) above, solely in accordance with the Approved Budget (subject to the applicable permitted variances set forth herein in Section 5.22) and the Financing Orders.  The Borrower shall not be permitted to use Cash Collateral, the Carve-Out or proceeds of the Term Loans, directly or indirectly: (i) for the payment of interest and principal with respect to any Indebtedness (other than the Obligations), (ii) to finance in any way (including, without limitation, the payment of professional fees in respect of) any action, suit, arbitration, proceeding, application, motion or other litigation of any type adverse to: (A) the interests of the Administrative Agent and the Lender or their rights or remedies under this Agreement, the other Credit Documents or the Financing Orders, or (B) the interests of the Prepetition Agent and Prepetition Lender under the Prepetition Note Purchase Documents, including, without limitation, in each of the cases of clauses (A) and (B) above, to finance in any way any assertion of or joinder in any claim, counterclaim, action, proceeding, application, motion, objection, defense or other contested matter, the purpose of which is to seek, or the result of which would be to obtain, any order, judgment, determination, declaration or similar relief (u) invalidating, setting aside, avoiding or subordinating, in whole or in part, the Prepetition Obligations or the Liens securing same, or the Obligations or the Liens securing same, (v) for monetary, injunctive or other similar relief against the Prepetition Lender or the Prepetition Agent or the Administrative Agent or the Lender or their respective collateral, (w) preventing, hindering or otherwise delaying the exercise by the Prepetition Lender, the Prepetition Agent, the Administrative Agent or the Lender of any rights and remedies under the Financing Orders, the Prepetition Note Purchase Documents, the Credit Documents or Applicable Law, or the enforcement or realization (whether by foreclosure, credit bid, further order of the court or otherwise) by any or all of the Prepetition Lender, the Prepetition Agent, the Administrative Agent or the Lender upon any of their collateral, (x) to make any distribution under a Plan of Reorganization in the Chapter 11 Case, (y) to make any settlement of any claims, action or proceeding, before any court, arbitrator or other governmental body without the prior written consent of the Lender, except as contemplated by the Approved Budget (subject to the applicable permitted variances set forth herein in Section 5.22) or (z) to pay any expense other than the itemized amounts set forth in the Approved Budget (subject to the applicable permitted variances set forth herein in Section 5.22) unless the Lender provides prior written consent to make such non-conforming payment; provided, however, that an amount not in excess of $20,000 will be available for the payment of fees and expenses of professionals of any Committee incurred in investigating the claims of the Prepetition Agent and the Prepetition Lender.  Notwithstanding the foregoing, unless otherwise consented to in writing by the

-50-

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 96 of 136

Lender, upon the occurrence of an Event of Default, the Debtor shall not use any Cash Collateral or the proceeds of the Term Loans made hereunder other than for the satisfaction of the Obligations, the Prepetition Obligations and the Carve-Out.

Section 5.19    Board of Directors.  The Borrower shall maintain, at all times, at least three (3) directors on its board of directors, which directors shall be reasonably acceptable to the Lender.

Section 5.20    Chief Restructuring Officer.  The Borrower  shall retain (or continue to retain as the case may be) the Chief Restructuring Officer (or a successor thereto acceptable to the Lender) on terms and having scope of authority acceptable to the Lender, which Chief Restructuring Officer (i) shall have financial and legal control of the Borrower subject to the ultimate authority of the board of directors of the Borrower, (ii) report directly to the board of directors of the Borrower and (iii) be authorized to communicate directly with the Lender on all matters.  Without limiting the foregoing or any other reporting requirements herein, the Borrower shall cause the Chief Restructuring Officer to provide an update to Lender regarding the financial condition of the Borrower, in form and scope acceptable to the Lender, once per week (or more or less frequently as the Lender may from time to time  require) on a date to be mutually agreed upon by the Lender and the Chief Restructuring Officer.

Section 5.21    Access.  The Borrower shall provide to the Lender (i) direct access to the Chief Restructuring Officer and any other consultant or investment banker retained by the Borrower (without the Borrower or any of its Subsidiaries being required to participate) and (ii) prompt notice of, copies of (if requested) and unrestricted access to all related diligence materials, opinions, reports and other communications provided by the Chief Restructuring Officer or any other consultant or investment bank retained by the Borrower, including, without limitation, access to any data room, presentations and summaries of offers prepared by the Chief Restructuring Officer or any other financial consultant or investment bank.  Without limiting the foregoing, the Borrower shall promptly provide the Lender with (x) updates of any material developments in connection with any proposed Approved Sale (or similar transaction) or Acceptable Plan of Reorganization and the marketing of the Borrower and any of its Subsidiaries in connection with an Approved Sale, (y) copies of any informational packages provided to potential bidders, a status report (upon the request of the Lender) and updated information relating to any such  Approved Sale (or similar transaction), and (z) copies of all drafts of proposed sale or credit documentation, any and all offers, bids and bid materials received by the Borrower or any of its Subsidiaries or their agents in connection with any such proposed Approved Sale (or similar transaction), and any updates, modifications or supplements to such information and materials and, in any case, shall hold daily conference calls with the Lender, if and as requested by the Lender, as to the status of the all matters pertaining to the above.

Section 5.22    Approved Budget.

(a)    Disbursements.  At all times from and after the Closing Date, unless and until otherwise consented to in writing by the Lender, the Borrower shall not make any disbursements or payments (whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition) or incur any obligation to do so, other than as set forth in the Approved Budget, other than the items described in clauses (a) through (c) of Section 5.18; provided, however, that actual disbursements (measured on a line-by-line basis and on an aggregate basis) (excluding disbursements set forth in the line item labeled "Professional Fees" in the Approved Budget) for the periods corresponding to the following periods shall not be more than, in each case, both on a line-by-line basis and on an aggregate basis, 110% of (1) the projected amount of such disbursements set forth in the Approved Budget for the one week period ending September 18, 2015, (2) the cumulative projected amount of such disbursements set forth in the Approved Budget for the preceding two week period ending September 25, 2015, (3) the cumulative projected amount of such disbursements set forth in the Approved Budget for the preceding

NAI-1500501901v9

three week period ending October 2, 2015 or (4) for each week ending on or after October 9, 2015, the cumulative projected amount of such disbursements set forth in the Approved Budget for the preceding four week period then ending on such date.

(b)  Net Cash Flow.  At all times from and after the Closing Date, the Borrower shall maintain Net Cash Flow from operations for the periods corresponding to the following periods of not less than 90% of (1) the projected amount of such Net Cash Flow set forth in the Approved Budget for the one week period ending September 18, 2015, (2) the cumulative projected amount of such Net Cash Flow set forth in the Approved Budget for the preceding two week period ending September 25, 2015, (3) the cumulative projected amount of such Net Cash Flow set forth in the Approved Budget for the preceding three week period ending October 2, 2015 or (4) for each week ending on or after October 9, 2015, the cumulative projected amount of such Net Cash Flow set forth in the Approved Budget for the preceding four week period then ending on such date.

(c)  Professional Fees.  At all times from and after the Closing Date, disbursements in respect of items or amounts set forth in the line items under the heading designated "Professional Fees" (other than items or amounts in respect of fees and expenses of professionals (including, without limitation, legal counsel and financial advisors) not retained by the Debtors or the Committee) in the Approved Budget shall at no time exceed (x) on a cumulative basis, the aggregate amount of the sum of the Post-Default Carve-Out Cap plus the Pre-Default Accrued Fees plus the US Trustee Fees, at any time of determination and (y) on an line-by-line basis for each professional identified in the Approved Budget, the budgeted, accrued but unpaid professional fees and disbursements for each such professional so identified (less the amount of any unused retainer in respect of such professional fees held by such professional).

The foregoing clauses (a) through (c) shall be tested each applicable week pursuant to the Variance Report delivered by the Borrower to the Lender for the immediately preceding week.

Section 5.23       13-Week Projections; Variance Reports.

(i)  Not later than twelve (12) days after the Petition Date and thereafter, no later than 12:00 p.m. (New York time) on each Tuesday of each week after such date, and continuing weekly thereafter, the Borrower, through the Chief Restructuring Officer shall provide to the Lender and the Administrative Agent, a rolling 13-week cash flow forecast, which sets forth on a weekly basis sales, receipts, Net Cash Flow and disbursements, including the anticipated uses of proceeds of issuance of the Term Loans for each week during such period (the "13-Week Projections"), which projections shall be in form and substance satisfactory to the Lender.  It is hereby acknowledged and agreed that such 13-Week Projections shall not become the applicable Approved Budget until the Lender shall have delivered a notice of approval of such 13-Week Projections to the Borrower; provided, that if the Lender does not deliver a notice of approval to the Borrower, the then existing Approved Budget shall continue to constitute the applicable Approved Budget until such time as the 13-Week Projections are agreed to by the Lender pursuant to this Section 5.23.

(ii)  Concurrently with the delivery of each of the 13-Week Projections (other than the initial delivery), the Chief Restructuring Officer shall provide (x) a weekly line-by-line variance report (the "Variance Report"), in form and detail acceptable to the Lender, which Variance Report shall compare actual sales, cash receipts, Net Cash Flow and disbursements of the Borrower with amounts provided for in the Approved Budget on a line-by-line basis for the prior week period and the preceding four-week rolling period (or such shorter period as may have elapsed from the date hereof), to be certified by the Chief Restructuring Officer as being accurate and complete in all material respects and (y) any proposed

-52-

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 98 of 136

modifications to the Approved Budget (such proposed modifications to be in compliance at all times with Section 5.22 and 5.23(i)).

Section 5.24    Acknowledgment of Lender's Right to Assign Obligations; Borrower Cooperation.  The Borrower hereby acknowledges and agrees that notwithstanding any other provision of the Credit Documents to the contrary, the Lender shall be entitled to sell or assign all or any portion of the Obligations under the Credit Documents and its rights, remedies, security interest, liens, duties and obligations thereunder or in connection therewith to any Person at any time without the consent of the Borrower in accordance with Section 9.06, and the Borrower hereby agrees to fully-cooperate with all reasonable requests by the Lender and/or such assignee or transferee to effect the transfers of such Obligations and the related rights, remedies, security interests, liens, duties and obligations (or portions thereof) in accordance therewith, including, executing and delivering any and all instruments, documents and/or agreements and taking or causing to be taken all such actions, filings, registrations or other actions as, in each case, are reasonably requested by the Lender and/or such assignee or transferee in connection therewith.

Section 5.25    Financial Advisor for the Lender.  The Borrower hereby acknowledges and agrees that the Lender may at the sole expense of the Borrower (payable upon demand by the Lender), retain a financial advisor (the "Lender Financial Advisor") for such term and to perform such services and duties with respect to the Borrower, and its financial condition, assets, liabilities, operations and/or businesses, as determined by the Lender in its sole discretion. The Borrower agrees to, and to cause its Subsidiaries to, cooperate fully with the Lender Financial Advisor and the Lender's personnel and representatives with respect to, among other things, any reasonable request for information by the Lender Financial Advisor or such personnel and representatives including, without limitation, to (i) participate fully in, and cause its Chief Restructuring Officer and/or any investment bank or similar advisor for the Borrower to participate fully in, calls with the Lender Financial Advisor and/or the Lender at such times and with such frequency as reasonably requested by the Lender and (ii) provide, and cause its Chief Restructuring Officer and/or any investment bank or similar advisor for the Borrower to provide, such other reports and information (financial or otherwise) as the Lender and/or the Lender Financial Advisor may reasonably request from time to time in connection with any Collateral or any of the Borrower's or its Subsidiaries' financial condition, assets, liabilities, operations or businesses.  The Borrower acknowledges and agrees that the fees, costs and expenses of the Lender Financial Advisor shall constitute "Obligations" hereunder and shall be secured by the Collateral under the Security Documents.

Section 5.26    Plan Milestones; Sale Milestones.

(a)    Plan Milestones.  The Borrower shall take the following actions, comply with or obtain the following approvals, as applicable, as soon as possible but not later than the following dates (all such actions and approvals together with any additional actions or approvals as the Lender may reasonably require, collectively, the "Plan Milestones"):

(i)    By no later than September 22, 2015, the Borrower shall file with the Bankruptcy Court (A) a proposed Acceptable Plan of Reorganization and (B) a related solicitation motion and disclosure statement (the "Disclosure Statement") in connection with the Acceptable Plan of Reorganization, in each case, in form and substance acceptable to the Lender.

(ii)    By no later than October 14, 2015, obtain entry by the Bankruptcy Court of an orders, which orders have not been reversed, stayed, modified, amended, vacated or appealed, approving the Disclosure Statement and the solicitation motion, which orders shall be in form and substance acceptable to the Lender.

NAI-1500501901v9

(iii)     By no later than November 20, 2015, obtain entry of an order of the Bankruptcy Court confirming an Acceptable Plan of Reorganization, which order shall be in form and substance acceptable to the Lender.

(iv)     By no later than December 1, 2015, the effective date of the Acceptable Plan of Reorganization shall have occurred and the order confirming the Acceptable Plan of Reorganization shall not have been reversed, stayed, modified, amended, vacated or appealed, other than as agreed in writing by the Lender;

provided, however, that at any time the Lender determines, in its sole and absolute discretion, that any discussions or negotiations it is engaged in with any landlord, customer, vendor or other party are, or have become, ineffective or otherwise not sufficiently productive to facilitate the terms or approval of an Acceptable Plan of Reorganization, the Lender shall issue to the Borrower a written notice (a "Sale Trigger Notice"), and within three (3) Business Days of the delivery of such Sale Trigger Notice, the Borrower shall (i) withdraw from the Bankruptcy Court, the Disclosure Statement and the Plan of Reorganization filed with the Bankruptcy Court pursuant to the Plan Milestones and thereafter comply in all respects with the Sale Milestones set forth in clause (b) below and (ii) deliver to the Administrative Agent and the Lender updated 13-Week Projections, in form and substance acceptable to the Lender in its sole discretion, which updated 13-Week Projections as approved by the Lender shall constitute the Approved Budget from and after such date (until such time as such Approved Budget may otherwise be amended with the consent of the Lender pursuant to Section 5.23); provided, that, without limiting the Administrative Agent's and the Lender's rights and remedies under the Credit Documents, including, without limitation under Sections 7.01 and 7.02, nothing herein shall bind the Lender to approve such updated 13-Week Projections as the Approved Budget, and until such time as the Lender approves such 13-Week Projections as the Approved Budget, the Borrower shall not be obligated to commence the Sale Milestones.

It is hereby acknowledged and agreed that neither the Acceptable Plan of Reorganization, the Disclosure Statement, or any order of the Bankruptcy Court approving the Disclosure Statement or Acceptable Plan of Reorganization shall be amended or otherwise modified without the prior written consent of the Lender.

(b)     Sale Milestones.  Upon the delivery by the Lender to the Borrower of a Sale Trigger Notice (the "Sale Trigger Date"), the Borrower shall take the following actions, comply with or obtain the following approvals, as applicable, as soon as possible but not later than the following dates (all such actions and approvals together with any additional actions or approvals as the Lender may reasonably require, collectively, the "Sale Milestones"):

(i)     Not later than three (3) Business Days after the Sale Trigger Date, file a motion under Sections 363(b) and (f) of the Bankruptcy Code ("Sale Motion") seeking Bankruptcy Court approval to sell all or substantially all of Borrower's assets in one transaction or a series of transactions to a purchaser or purchasers reasonably acceptable to the Lender (the "Stalking Horse Bidder") pursuant to definitive documentation (including, without limitation, an asset purchase agreement and orders of the Bankruptcy Court approving such transaction or series of transactions) (i) in form and substance acceptable to the Lender or (ii) which sale provides for cash consideration payable on the effective date of such sale in an amount sufficient to pay in full, in cash, all Obligations and all Prepetition Obligations and any and all claims senior or *pari passu* thereto or therewith, in each case, subject to higher and/or better offers as determined by the Borrower (with the prior written consent of the Lender) in an auction process and approved by the Bankruptcy Court (an "Approved Sale"), together with a motion ("Bid Procedures Motion") for approval of bidding and auction procedures (the "Bid Procedures"), in each case, in form and substance acceptable to the Lender.  Notwithstanding the foregoing, the Administrative Agent, the

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 100 of 136

Lender, the Prepetition Agent and the Prepetition Lender and/or their respective designees expressly reserve the right to credit bid for all or any portion of the Borrower's assets, whether pursuant to an Auction or Plan of Reorganization under Section 1129 of the Bankruptcy Code.

(ii)    obtain Bankruptcy Court approval, pursuant to an order (the "Bid Procedures Order") in form and substance acceptable to the Lender, of the Bid Procedures no later than 21 days after the filing of the Sale Motion with the Bankruptcy Court.

(iii)    conduct, subject to Bankruptcy Court approval, an auction in accordance with the Bid Procedures (the "Auction") no later than 50 days after the Sale Trigger Date.

(iv)    obtain entry by the Bankruptcy Court of an order, which order has not been reversed, stayed, modified, amended, vacated or appealed, approving the Approved Sale (the "Approved Sale Order"), in form and substance acceptable to the Lender and Prepetition Lender, no later than 55 days after the Sale Trigger Date.

(v)    consummate the Approved Sale by no later than 60 days after the Sale Trigger Date.

It is hereby acknowledged and agreed that neither the Bid Procedures Order, the Bid Procedures, the Approved Sale definitive documentation or the Approved Sale Order nor any of the other approvals described above shall be amended or otherwise modified without the prior written consent of the Lender.

Section 5.27    Additional Bankruptcy Matters. (a) The Borrower shall promptly provide the Administrative Agent and the Lender with updates of any material developments in connection with the Borrower's reorganization efforts under the Chapter 11 Case, whether in connection with the sale of all or substantially all of the Borrower's assets, the marketing of the Borrower's assets, the formulation of any Plan of Reorganization, or otherwise.    Without limiting the foregoing, promptly upon any such information becoming available to the Borrower, the Borrower shall provide the Administrative Agent and the Lender with copies of any informational packages provided to potential bidders, a status report (upon request of the Administrative Agent and/or the Lender) and updated information relating to the sale of assets, and copies of all drafts of proposed sale documentation, any such bids and any updates, modifications or supplements to such information and materials.

(b)    The Borrower shall comply with, and promptly, punctually, and faithfully perform all the terms and conditions of, the Financing Orders.

Section 5.28    Marketing of Borrower's Assets.  The Borrower shall proactively market its assets in connection with the sale of all or substantially all of its assets pursuant to Section 363 of the Bankruptcy Code, which marketing efforts shall be in form, substance, scope and detail reasonably acceptable to the Lender.  Without limiting the foregoing or any other reporting requirements herein, the Borrower shall provide an update to the Lender regarding the marketing efforts in connection with the sale of its assets, in form and scope acceptable to the Lender, once per week (or more or less frequently as the Lender may from time to time  require) on a date to be mutually agreed upon by the Lender and the Chief Restructuring Officer.

NAI-1500501901v9

ARTICLE VI.

NEGATIVE COVENANTS

The Borrower hereby covenants and agrees that on the Closing Date and thereafter for so long as this Agreement is in effect and until such time as this Agreement has been terminated in accordance with the terms hereof and all Obligations, have been irrevocably and indefeasibly satisfied and paid in full:

Section 6.01    Changes in Business.  Neither the Borrower nor any of its Subsidiaries shall, directly or indirectly, engage in any business, other than its business as conducted on the Closing Date and any activities incidental thereto.

Section 6.02    Consolidation, Merger, Acquisitions, Asset Sales, etc.  The Borrower will not, and will not permit any Subsidiary to:

(a)    (i) wind up, liquidate or dissolve its affairs, (ii) enter into any transaction of merger or consolidation, (iii) make or otherwise effect any Acquisition, (iv) make or otherwise effect any Asset Sale, or (v) agree to do any of the foregoing at any future time, in each case, without the prior written consent of the Lender; or

(b)    Change its name or conduct business under any fictitious name, change its tax, charter or other organizational identification number, or change its form or state of organization,  except where, in each case, the Borrower shall have provided at least 30 days' prior written notice thereof to the Administrative Agent and the Lender and all actions shall have been taken prior thereto to ensure that the Agent has a perfected and continuing first priority Lien on and security interest in all Collateral, in each case, (i) encumbered by no Liens other than Permitted Liens and (ii) prior and superior in right to any other Person or Lien, other than the Carve-Out.

Section 6.03    Liens.  The Borrower will not, and will not permit any of its Subsidiaries to, create, incur, assume or suffer to exist any Lien upon or with respect to any property or assets of any kind of the Borrower or any such Subsidiary whether now owned or hereafter acquired, *except* that the foregoing shall not apply to:

(a)    any Standard Permitted Lien;

(b)    Liens in existence on the Closing Date that are listed in Schedule 6.03(b) hereto so long as (i) such Liens are expressly permitted under the Prepetition Note Purchase Agreement, (ii) the aggregate principal amount of Indebtedness secured thereby is not increased and (iii) such Lien does not encumber any property other than the property such Lien secures as of the Closing Date;

(c)    Liens created by this Agreement and the other Credit Documents; and

(d)    Liens in favor of the Prepetition Agent securing the Prepetition Obligations.

Notwithstanding the foregoing, subject to Section 2.10, the Liens permitted under subsections 6.03(a), (b) and (d) shall at all times be junior and subordinate to the Liens under the Credit Documents and the Financing Orders (and the adequate protection Liens, if any, of the Prepetition Agent and the Prepetition Lender), other than the Carve-Out.   The prohibition provided for in this Section 6.03 specifically includes, without limitation, the Borrower, any Committee, or any other party-in-interest in the Chapter 11 Case or any successor case to priming or creating pari passu to any claims, Liens or interests of the Administrative Agent (and the adequate protection claims and Liens, if any, of the

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 102 of 136

Prepetition Agent and the Prepetition Lender) any Lien (other than for the Carve-Out) irrespective of whether such claims, Liens or interests may be "adequately protected" (unless the Obligations and adequate protection claims will be paid in full in cash upon the granting of any such Lien and the Term Loan Commitments terminated).

Section 6.04    Indebtedness.    The Borrower will not, and will not permit any of its Subsidiaries to, contract, create, incur, assume or suffer to exist any Indebtedness of the Borrower or any of its Subsidiaries, *except*:

(a)    The Obligations and any other Indebtedness incurred under this Agreement and the other Credit Documents;

(b)    the Indebtedness existing on the Closing Date as set forth on Schedule 6.04(b) hereto, but only to the extent expressly permitted under Section 6.04(b) of the Prepetition Note Purchase Agreement;

(c)    [Reserved];

(d)    [Reserved];

(e)    [Reserved];

(f)    Indebtedness constituting Guaranty Obligations permitted by Section 6.05;

(g)    [Reserved];

(h)    [Reserved]; and

(i)    The Prepetition Obligations.

Notwithstanding the foregoing, and except for the Carve-Out, no Indebtedness under subsections 6.02(b) through (i), shall be permitted to have an administrative expense claim status under the Bankruptcy Code senior to or pari passu with the superpriority administrative expense claims of the Administrative Agent and the Lender (or the adequate protection claims, if any such claims, of the Prepetition Agent and Prepetition Lender) as set forth herein and in the Financing Orders.

Section 6.05    Investments and Guaranty Obligations.    The Borrower will not, and will not permit any of its Subsidiaries to, directly or indirectly, (i) make or commit to make any Investment or (ii) be or become obligated under any Guaranty Obligations, *except*:

(a)    Investments by the Borrower or any of its Subsidiaries in cash and Cash Equivalents, in each case, that are subject to the Administrative Agent's Lien and control, pursuant to documentation in form and substance satisfactory to the Lender;

(b)    any endorsement of a check or other medium of payment for deposit or collection, or any similar transaction, in each case, in the normal course of business;

(c)    the Borrower and its Subsidiaries may acquire and hold receivables and similar items owing to them in the ordinary course of business and payable or dischargeable in accordance with customary trade terms;

(d)    any securities (whether debt or equity) received by the Borrower or any of its Subsidiaries in connection with the bankruptcy or reorganization of any customer or supplier of the

-57-

Borrower or any such Subsidiary and in settlement of delinquent obligations of, and other disputes with, customers and suppliers arising in the ordinary course of business;

(e)        [Reserved];

(f)        Investments existing as of the Closing Date and described on Schedule 6.05(f) hereto, but only to the extent expressly permitted under Section 6.05 of the Prepetition Note Purchase Agreement;

(g)        any Guaranty Obligations of the Borrower or any Subsidiary arising under the Credit Documents and/or the Pre-petition Note Purchase Documents;

(h)        [Reserved];

(i)        Investments of the Borrower or any of its Subsidiaries in any Subsidiary existing as of the Closing Date;

(j)        [Reserved];

(k)        [Reserved];

(l)        [Reserved];

(m)        [Reserved];

(n)        [Reserved];

(o)        unsecured Guaranty Obligations (other than of a type otherwise described in this Section 6.05) as in effect as of the Closing Date and described on Schedule 6.05(f).

Section 6.06        Restricted Payments.  The Borrower will not, and will not permit any of its Subsidiaries to, declare or make, or agree to pay or make, directly or indirectly, any Restricted Payment, *except* (i) any Subsidiary of the Borrower may declare and pay or make Capital Distributions to the Borrower, and (ii) any Foreign Subsidiary of the Borrower may declare and pay or make Capital Distributions to any other Foreign Subsidiary or to the Borrower.

Section 6.07        [Reserved].

Section 6.08        [Reserved].

Section 6.09        Prepayments of other Indebtedness.  Except as permitted by the terms of the Credit Documents, the Approved Budget (subject to the applicable permitted variances set forth herein in Section 5.22) and by the Financing Orders (and then only at the time scheduled to be paid), the Borrower will not, and will not permit any of its Subsidiaries to, make or offer to make (i) any payments (whether voluntary or mandatory, or a prepayment, redemption, retirement, defeasance or acquisition) with respect to any (a) permitted Indebtedness for borrowed money (other than the Obligations and the Prepetition Obligations), or (b) other Lien or Indebtedness incurred or arising Prepetition, in each case, including, without limitation, any adequate protection payments in respect of such Indebtedness (other than with respect to the Prepetition Obligations), or (ii) prepay any Indebtedness (other than the Obligations and the Prepetition Obligations).

Section 6.10        Limitation on Certain Restrictive Agreements.  Other than as set forth in the Financing Orders, the Borrower will not, and will not permit any of its Subsidiaries to, directly or

-58-

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 104 of 136

indirectly, enter into, incur or permit to exist or become effective, any Restrictive Agreement, except a Restrictive Agreement (a) in effect on the Closing Date and disclosed on Schedule 6.10 (without giving effect to any amendments thereof making any such restrictive provisions more restrictive to the Borrower); (b) relating to secured Indebtedness permitted hereunder, as long as the restrictions apply only to collateral for such Indebtedness; (c) constituting customary restrictions on assignment in leases and other contracts; (d) the Prepetition Note Purchase Documents, as in effect as of the date hereof.

Section 6.11    Transactions with Affiliates.  The Borrower will not, and will not permit any Subsidiary to, enter into any transaction or series of transactions with any Affiliate other than in the ordinary course of business of and pursuant to the reasonable requirements of the Borrower's or such Subsidiary's business and upon fair and reasonable terms no less favorable to the Borrower or such Subsidiary than would be obtained in a comparable arm's-length transaction with a Person other than an Affiliate, *except* (i) sales of goods to an Affiliate for cash for use or distribution outside the United States that in the good faith judgment of the Borrower comply with any applicable legal requirements of the Code (ii) payment of customary directors' fees and indemnities (other than fees for affiliated directors); (iii) transactions with Affiliates that were consummated prior to the Closing Date, as shown on Schedule 6.11; and (iv) transactions with Affiliates in the ordinary course of business, upon fair and reasonable terms fully disclosed to the Lender and on terms no less favorable than would be obtained in a comparable arm's-length transaction with a non-Affiliate.

Section 6.12    Accounting Changes.   The Borrower will not, and will not permit any Subsidiary to, directly or indirectly, (i) change its methodology for determining its fiscal quarters and/or its fiscal year from that currently in effect with respect to the Borrower as of the Closing Date, or (ii) make any material change in accounting treatment or reporting practices, except as required by GAAP and in accordance with Section 1.03.

Section 6.13    Plan Terminations, Minimum Funding, etc.  The Borrower will not, and will not permit any Subsidiary of the Borrower or ERISA Affiliate to, (i) terminate any Plan or Plans, (ii) other than as an Effect of Bankruptcy, permit to exist one or more events or conditions that present a material risk of the termination by the PBGC of any Plan or Plans, (iii) subject to the approval of the Bankruptcy Court in the Chapter 11 Case and the Approved Budget (subject to the applicable permitted variances set forth herein in Section 5.22), fail to comply with the minimum funding standards of ERISA and the Code with respect to any Plan, or (iv) incur an obligation to contribute to, or become a contributing sponsor (as such term is defined in Section 4001 of ERISA) in, any Multi-Employer Plan or Multiple Employer Plan.

Section 6.14    Anti-Terrorism Laws.  Neither the Borrower nor any of its Subsidiaries shall be subject to or in violation of any law, regulation, or list of any government agency (including, without limitation, the U.S. Office of Foreign Asset Control list, Executive Order No. 13224 or the USA Patriot Act) that prohibits or limits the conduct of business with or the receiving of funds, goods or services to or for the benefit of certain Persons specified therein or that prohibits or limits the Lender from making the Term Loans hereunder, in whole or in part, from the Borrower or from otherwise conducting business with the Borrower.

Section 6.15    Material Amendments of Material Contracts and Certain Other Agreements.  The Borrower shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly, amend, modify, cancel or terminate or permit the amendment, modification, cancellation or termination of, any of the Material Contracts, in any manner adverse to the interests to the interests of the Borrower, its Subsidiaries, the Agent or the Lender; and

NAI-1500501901v9

Section 6.16    No Additional Subsidiaries.  The Borrower shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly, form, create or acquire any new Subsidiaries unless consented to in writing by the Lender or (ii) enter into any joint venture or partnership.

Section 6.17    Hedging Agreements.  The Borrower shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly, enter into any Hedge Agreement.

Section 6.18    Organizational Documents. The Borrower shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly, amend, modify or otherwise change its articles or certificate of incorporation, operating agreement, partnership agreement, by-laws or other organizational documents, except (i) in connection with a transaction permitted under Section 6.02 or (ii) any other amendment, modification or change, so long as in either cases of clause (i) or (ii) above, any such amendment, modification or change is not adverse to the Agent and/or the Lender.

Section 6.19    Use of Proceeds.  The Borrower shall not, nor shall it permit any of its Subsidiaries to, directly or indirectly, use Cash Collateral or the proceeds of the Term Loans made hereunder, for the purpose, whether immediate, incidental or ultimate, of "purchasing or carrying" any Margin Stock or other than for the purposes set forth in Section 5.18.

ARTICLE VII.

EVENTS OF DEFAULT

Section 7.01    Events of Default.  Any of the following specified events shall constitute an Event of Default (each an "Event of Default"):

(a)    failure of the Borrower to pay any Obligations when due (whether at stated maturity, upon acceleration or otherwise);

(b)    the Borrower breaches or fails to perform any term, covenant or agreement contained in Section 2.10 through 2.13, 5.01, 5.02, 5.05, 5.07, 5.18 through 5.27, or Article VI;

(c)    (i) Any representation, warranty, certification or other written statement of the Borrower given, made or deemed made in connection with any Credit Documents or the transactions contemplated thereby is incorrect or misleading in any material respect when given, made or deemed made, or (ii) the Borrower breaches or fails to perform any other covenant contained in any Credit Documents (and such breach does not constitute an Event of Default under any other provision of this Section 7.01), and such breach or failure is not cured within 5 days after an Authorized Officer of the Borrower, as applicable, has knowledge thereof or receives notice thereof from the Administrative Agent (at the direction of the Lender), whichever is sooner; provided, however, that such notice and opportunity to cure shall not apply if the breach or failure to perform is not capable of being cured within such period or is a willful breach by the Borrower;

(d)    a Change of Control shall occur;

(e)    except with respect to the Effect of Bankruptcy, the occurrence of any, breach, default or event of default with respect to any other note, agreement or instrument evidencing any Indebtedness of the Borrower (other than the Obligations or the Prepetition Obligations) in excess, individually or in the aggregate, of $100,000, which results in the acceleration of, or would permit the holders thereof to accelerate, the maturity of, or to otherwise cause (or permit the holders thereof to cause) such other Indebtedness to become due prior to the stated maturity date thereof (including by way of a forced

-60-

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 106 of 136

redemption thereof) (whether or not such Indebtedness is in fact accelerated, redeemed or demanded due); it being acknowledged and agreed that no waiver by the holder of any such Indebtedness shall serve to effect, cure or waive the resulting Event of Default hereunder, which Event of Default shall remain in effect and be continuing until separately waived by the Lender hereunder;

(f)     the Security Documents and/or the Financing Orders fail or cease to create in favor of the Administrative Agent, valid, enforceable, unavoidable and perfected first priority security interests in and/or Liens on the Collateral in favor of the Administrative Agent, for the benefit of the Administrative Agent and the Lender, in each case, (i) encumbered by no Liens other than Permitted Liens and (ii) prior and superior in right to any other Person or Lien, other than the Carve-Out; or any portion of the Collateral having a book value of $100,000 or more is seized, levied upon or is attached, becomes the subject of any eminent domain proceeding, is taken or impaired through condemnation, or is lost, stolen, damaged or destroyed (and such loss, theft, damage or destruction is not covered by insurance and/or the insurer has denied or repudiated its liability therefor);

(g)     one or more judgments in the amount of $200,000 in the aggregate (which are not covered by insurance and/or the insurer has denied or repudiated its liability therefor), are entered against any of the Borrower or any of its Subsidiaries, which judgments are not paid, released, discharged or stayed within 10 days thereafter;

(h)     the Borrower or any of its Subsidiaries is enjoined, restrained or in any way prevented by any Governmental Authority from conducting any material part of its business; the Borrower or any of its Subsidiaries suffers the loss, revocation or termination of any material license, permit, lease or agreement necessary to its business; there is a cessation of any material part of the Borrower's or such Subsidiary's business for a material period of time;

(i)     an ERISA Termination Event occurs with respect to a Pension Plan or Multiemployer Plan that has or could reasonably be expected to result in a lien on or claim to the Collateral that is pari passu or senior to the Liens and claims of the Administrative Agent and the Lender in the Collateral; the Borrower or ERISA Affiliate fails to pay when due any installment payment with respect to its withdrawal liability under Section 4201 of ERISA under a Multiemployer Plan; or any event similar to the foregoing occurs or exists with respect to a Foreign Plan;

(j)     any subordination or intercreditor provision in any document or instrument, or any subordination provision in any guaranty by the Borrower or any of its Subsidiaries, shall cease to be in full force and effect, or the Borrower or any of its Subsidiaries shall contest in any manner the validity, binding nature or enforceability of any such provision or a proceeding shall be commenced by any subordinating party or any governmental authority having jurisdiction over any of them, seeking to establish the invalidity or unenforceability thereof;

(k)     (i) the Borrower shall fail to file with the Bankruptcy Court a motion requesting the approval of the retention of the Chief Restructuring Officer, in such capacity, on the Petition Date or (ii) the Bankruptcy Court shall not have entered an order approving the retention of the Chief Restructuring Officer, in such capacity, within 28 days after the Petition Date, or such later date as may be agreed to in writing by the Lender;

(l)     the Final Order shall not have been entered within 21 days after the Petition Date;

(m)     any of the Interim Order (or the Final Order, when applicable), the Cash Management Order, the Bid Procedures Order, the Approved Sale Order, any order approving the Disclosure Statement or Acceptable Plan of Reorganization or any other order with respect to the Chapter 11 Case affecting in

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 107 of 136

any material respect this Agreement and/or the other Credit Documents (including any order in respect of the Sale Milestones specified herein and/or in the Financing Orders) shall cease to be in full force and effect, or the Bankruptcy Court shall enter any order amending, supplementing, altering, staying, vacating, rescinding or otherwise modifying the Interim Order (or the Final Order, when applicable), the Cash Management Order, the Bid Procedures Order, the Bid Procedures, the Approved Sale definitive documentation, the Approved Sale Order, the Disclosure Statement, the Acceptable Plan of Reorganization, any order approving the Disclosure Statement or Acceptable Plan of Reorganization, or any other such order in any material respect without the prior written consent of the Lender;

(n)      (i) The Borrower or any of its Subsidiaries shall fail to comply with the Financing Orders (including any of the Sale Milestones and/or Plan Milestones set forth therein), Cash Management Order or any other order with respect to any of the Chapter 11 Case affecting in any material respect this Agreement and/or the other Credit Documents (including any order in respect of the Sale Milestones specified herein and/or in the Financing Orders), or (ii) the Borrower or any of its Subsidiaries shall fail to comply with any order of the Bankruptcy Court, other than the orders described in the preceding clause (ii), in any material respect;

(o)      The Bankruptcy Court shall enter any order (i) dismissing any of the Chapter 11 Case or converting any of the Chapter 11 Case to a Chapter 7 case, (ii) appointing a Chapter 11 trustee or an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code in any of the Chapter 11 Case, (iii) appointing a fiduciary or representative of the estate with decision-making or other management authority over some or all of the Borrower's senior management other than the Chief Restructuring Officer, or its designated principal, or (iv) any other superpriority claim (other than the Carve-Out) or grant of any other Lien (including any adequate protection lien) having a priority equal or superior to the claims and Lien in favor of the Administrative Agent securing the Obligations or in favor of the Prepetition Agent securing the Prepetition Obligations (other than the Liens in favor of the Agent) shall be granted in any of the Chapter 11 Cases;

(p)      Other than payments authorized by the Bankruptcy Court and which are set forth in the Approved Budget, in each case to the extent authorized by one or more "first day" or other orders satisfactory to the Lender, the Borrower shall make any payment (whether by way of adequate protection or otherwise) of principal or interest or otherwise on account of any Prepetition Indebtedness (other than the Prepetition Obligations) or payables (including, without limitation, reclamation claims);

(q)      The Bankruptcy Court shall enter an order granting relief from the automatic stay to any creditor holding or asserting a Lien to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any assets of the Borrower which have an aggregate value in excess of $100,000;

(r)      The occurrence of any event set forth in clauses (d) through (k) of the definition of Maturity Date;

(s)      The filing by or the acquiescence of the Borrower of any Plan of Reorganization that is not an Acceptable Plan of Reorganization;

(t)      The Borrower or any of its Subsidiaries shall file a motion or other pleadings in any of the Chapter 11 Cases (i) to use Cash Collateral of the Lenders under Section 363(c) of the Bankruptcy Code without the Lender's consent, (ii) to obtain additional financing under Sections 364(c) or (d) of the Bankruptcy Code *pari passu* or senior to the Obligations and/or to the Liens securing the Obligations or to the Prepetition Obligations and/or to the Liens securing the Prepetition Obligations (other than the financing provided hereunder) or (iii) to take any other action or actions adverse to the Administrative

-62-

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 108 of 136

Agent or the Lender or their rights and remedies hereunder or under any of the other Credit Documents or the Financing Orders, or the Administrative Agent's or the Lender's interest in any of the Collateral;

(u)     (i) Any of the Credit Documents and/or the Prepetition Credit Documents and/or any covenant, agreement or obligation of any party contained therein or evidenced by any of the Credit Documents (including the guaranty by any guarantor) or Prepetition Note Purchase Documents for any reason ceases to be in full force and effect or is declared to be null and void, illegal, invalid or unenforceable by a court of competent jurisdiction; (ii) the Borrower or any of its Subsidiaries or a third party engages in or supports any challenge to the validity, perfection, first priority, extent or enforceability of any of the Credit Documents or the Liens securing the Obligations or the Prepetition Obligations or the Prepetition Note Purchase Documents or the Liens securing the Prepetition Obligations including without limitation seeking to equitably subordinate or avoid the Liens securing the Prepetition Obligations; or (iii) the Borrower or any of its Subsidiaries engages in or supports (other than by way of providing specific factual information in response to inquiries from any such Person) any investigation or asserts any claims or causes of action (or directly or indirectly support (other than by the way of providing specific factual information in response to inquiries from any such Person) assertion of the same) against the Administrative Agent, the Lender, the Prepetition Agent or the Prepetition Lender; provided, however, that it shall not constitute an Event of Default if the Borrower or any of its Subsidiaries provide information with respect to the Prepetition Note Purchase Documents to a party in interest, or are compelled to provide information by an order of the Bankruptcy Court so long as the Administrative Agent and the Lender have been served with the request for such an order or, if no such service has been made prior to the time the Borrower or any such Subsidiary are required to provide information, so long as the Borrower or such Subsidiary provide prior written notice to the Administrative Agent, the Lender, the Prepetition Agent and the Prepetition Lender of any intention or requirement to do so;

(v)     Any Lien purported to be created under any Financing Order and/or Credit Document shall cease to be, or shall be asserted by the Debtor not to be, a valid, perfected and unavoidable first priority Lien on any Collateral, with the priority required by the applicable Financing Order or Credit Document;

(w)     Entry of an order by the Bankruptcy Court authorizing or directing payment of any claim or claims under Section 506(c) or 552(b) of the Bankruptcy Code against or with respect to any of the Collateral (other than the Carve-Out);

(x)     The making of any payment (after allowance) in respect of any claim or claims under Section 546(c) or 503(b)(9) of the Bankruptcy Code that is not contemplated in the Approved Budget or is otherwise unacceptable to the Lender;

(y)     The Borrower or any of its Subsidiaries files a motion with the Bankruptcy Court or supports a motion filed with the Bankruptcy Court, except for the Bid Procedures Motion, which fails to provide that the Administrative Agent, on behalf of the Lenders, or the Prepetition Agent, on behalf of the Prepetition Lender, has the right to credit bid for any assets of the Borrower in connection with any sale pursuant to Section 363(k) of the Bankruptcy Code or pursuant to a Plan of Reorganization;

(z)     Unless consented to in writing by the Lender, entry of an order by the Bankruptcy Court authorizing an Approved Sale, the cash proceeds of which are not in an amount sufficient to Pay in Full all Obligations, all Prepetition Obligations and all claims prior thereto or on parity therewith on the effective date of such Approved Sale; or

(aa)     Any non-compliance with, or breach or termination of, any Approved Sale definitive documentation by any party thereto, or such documentation is held to be invalid or unenforceable.

-63-

Section 7.02    Remedies.  If an Event of Default described in Sections 7.01(o) or 7.01(u) occurs, then to the extent permitted by applicable law, all Obligations shall become automatically due and payable, the Maturity Date shall be deemed to have occurred and all Term Loan Commitments shall terminate, without any action by the Administrative Agent or the Lender or notice of any kind.   In addition, or upon the occurrence and during the continuance of any other Event of Default which has not been waived by the Administrative Agent at the direction of the Lender required pursuant to Section 9.11, the Agent shall (solely upon the written direction of the Lender), notwithstanding the provisions of Section 362 of the Bankruptcy Code, without any application, motion or notice to, or hearing before, or order from the Bankruptcy Court (subject to any applicable provisions of the Financing Orders), take any or all of the following actions, at the same or different times:

(a)    declare any Obligations immediately due and payable, whereupon they shall be due and payable without diligence, presentment, demand, protest or notice of any kind, all of which are hereby waived by the Borrower to the fullest extent permitted by law;

(b)    terminate, reduce or condition any Term Loan Commitment;

(c)    require the Borrower to Cash Collateralize any Obligations that are contingent or not yet due and payable, and, if the Borrower fails promptly to Cash Collateralize such Obligations, the Lender may advance the amounts sufficient to Cash Collateralize such Obligations as Term Loans (whether or the conditions in Section 3.02 are satisfied);

(d)    subject to the three (3) Business Days' notice and related procedures set forth in clause (f) below, direct the Borrower to sell or otherwise dispose of any or all of the Collateral on terms and conditions reasonably acceptable to the Lender pursuant to Sections 363, 365 and other applicable provisions of the Bankruptcy Code (and, without limiting the foregoing, direct the Borrower to assume and assign any lease or executory contract included in the Collateral to the Administrative Agent's designees in accordance with and subject to Section 365 of the Bankruptcy Code);

(e)    subject to the three (3) Business Days' notice and related procedures set forth in clause (f) below, enter onto the premises of the Borrower in connection with a commercially reasonable liquidation of the Collateral;

(f)    exercise any other rights or remedies afforded under any agreement, by law, at equity or otherwise, including the rights and remedies of a secured party under the UCC, the rights and remedies provided for under the Bankruptcy Code and, pursuant to the Interim Order and the Final Order, the automatic stay of Section 362 of the Bankruptcy Code shall be modified and vacated to permit the Administrative Agent and the Lender to exercise their remedies under (and in accordance with) this Agreement and the other Credit Documents and applicable law, without further notice, application or motion to, or hearing before, or order from, the Bankruptcy Court; provided, however, notwithstanding anything to the contrary herein, the Administrative Agent and/or the Lender shall be permitted to exercise any remedy in the nature of a liquidation of, or foreclosure on, any interest of the Borrower in the Collateral only upon three (3) Business Days' prior written notice of the Borrower, the Office of the United States Trustee, and counsel approved by the Bankruptcy Court for the Committee, during which period the Debtor, the Committee and/or the U.S. Trustee may seek an emergency hearing before the Bankruptcy Court for the sole purpose of determining whether an Event of Default has occurred; provided that the Debtor shall have no right to use or seek to use Cash Collateral and may not use the proceeds of any Term Loans made hereunder during such three (3) Business Day-period other than (i) for the satisfaction of the Obligations, the Prepetition Obligations and the Carve-Out, and (ii) as otherwise consented to in writing by the Lender.  Unless during such three (3) Business Day-period the Bankruptcy Court determines that an Event of Default has not occurred, upon the expiration of such three (3) Business

NAI-1500501901v9

Day-period, (x) the Debtor shall no longer have the right to use Cash Collateral pursuant to this Agreement, the other Credit Documents or the Financing Orders, except with respect to the Carve-Out as provided herein and in the Financing Orders, (y) the Administrative Agent and the Lender shall have relief from the automatic stay without further notice or order and may foreclose on all or any portion of the Collateral or otherwise exercise remedies against the Collateral permitted under the Credit Documents, the Financing Orders and applicable non-bankruptcy law, including the exercise of rights of setoff, and (z) the Administrative Agent shall be deemed appointed, with full power of substitution, as the true and lawful attorney-in-fact for the Debtor with full power and authority in the place and stead of the Debtor or in the Administrative Agent's own name, in each case, at the written direction of the Lender, to take any action and to execute any and all documents and instruments to maintain, complete the manufacturing, processing and/or packaging of, sell, lease, liquidate or dispose of the Collateral and to any other exercise remedies against the Collateral permitted under the Credit Documents, the Financing Orders and applicable non-bankruptcy law. Without limiting the foregoing, such rights and remedies include the rights to (i) take possession of or complete the manufacturing, processing and/or packaging of any Collateral; (ii) require the Borrower to assemble Collateral, at the Borrower's expense, and make it available to Administrative Agent at a place designated by the Administrative Agent; (iii) enter any premises where Collateral is located and store Collateral on such premises until sold (and if the premises are owned or leased by the Borrower or a Subsidiary thereof, the Borrower agrees not to, or cause such Subsidiary not to, charge for such storage); and (iv) sell or otherwise dispose of any Collateral in its then condition, or after any further manufacturing or processing thereof, at public or private sale, with such notice as may be required by applicable law, in lots or in bulk, at such locations, all as Agent, at the direction of the Lender, deems advisable. The Borrower agrees that 10 days notice of any proposed sale or other disposition of Collateral by the Administrative Agent shall be reasonable, and any sale conducted on the internet or to a licensor of intellectual property shall be commercially reasonable. The Administrative Agent may conduct sales on the Borrower's premises, without charge, and any sale may be adjourned from time to time in accordance with applicable law. The Administrative Agent shall have the right to sell, lease or otherwise dispose of any Collateral for cash, credit or any combination thereof, and the Agent may purchase any Collateral at public or, if permitted by law, private sale and, in lieu of actual payment of the purchase price, may credit bid and set off the amount of such price against the Obligations.

(g)    Upon the entry of the Interim Order, the Administrative Agent is hereby granted an irrevocable, non-exclusive license or other right to use, license or sub-license (without payment of royalty or other compensation to any Person) any or all intellectual property of the Borrower, computer hardware and software, trade secrets, brochures, customer lists, promotional and advertising materials, labels, packaging materials and other property, in advertising for sale, marketing, selling, collecting, completing manufacture of, or otherwise exercising any rights or remedies with respect to, any Collateral; provided, however, that the Administrative Agent's exercise of any rights under such license are subject to the three (3) Business Days' notice and related procedures set forth in clause (f) above. The Borrower's rights and interests under intellectual property shall inure to the Administrative Agent's benefit.

(h)    At any time during an Event of Default (but in all cases subject to the other terms of this Credit Agreement, the Administrative Agent, the Lender, and any of their Affiliates are authorized, to the fullest extent permitted by applicable law, to set off and apply any and all deposits (general or special, time or demand, provisional or final, in whatever currency) at any time held and other obligations (in whatever currency) at any time owing by the Administrative Agent, the Lender or such Affiliate to or for the credit or the account of the Borrower against any Obligations, irrespective of whether or not Agent, the Lender or such Affiliate shall have made any demand under this Agreement or any other Credit Document and although such Obligations may be contingent or unmatured or are owed to a branch or office of Agent, the Lender or such Affiliate different from the branch or office holding such deposit or obligated on such indebtedness. The rights of Administrative Agent, the Lender and each such Affiliate

-65-

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 111 of 136

under this Section are in addition to other rights and remedies (including other rights of setoff) that such Person may have.

Section 7.03    Remedies Cumulative; No Waiver.

(a)    Cumulative Rights.    All agreements, warranties, guaranties, indemnities and other undertakings of the Borrower under the Credit Documents are cumulative and not in derogation of each other.    Subject to the terms of this Agreement, the rights and remedies of Administrative Agent and Lender are cumulative, may be exercised at any time and from time to time, concurrently or in any order, and are not exclusive of any other rights or remedies available by agreement, by law, at equity or otherwise.    All such rights and remedies shall continue in full force and effect until Full Payment of all Obligations, in cash.

(b)    Waivers.    No waiver or course of dealing shall be established by (a) the failure or delay of Administrative Agent or Lender to require strict performance by the Borrower with any terms of the Credit Documents, or to exercise any rights or remedies with respect to Collateral or otherwise; (b) the making of any Term Loan a Default, Event of Default or other failure to satisfy any conditions precedent; or (c) acceptance by Administrative Agent or Lender of any payment or performance by the Borrower under any Credit Documents in a manner other than that specified therein.    It is expressly acknowledged by the Borrower that any failure to satisfy a financial covenant on a measurement date shall not be cured or remedied by satisfaction of such covenant on a subsequent date.

Section 7.04    Application of Certain Payments and Proceeds.    All payments and other amounts received by the Administrative Agent including without limitation through the exercise of remedies hereunder or under the other Credit Documents shall be applied as follows:

(i)    *first*, to pay Obligations in respect of any cost or expense reimbursements (including, without limitation, the costs, expenses and disbursements of its agents and counsels) and indemnities incurred by (a) first, the Administrative Agent and (b) second, the Lender pursuant to this Agreement and the other Credit Documents, until paid in full;

(ii)    *second*, to the payment of that portion of the Obligations constituting fees, costs, indemnities and expenses and other amounts (including attorneys' fees and amounts due under Article III), until paid in full;

(iii)    *third*, to the payment of that portion of the Obligations constituting accrued and unpaid interest on Term Loans, until paid in full;

(iv)    *fourth*, to the payment of principal of the Term Loans, until paid in full;

(v)    *fifth*, to the payment of all other Obligations of the Borrower owing under or in respect of the Credit Documents that are then due and payable, until paid in full;

(vi)    *sixth*, to the payment of that portion of the Prepetition Obligations constituting fees, costs, indemnities and expenses and other amounts, until paid in full;

(vii)    *seventh*, to the payment of that portion of the Prepetition Obligations constituting accrued and unpaid interest, until paid in full;

(viii)    *eighth*, to the payment of that portion of the Prepetition Obligations constituting principal, until paid in full;

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 112 of 136

(ix)     *ninth*, to the payment of all other Prepetition Obligations owing under or in respect of the Prepetition Note Purchase Documents that are then due and payable, until paid in full; and

(x)     *finally*, any remaining surplus after all of the Obligations and Prepetition Obligations have been paid in full, to the Borrower or to whomsoever shall be lawfully entitled thereto.

Payments shall be applied to the satisfaction of each of the Obligations in the order specified above before being applied to amounts owing under any succeeding item.  To the extent insufficient amounts are available to pay the entire amount then owing to any Person under any of the foregoing specified items, such payments shall be applied to payment of such amounts owing to all such Persons pursuant to such item ratably based on the percentage of such total obligations described in such item as are then owing to each such Person entitled thereto.  The allocations set forth in this Section are solely to determine the rights and priorities among the Administrative Agent and the Lender, and may be changed by agreement among them without the consent of the Borrower.  This Section is not for the benefit of or enforceable by the Borrower, and the Borrower irrevocably waives the right to direct the application of any payments or Collateral proceeds subject to this Section.

ARTICLE VIII.

THE ADMINISTRATIVE AGENT

Section 8.01      Appointment.  The Lender hereby irrevocably designates and appoints the Administrative Agent as its agent of under this Agreement and the other Credit Documents, and the Lender irrevocably authorizes the Administrative Agent, in such capacity, to take such action on its behalf under the provisions of this Agreement and the other Credit Documents and to exercise such powers and perform such duties as are expressly delegated to the Administrative Agent by the terms of this Agreement and the other Credit Documents, together with such other powers as are reasonably incidental thereto.  Notwithstanding any provision to the contrary elsewhere in this Agreement, the Administrative Agent shall not have any duties or responsibilities, except those expressly set forth herein and in the other Credit Documents, or any fiduciary relationship with the Lender, and no implied covenants, functions, responsibilities, duties, obligations or liabilities shall be read into this Agreement or any other Lender Document or otherwise exist against the Administrative Agent.

Section 8.02      Delegation of Duties.  The Administrative Agent may execute any of its duties under this Agreement and the other Credit Documents by or through agents or attorneys in fact and shall be entitled to advice of counsel concerning all matters pertaining to such duties.  The Administrative Agent shall not be responsible for the negligence or misconduct of any agents or attorneys-in fact selected by it with reasonable care.

Section 8.03      Exculpatory Provisions.  (a) Neither the Administrative Agent nor any of its officers, directors, employees, agents, attorneys in fact or Affiliates shall (i) be liable for any action lawfully taken or omitted to be taken by it or such Person under or in connection with this Agreement or any other Credit Document (except to the extent that any of the foregoing are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted solely and proximately from its or such Person's own gross negligence, bad faith or willful misconduct); (ii) be subject to any fiduciary or other implied duties, regardless of whether a Default has occurred and is continuing, (iii) have any duty to take any discretionary action or exercise any discretionary powers, except discretionary rights and powers expressly contemplated hereby or by the other Credit Documents that the Administrative Agent is

-67-

Case: 15-31141     Doc# 10     Filed: 09/10/15     Entered: 09/10/15 06:48:32     Page 113 of 136

required to exercise as directed in writing by the Lender; *provided* that the Administrative Agent shall not be required to take any action that, in its judgment or the judgment of its counsel, may expose the Administrative Agent to liability or that is contrary to any Credit Document or applicable law; and (iv) except as expressly set forth herein and in the other Credit Documents, have any duty to disclose, and shall not be liable for the failure to disclose, any information relating to the Borrower or any of its Affiliates that is communicated to or obtained by the Administrative Agent or any of its Affiliates in any capacity. The Administrative Agent shall not be under any obligation to the Lender to ascertain or to inquire as to the observance or performance of any of the agreements contained in, or conditions of, this Agreement or any other Credit Document, or to inspect the properties, books or records of the Borrower.

(b)    The Administrative Agent shall not be responsible for or have any duty to ascertain or inquire into (i) any statement, warranty or representation made in or in connection with this Agreement or any other Credit Document, (ii) the contents of any certificate, report or other document delivered hereunder or thereunder or in connection herewith or therewith, (iii) the performance or observance of any of the covenants, agreements or other terms or conditions set forth herein or therein or the occurrence of any Default, (iv) the validity, enforceability, effectiveness or genuineness of this Agreement, any other Credit Document or any other agreement, instrument or document, (v) the satisfaction of any condition set forth in ARTICLE III or elsewhere herein, other than to confirm receipt of items expressly required to be delivered to the Administrative Agent. Without limiting the generality of the foregoing, the use of the term "agent" in this Agreement with reference to the Administrative Agent is not intended to connote any fiduciary or other implied (or express) obligations arising under agency doctrine of any applicable law. Instead, such term is used merely as a matter of market custom and is intended to create or reflect only an administrative relationship between independent contracting parties.

Section 8.04    <u>Reliance by Administrative Agent</u>. The Administrative Agent shall be entitled to rely, and shall be fully protected in relying, upon any instrument, writing, resolution, notice, consent, certificate, affidavit, letter, telecopy, telex or teletype message, statement, order or other document or conversation reasonably believed by it to be genuine and correct and to have been signed, sent or made by the proper Person or Persons and upon advice and statements of legal counsel (including, without limitation, counsel to the Borrower), independent accountants and other experts selected by the Administrative Agent. The Administrative Agent also may rely upon any statement made to it orally or by telephone and reasonably believed by it to have been made by the proper Person, and shall not incur any liability for relying thereon. In determining compliance with any condition hereunder to the making of the Term Loans that by its terms must be fulfilled to the satisfaction of the Lender, the Administrative Agent may presume that such condition is satisfactory to the Lender unless the Administrative Agent shall have received notice to the contrary from the Lender prior to the making of such Term Loan. The Administrative Agent may consult with legal counsel (who may be counsel for the Borrower), independent accountants and other experts selected by it, and shall be entitled to rely upon the advice of any such counsel, accountants or experts and shall not be liable for any action taken or not taken by it in accordance with such advice. The Administrative Agent may deem and treat the payee of any Term Loan Note as the owner thereof for all purposes unless such Term Loan Note shall have been transferred in accordance with <u>Section 9.06</u> and all actions required by such Section in connection with such transfer shall have been taken. The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any other Credit Document unless it shall first receive such advice or concurrence of the Lender as it deems appropriate or it shall first be indemnified to its satisfaction by the Lender against any and all liability and expense that may be incurred by it by reason of taking or continuing to take any such action. The Administrative Agent shall in all cases be fully protected in acting, or in refraining from acting, under this Agreement and the other Credit Documents in accordance with a request of the Lender, and such request and any action taken or failure to act pursuant thereto shall be binding upon all the Lender and all future holders of the Obligations.

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 114 of 136

Section 8.05　　Notice of Default.  The Administrative Agent shall not be deemed to have knowledge or notice of the occurrence of any Default or Event of Default hereunder unless the Administrative Agent shall have received written notice from the Lender or the Borrower referring to this Agreement, describing such Default or Event of Default and stating that such notice is a "notice of default."  In the event that the Administrative Agent shall receive such a notice, the Administrative Agent shall give notice thereof to the Lender.  The Administrative Agent shall only take such action with respect to declaring such Default or Event of Default and accelerating the Obligations as shall be reasonably directed by the Lender.  In no event shall the Administrative Agent be required to comply with any such directions to the extent that the Administrative Agent reasonably believes that its compliance with such directions would be unlawful.

Section 8.06　　Non-Reliance on the Administrative Agent.　The Lender expressly acknowledges that neither the Administrative Agent nor any of its respective officers, directors, employees, agents, attorneys and other advisors, partners, attorneys in fact or Affiliates have made any representations or warranties to it and that no act by the Administrative Agent hereafter taken, including any review of the affairs of the Borrower or any Affiliate of the Borrower, shall be deemed to constitute any representation or warranty by the Administrative Agent to the Lender.  The Lender represents to the Administrative Agent that it has, independently and without reliance upon the Administrative Agent, and based on such documents and information as it has deemed appropriate, made its own appraisal of and investigation into the business, operations, property, financial and other condition and creditworthiness of the Borrower and its Affiliates and made its own decision to make the Term Loans hereunder and enter into this Agreement.  The Lender also represents that it will, independently and without reliance upon the Administrative Agent, and based on such documents and information as it shall deem appropriate at the time, continue to make its own credit analysis, appraisals and decisions in taking or not taking action under this Agreement and the other Credit Documents, and to make such investigation as it deems necessary to inform itself as to the business, operations, property, financial and other condition and creditworthiness of the Borrower and its Affiliates.  Except for notices, reports and other documents expressly required to be furnished to the Lender by the Administrative Agent hereunder, the Administrative Agent shall have no duty or responsibility to provide the Lender with any credit or other information concerning the business, operations, property, condition (financial or otherwise), prospects or creditworthiness of the Borrower or any Affiliate of the Borrower that may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents, attorneys and other advisors, partners, attorneys in fact or Affiliates.

Section 8.07　　Indemnification.  The Lender agrees to indemnify the Administrative Agent, its Affiliates, and its officers, directors, partners, trustees, employees, shareholders, attorneys and other advisors, agents and controlling Persons and each of their respective heirs, successors and permitted assigns (each an "Indemnified Person") in its capacity as such (to the extent not reimbursed by the Borrower and without limiting the obligation of the Borrower to do so), for, and to save each Indemnified Person harmless from and against, any and all liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind whatsoever that may at any time (including, without limitation, at any time following the payment of the Obligations) be imposed on, incurred by or asserted against such Indemnified Person in any way relating to or arising out of, the Obligations, this Agreement, any of the other Credit Documents, or any documents contemplated by or referred to herein or therein or the transactions contemplated hereby or thereby or any action taken or omitted by such Indemnified Person under or in connection with any of the foregoing; *provided* that the Lender shall not be liable for the payment of any portion of such liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements that are found by a final and non-appealable decision of a court of competent jurisdiction to have resulted solely and proximately from the Indemnified Person's gross negligence or willful misconduct.  If any indemnity furnished to the Administrative Agent for any purpose shall, in the opinion of the Administrative Agent, be insufficient or

-69-

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 115 of 136

become impaired, the Administrative Agent may call for additional indemnity and cease, or elect not to commence, to do the acts indemnified against until such additional indemnity (which additional indemnity may include cash collateral or other form of security acceptable to such Agent) is furnished. The agreements in this <u>Section 8.07</u> shall survive the Payment in Full of the Obligations and the termination of this Agreement.

Section 8.08 <u>Administrative Agent in its Individual Capacities</u>. The Administrative Agent and its Affiliates may make loans to, issue letters of credit at the request of, accept deposits from and generally engage in any kind of business with the Borrower and/or its Subsidiaries as though the Administrative Agent were not the Administrative Agent.

Section 8.09 <u>Successor Administrative Agent</u>. The Administrative Agent shall have the right to resign at any time by giving at least 30 days' prior written notice thereof to the Lender and the Borrower and the Administrative Agent may be removed at any time with or without cause by an instrument or concurrent instruments in writing delivered to the Borrower and the Administrative Agent and signed by the Lender. In the event of such resignation, the Lender shall have the right to appoint any financial institution to act as the Administrative Agent hereunder, subject such financial institution agreeing to be bound by the terms of this Agreement and any other applicable Credit Documents, and the Administrative Agent's resignation shall become effective on the thirtieth day after such notice of resignation; *provided* that if the Lender does not make such appointment, then the Administrative Agent's resignation shall nonetheless become effective in accordance with such notice and (1) the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents and (2) all payments, communications and determinations provided to be made by, to or through the Administrative Agent shall instead be made by or to the Lender directly, until such time as the Lender appoints a successor Administrative Agent as provided for above in this <u>Section 8.09</u>. If the Administrative Agent is removed pursuant to this <u>Section 8.09</u>, the Lender shall have the right, upon five (5) Business Days' notice to the Borrower prior to the effective date of such removal, to appoint a successor Administrative Agent. If the Lender has not appointed a successor Administrative Agent within thirty days after notice of removal or resignation, as applicable, was sent to the Administrative Agent, then the Lender shall be deemed to have succeeded to and become vested with all the rights, powers, privileges and duties of the retiring Administrative Agent and the retiring Administrative Agent shall be discharged from its duties and obligations hereunder and under the other Credit Documents; *provided* that, until a successor Administrative Agent is so appointed by the Lender, any collateral security held by the Administrative Agent on behalf of the Lender shall continue to be held by the retiring Administrative Agent as nominee until such time as a successor Administrative Agent is appointed. Upon the acceptance of any appointment as Administrative Agent hereunder by a successor Administrative Agent, such successor Administrative Agent shall thereupon succeed to and become vested with all the rights, powers, privileges and duties of the retiring or removed Administrative Agent and the retiring or removed Administrative Agent shall promptly transfer to such successor Administrative Agent all sums held, together with all records and other documents necessary or appropriate in connection with the performance of the duties of a successor Administrative Agent under the Credit Documents (at the sole expense of the Lender), whereupon such retiring or removed Administrative Agent shall be discharged from its duties and obligations hereunder. After any retiring or removed Administrative Agent's resignation or removal hereunder as the Administrative Agent, the provisions of this ARTICLE VIII shall inure to its benefit as to any actions taken or omitted to be taken by it while it was the Administrative Agent hereunder.

Section 8.10 <u>Reports and Financial Statements</u>. By signing this Agreement, the Lender:

NAI-1500501901v9

(a)      is deemed to have requested that the Administrative Agent furnish it, promptly after they become available, copies of all financial statements and other materials required to be delivered by the Borrower hereunder, including pursuant to ARTICLE V hereof (collectively, the "Reports");

(b)      expressly agrees and acknowledges that the Administrative Agent makes no representation or warranty as to the accuracy of the Reports, and shall not be liable for any information contained in any Report;

(c)      expressly agrees and acknowledges that the Reports are not comprehensive audits or examinations, that the Administrative Agent or any other party performing any audit or examination will inspect only specific information regarding the Borrower and its Subsidiaries  and will rely significantly upon the Borrower's books and records, as well as on representations of the Borrower's personnel;

(d)      agrees to keep all Reports confidential in accordance with the provisions of Section 9.13 hereof; and

(e)      without limiting the generality of any other indemnification provision contained in this Agreement, agrees: (i) to hold the Administrative Agent harmless from any action it may take or conclusion it may reach or draw from any Report in connection with any Obligations that it has made or may make to the Borrower; and (ii) to pay and protect, and indemnify, defend, and hold the Administrative Agent harmless from and against, the claims, actions, proceedings, damages, costs, expenses, and other amounts (including attorney costs) incurred by the Administrative Agent as the direct or indirect result of.

Section 8.11      Withholding Tax.  (a) To the extent required by any applicable law, the Administrative Agent may withhold from any payment to the Lender an amount equivalent to any applicable withholding tax.

(b)      If any payment has been made to the Lender by the Administrative Agent without the applicable withholding tax being withheld from such payment and the Administrative Agent has paid over the applicable withholding tax to the Internal Revenue Service or any other Governmental Authority, or the Internal Revenue Service or any other Governmental Authority asserts a claim that the Administrative Agent did not properly withhold tax from amounts paid to or for the account of the Lender (because the appropriate form was not delivered, was not properly executed, or because the Lender failed to notify the Administrative Agent of a change in circumstances which rendered the exemption from, or reduction of, withholding tax ineffective, or for any other reason), the Lender shall indemnify the Administrative Agent fully for all amounts paid, directly or indirectly, by the Administrative Agent as tax or otherwise, including penalties and interest, together with all expenses incurred, including legal expenses, allocated staff costs and any out of pocket expenses.

Section 8.12      Other Rights of the Administrative Agent.

(a)      The Administrative Agent shall not be responsible for, nor incur any liability with respect to, (i) the existence, genuineness or value of any of the Collateral or for the validity, perfection, priority or enforceability of the security interest in any of the Collateral, whether impaired by operation of law or by reason of any action or omission to act on its part under this Agreement or any of the Credit Documents, (ii) the validity or sufficiency of the Collateral or any agreement or assignment contained therein, (iii) the validity of the title of the Lender to the Collateral, (iv) insuring the Collateral or (v) the payment of taxes, charges or assessments upon the Collateral or otherwise as to the maintenance of the Collateral.  The Administrative Agent shall be authorized to but shall not be responsible for filing any financing or continuation statements or recording any documents or instruments in any public office at any time or

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 117 of 136

times or otherwise perfecting or monitoring or maintaining the perfection of any security interest in the Collateral. It is expressly agreed, to the maximum extent permitted by applicable law, that the Administrative Agent shall have no responsibility for (i) taking any necessary steps to preserve rights against any Person with respect to any Collateral or (ii) taking any action to protect against any diminution in value of the Collateral.

(b)     The Administrative Agent shall not be liable or responsible for any loss or diminution in the value of any of the Collateral, by reason of the act or omission of any carrier, forwarding agency or other agent or bailee selected by the Administrative Agent in good faith.

(c)     The Administrative Agent shall have no obligation to invest and reinvest any cash held in any account in the absence of timely and specific written investment direction from the Borrower. In no event shall the Administrative Agent be liable for the selection of investments or for investment losses incurred thereon. The Administrative Agent shall have no liability in respect of losses incurred as a result of the liquidation of any investment prior to its stated maturity or the failure of the Borrower to provide timely written investment direction.

(d)     The Administrative Agent shall be fully justified in failing or refusing to take any action under this Agreement or any of the Credit Documents if, notwithstanding anything to the contrary contained in this Agreement, in connection with the taking of any such action that would constitute a payment due under any agreement or document, it shall not first have received from the Borrower or the Lender funds equal to the amount payable.

(e)     If, with respect to a proposed action to be taken by it, the Administrative Agent shall determine in good faith that the provisions of this Agreement or any other Credit Document relating to the functions or responsibilities or discretionary powers of the Administrative Agent are or may be ambiguous or inconsistent, the Administrative Agent shall notify the Lender, identifying the proposed action, and may decline either to perform such function or responsibility or to take the action requested unless it has received the written confirmation of the Lender that the action proposed to be taken by the Administrative Agent is consistent with the terms of this Agreement or of the Credit Documents or is otherwise appropriate. The Administrative Agent shall be fully protected in acting or refraining from acting upon the confirmation of the Lender, in this respect, and such confirmation shall be binding upon the Lender and the Borrower.

(f)     The Administrative Agent shall be under no obligation or duty to take any action under this Agreement or any of the Credit Documents or otherwise if taking such action (i) would subject the Administrative Agent to a tax in any jurisdiction where it is not then subject to a tax or (ii) would require the Administrative Agent to qualify to do business in any jurisdiction where it is not then so qualified.

(g)     The Borrower and the Lenders each expressly acknowledge that neither the Administrative Agent nor any of its officers, directors, employees, agents or attorneys-in-fact has made any representations or warranties to it and that no act by the Administrative Agent hereafter taken shall be deemed to constitute any representation or warranty by the Administrative Agent to any party to this agreement. Except for notices, reports and other documents expressly required to be furnished to the Lender by the Administrative Agent hereunder, the Administrative Agent shall not have any duty or responsibility to provide the Lender with any credit or other information concerning the business, operations, property, financial and other condition or creditworthiness of the Borrower which may come into the possession of the Administrative Agent or any of its officers, directors, employees, agents or attorneys-in-fact.

NAI-1500501901v9

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 118 of 136

(h)     The powers conferred on the Administrative Agent hereunder are solely to protect the Administrative Agent's and the Lender's interests in the Collateral and shall not impose any duty upon the Administrative Agent to exercise any such powers other than as expressly set forth herein.  The Administrative Agent shall be accountable only for amounts that it actually receives as a result of the exercise of such powers, and neither it nor any of its officers, directors, employees or agents shall be responsible to any Person for any act or failure to act hereunder, except for their own willful misconduct or gross negligence.

(i)     Any corporation into which the Administrative Agent may be merged, or with which it may be consolidated, or any corporation resulting from any merger or consolidation to which the Administrative Agent shall be a party, shall become an Administrative Agent under this Agreement without the execution or filing of any paper or any further act on the part of the parties hereto.

(j)     The Administrative Agent shall be afforded all of the rights, powers, immunities and indemnities set forth in this Agreement in all of the Credit Documents to which it is a signatory as if such rights, powers, immunities and indemnities were specifically set out in each such Credit Document.

(k)     The Administrative Agent shall have no obligation to enter into any pledge agreement or any other document or instrument purporting to grant a Lien on any property to secure payment of the Obligations or otherwise in relation to the transaction contemplated by this Agreement or any of the Credit Documents which are subject to the laws of any jurisdiction outside of the United States to the extent that such agreement, document, or instrument would result in the Administrative Agent violating any Requirement of Law or that may be contrary to the internal policies and procedures of the Administrative Agent; *provided*, that in the event that the execution of any such document would result in the Administrative Agent violating any Requirement of Law or is contrary to the internal policies and procedures of the Administrative Agent, the Lender or the Administrative Agent may (without obligation) appoint a subagent to execute such document as agent for the Administrative Agent and the Lender.

(l)     The Administrative Agent shall have no obligation to enter into any mortgage, deed of trust or any other similar document or instrument purporting to grant a Lien on any real property to secure payment of the Obligations or otherwise in relation to the transaction contemplated by this Agreement or any of the Credit Documents to the extent that such agreement, document, or instrument would result in the Administrative Agent violating any Requirement of Law or that may be contrary to the internal policies and procedures of the Administrative Agent, and the Administrative Agent shall be entitled (in its sole discretion) to request from the Borrower or the Lender, as the case may be, any opinions, certificates and/or other documents or instruments as it shall deem necessary or appropriate in order for it to execute and deliver such mortgage, deed of trust or other similar document or instrument purporting to grant a Lien on any real property.

(m)     Notwithstanding anything contained herein to the contrary, in no event shall the Administrative Agent be liable on any theory of liability for any special, indirect, consequential or punitive damages (including, without limitation, any loss of profits, business or anticipated savings) even if the Administrative Agent has been advised of the likelihood of such loss or damage and regardless of the form of action.

(n)     No provision of this Agreement or any Credit Document shall require the Administrative Agent to expend or risk its own funds or otherwise incur financial liability in the performance of any of its duties hereunder or in the exercise of any of its rights or powers, if it shall have reasonable grounds to believe that repayment of such funds or indemnity and/or security satisfactory to it against such risk or liability is not reasonably assured to it.

NAI-1500501901v9

ARTICLE IX.

MISCELLANEOUS

Section 9.01        <u>Payment of Expenses etc</u>.  The Borrower agrees to pay (or reimburse the Administrative Agent, the Lender, the Prepetition Agent, the Prepetition Lender, or their respective Affiliates, as the case may be) all present and reasonable future costs, fees, out-of-pocket expenses or advances incurred by or on behalf of the Agent, the Lender, the Prepetition Agent and the Prepetition Lender  in connection with any Insolvency Proceeding of the Borrower or any of its Subsidiaries (including, without limitation, the Chapter 11 Case), any Approved Sale (and/or any other disposition or transfer of assets of the Borrower), this Agreement, the Disclosure Statement, an Acceptable Plan of Reorganization, any order approving the Disclosure Statement or Acceptable Plan of Reorganization, the Financing Orders, the Prepetition Credit Agreement or any Credit Document or Prepetition Note Purchase Document, whether incurred heretofore or hereafter, whether incurred during the pendency of the Chapter 11 Cases or any other Insolvency Proceeding of the Borrower or any of its Subsidiaries, which expenses shall include, without being limited to, the cost of record searches, reasonable counsel fees (including the allocated cost of internal counsel where not duplicative of the fees of outside counsel), all costs and expenses incurred by the Administrative Agent and/or Prepetition Agent in opening bank accounts, depositing checks, receiving and transferring funds, and any charges imposed on the Agent and/or Prepetition Agent due to insufficient funds of deposited checks, collateral examination fees and expenses, fees and expenses of accountants, appraisers or other experts or advisors and professionals retained by the Agent, the Lender, the Prepetition Agent and Prepetition Lender, fees, costs and expenses, of whatever kind and nature (including any taxes, reasonable attorneys' fees or costs for insurance of any kind) which the Administrative Agent, the Lender, Prepetition Agent and/or the Prepetition Lender has incurred or may incur with respect to the Prepetition Collateral, the Collateral, the Prepetition Obligations, the Obligations, the Disclosure Statement, an Acceptable Plan of Reorganization or any Approved Sale (and/or any other disposition or transfer of assets of the Borrower), in filing public notices, in preparing or filing financing statements (including amendments and continuations thereto or thereof) or other documents, in protecting, maintaining, or preserving the Collateral, the Prepetition Collateral or its interest therein, in enforcing or foreclosing the Liens under the Credit Documents or under the Prepetition Note Purchase Documents, whether through judicial procedures or otherwise, or in defending or prosecuting any actions or proceedings arising out of or relating to any Insolvency Proceeding of the Borrower or any of its Subsidiaries (including, without limitation, the Chapter 11 Case), its transactions with the Borrower or any of the Subsidiaries under this Agreement, the Prepetition Note Purchase Agreement and any other Credit Document or Prepetition Note Purchase Document or in connection with any Approved Sale (and/or any other disposition or transfer of assets of the Borrower) and/or Acceptable Plan of Reorganization, and all expenses, costs and fees set forth in <u>Article II</u> of this Agreement or the Prepetition Note Purchase Agreement, in each case, including without limitation, any such fees, costs and expenses paid or incurred by the Agent, the Prepetition Agent, the Lender or the Prepetition Lender in (i) administering and monitoring the transactions contemplated by the Credit Documents, the Prepetition Note Purchase Documents, the Financing Orders, an Acceptable Plan of Reorganization and any Approved Sale (and/or any other disposition or transfer of assets of the Borrower), including, without limitation, in connection with periodic field audits, appraisals and confirmations of the Collateral and the negotiating, documenting and executing the Credit Documents, the Prepetition Note Purchase Documents and, in each case, any amendments, modifications, waivers or forbearances thereunder, (ii) enforcing or defending its rights (and investigating and evaluating its legal rights and remedies) under or in respect of this Agreement, the other Credit Documents or any other document or instrument now or hereafter executed and delivered in connection herewith, or the Prepetition Note Purchase Documents, (iii) collecting the Term Loans, the other Obligations and the Prepetition Obligations, (iv) foreclosing or otherwise collecting or enforcing  upon the Collateral or any part thereof and (v) obtaining any legal, accounting or other advice in connection with any of the foregoing.

NAI-1500501901v9

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 120 of 136

Section 9.02    <u>Indemnification</u>.  The Borrower agrees to indemnify the Administrative Agent, the Lender, the Prepetition Agent, the Prepetition Lender and their respective Related Parties (collectively, the "<u>Indemnitees</u>") from and hold each of them harmless against any and all losses, liabilities, claims, damages, costs, fees, deficiencies, judgments and expenses incurred by any of them as a result of, or arising out of, or in any way related to, or by reason of (i) any investigation, litigation, claim, action or proceeding (whether or not any Indemnitee is a party thereto) which arise out of or are in any way related to this Agreement, any other Credit Document, the Financing Orders, the Prepetition Note Purchase Documents or the transactions contemplated hereby or thereby (including, without limitation, the entering into and performance of any of the foregoing or any other agreements and documents relating hereto or thereto, including, without limitation, amounts paid in settlement, court costs and the fees and disbursements of counsel incurred in connection with any such litigation, investigation, claim or proceeding or any advice rendered in connection with any of the foregoing) or any use or proposed use of the proceeds of the Term Loans hereunder, and (ii) the actual or alleged presence of Hazardous Materials in the air, surface water or groundwater or on the surface or subsurface of any Real Property owned, leased or at any time operated by the Borrower or any of its Subsidiaries, the release, generation, storage, transportation, handling or disposal of Hazardous Materials at any location, whether or not owned or operated by the Borrower or any of its Subsidiaries, if the Borrower or any such Subsidiary could have or is alleged to have any responsibility in respect thereof, the non-compliance of any such Real Property with foreign, federal, state and local laws, regulations and ordinances (including applicable permits thereunder) applicable thereto, or any Environmental Claim asserted against the Borrower or any of its Subsidiaries, in respect of any such Real Property, including, in the case of each of (i) and (ii) above, without limitation, the reasonable documented fees and disbursements of counsel incurred in connection with any such investigation, litigation or other proceeding (but excluding any such losses, liabilities, claims, damages or expenses that are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of the Person to be indemnified or of any other Indemnitee who is such Person or an Affiliate of such Person). To the extent that the undertaking to indemnify, pay or hold harmless any Person set forth in the preceding sentence may be unenforceable because it is violative of any law or public policy, the Borrower shall make the maximum contribution to the payment and satisfaction of each of the indemnified liabilities that is permissible under applicable law.

Section 9.03    <u>Net Payments</u>.

(a)    All payments made by the Borrower pursuant to this Agreement or any other Credit Document, will be made free and clear of, and without deduction or withholding for, any present or future taxes, levies, imposts, duties, fees, assessments or other charges of whatever nature now or hereafter imposed by any jurisdiction or by any political subdivision or taxing authority thereof or therein with respect to such payments (but excluding, except as provided in this <u>Section 9.03</u>, any tax imposed on or measured by the net income or net profits of the Lender and franchise taxes imposed on the Lender pursuant to the laws of the jurisdiction under which the Lender is organized or the jurisdiction in which the principal office of the Lender is located or any subdivision thereof or therein) and all interest, penalties or similar liabilities with respect to such non-excluded taxes, levies imposts, duties, fees, assessments or other charges (all such non-excluded taxes, levies, imposts, duties, fees, assessments or other charges being referred to collectively as "<u>Taxes</u>").  If any Taxes are so levied or imposed, the Borrower agrees to pay the full amount of such Taxes and such additional amounts (including additional amounts to compensate for withholding on amounts paid pursuant to this <u>Section 9.03</u>) as may be necessary so that every payment by it of all amounts due pursuant to this Agreement or any other Credit Document, after withholding or deduction for or on account of any Taxes will not be less than the amount provided for herein or such other Credit Document.  The Borrower will indemnify and hold harmless the Lender and reimburse the Lender upon its written request, for the amount of any Taxes imposed on and paid by the Lender.  If any amounts are payable in respect of Taxes pursuant to this <u>Section 9.03</u>, the

-75-

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 121 of 136

Borrower agrees to reimburse the Lender upon its written request, for taxes imposed on or measured by the net income, profits or franchise of the Lender pursuant to the laws of the jurisdiction in which the Lender is organized or in which the principal office of the Lender is located, as the case may be, or under the laws of any political subdivision or taxing authority therein, and for any withholding of taxes as the Lender shall determine are payable by, or withheld from, the Lender in respect of such reimbursement of taxes, which request shall be accompanied by a statement from the Lender setting forth, in reasonable detail, the computations used in determining such amounts. The Borrower will furnish to the Lender within 45 days after the date the payment of any Taxes, or any withholding or deduction on account thereof, is due pursuant to applicable law certified copies of tax receipts, or other evidence satisfactory to the Lender, evidencing such payment by the Borrower.

(b)     If the Lender, in its sole opinion, determines that it has finally and irrevocably received or been granted a refund in respect of any Taxes as to which indemnification has been paid by the Borrower pursuant to this Section 9.03, it shall promptly remit such refund (including any interest received in respect thereof), net of all out-of-pocket costs and expenses to the Borrower; *provided, however,* that the Borrower agrees to promptly return any such refund (plus interest) to the Lender, as applicable, in the event the Lender is required to repay such refund to the relevant taxing authority. The Lender shall provide the Borrower with a copy of any notice of assessment from the relevant taxing authority (redacting any unrelated confidential information contained therein) requiring repayment of such refund. Nothing contained herein shall impose an obligation on the Lender to apply for any such refund.

Section 9.04     Right of Setoff. In addition to any rights now or hereafter granted under applicable law or otherwise, and not by way of limitation of any such rights, upon the occurrence and during the continuance of an Event of Default, the Lender and the Administrative Agent are hereby authorized at any time or from time to time, without presentment, demand, protest or other notice of any kind to the Borrower or to any other Person, any such notice being hereby expressly waived, to set off and to appropriate and apply any and all deposits (general or special) and any other Indebtedness at any time held or owing by the Lender or the Administrative Agent, as applicable, (including, without limitation, by branches, agencies and Affiliates of the Lender or the Administrative Agent, as applicable, wherever located) to or for the credit or the account of the Borrower against and on account of the Obligations and liabilities of the Borrower to the Lender or the Administrative Agent, as applicable, under this Agreement or under any of the other Credit Documents, including, without limitation, all claims of any nature or description arising out of or connected with this Agreement or any other Credit Document, irrespective of whether or not the Lender or the Administrative Agent, as applicable, shall have made any demand hereunder and although said Obligations, liabilities or claims, or any of them, shall be contingent or unmatured. Each of the Lender and the Administrative Agent agrees to promptly notify the Borrower after any such set off and application; *provided, however,* that the failure to give such notice shall not affect the validity of such set off and application. Notwithstanding anything to the contrary in this Section 9.04, the rights of setoff of the Administrative Agent under this Section 9.04 shall be limited solely with respect to any reimbursement or indemnity amounts owing by the Borrower to the Administrative Agent pursuant to Sections 8.07, 9.01 or 9.02.

Section 9.05     Notices.

(a)     Generally. Except in the case of notices and other communications expressly permitted to be given by telephone (and except as provided in Section 9.05(c)), all notices and other communications provided for herein shall be in writing and shall be delivered by hand or overnight courier service as follows (or to such other address as may be hereafter notified by the respective parties hereto):

(i)     if to the Borrower:

NAI-1500501901v9

Case: 15-31141     Doc# 10     Filed: 09/10/15     Entered: 09/10/15 06:48:32     Page 122 of 136

NewZoom, Inc.
22 Fourth Street, Floor 16
San Francisco, California 94103
Attention:      Chief Executive Officer
Telephone:    (415) 400-8007
Email:        Jack.Lawrence@zoomsystems.com

With a copy to:

NewZoom, Inc.
22 Fourth Street, Floor 16
San Francisco, California 94103
Attention:      General Counsel
Telephone:    (415) 400-8093
Email:        Russ.Yoshinaka@zoomsystems.com

(ii)    if to counsel for the Borrower:

Pachulski Stang Ziehl & Jones LLP
150 California Street, 15th Floor
San Francisco, California 94111
Attention:  Debra Grassgreen/John D. Fiero
Telephone: (415) 263-7000
Email: dgrassgreen@pszjlaw.com; jfiero@pszjlaw.com

(iii)    if to the Lender:

MIHI LLC
c/o Macquarie Capital (USA) Inc.
125 West 55th Street
New York, New York 10019
Attention: Jared Doskow
Telephone: 212-231-1213
Email: Jared.Doskow@macquarie.com

With a copy to:

Jones Day
77 West Wacker Drive, 35th Floor
Chicago, Illinois 60601
Attention:  Brad B. Erens/Steven A. Domanowski
Telephone:  (312) 782-3939
Email: bberens@jonesday.com; sdomanowski@jonesday.com

(iv)    if to the Administrative Agent:

Wells Fargo Bank, N.A.
45 Broadway, 14th Floor
New York, New York 10006

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 123 of 136

Attention: CMES – NewZoom Inc.
Telecopy: (212) 515-1576
Email: michael.d.pinzon@wellsfargo.com

(b)    Receipt of Notices.  Notices and communications sent by hand or overnight courier service shall be deemed to have been given when received.  Notices delivered through electronic communications to the extent provided in Section 9.05(c) shall be effective as provided for therein.

(c)    Electronic Communications.  Notices and other communications to the Administrative Agent and the Lender hereunder and required to be delivered pursuant to Section 5.01(a), (b), (c), (d), or (m) may be delivered or furnished to the Administrative Agent and/or the Lender by electronic communication (including e-mail and Internet or intranet web sites) pursuant to procedures approved by such Person in writing prior to any such communication.  The Administrative Agent, the Lender and the Borrower may, in their discretion, agree in a separate writing to accept notices and other communications to them hereunder by electronic communications pursuant to procedures approved by it; *provided* that approval of such procedures may be limited to particular notices or communications.  Unless the Administrative Agent or the Lender, as applicable, otherwise prescribes, (i) notices and other communications sent to an e-mail address shall be deemed received upon the sender's receipt of an acknowledgement from the intended recipient (such as by the "return receipt requested" function, as available, return e-mail or other written acknowledgement); *provided* that if such notice or other communication is not sent during the normal business hours of the recipient, such notice or communication shall be deemed to have been sent at the opening of business on the next Business Day for the recipient, and (ii) notices or communications posted to an Internet or intranet web site shall be deemed received upon the deemed receipt by the intended recipient at its e-mail address as described in the foregoing clause (i) of notification that such notice or communication is available and identifying the web site address therefor.

(d)    Change of Address, Etc.  Any party hereto may change its address or other information for notices and other communications hereunder by notice to each of the other parties hereto in accordance with Section 9.05(a).

Section 9.06    Successors and Assigns.  This Agreement shall be binding upon and inure to the benefit of and be enforceable by the parties hereto and their respective successors and assigns.  The Borrower may not assign or transfer any of its rights or obligations hereunder without the prior written consent of the Lender.  The Lender may transfer the Obligations in whole or in part and may assign its rights under the Credit Documents to such transferee without consent of the Borrower.  Any such transfer of rights or interests in the Obligations shall be recorded on the register maintained by the Borrower pursuant to Section 5.17.  In addition, the Lender may at any time, without the consent of, or notice to, the Borrower, sell participations to any Person in all or a portion of the Lender's rights and/or obligations under this Agreement and the other Credit Documents; provided that the Lender's obligations under this Agreement and the other Credit Documents shall remain unchanged and the Borrower shall continue to deal solely and directly with the Lender in connection with the provisions of this Agreement and the other Credit Documents.

Section 9.07    Governing Law; Submission to Jurisdiction; Venue; Waiver of Jury Trial.

(a)    EXCEPT TO THE EXTENT GOVERNED BY THE BANKRUPTCY CODE, THIS AGREEMENT AND THE OTHER CREDIT DOCUMENTS AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES HEREUNDER AND THEREUNDER SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, WITHOUT REGARD TO CONFLICTS OF LAW PRINCIPLES.  TO THE

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 124 of 136

FULLEST EXTENT PERMITTED BY LAW, THE BORROWER, ON BEHALF OF ITSELF, HEREBY UNCONDITIONALLY AND IRREVOCABLY WAIVES ANY CLAIM TO ASSERT THAT THE LAW OF ANY JURISDICTION OTHER THAN THE STATE OF NEW YORK OR THE BANKRUPTCY CODE GOVERNS THIS AGREEMENT OR ANY OF THE OTHER CREDIT DOCUMENTS.  Any legal action or proceeding with respect to this Agreement or any other Credit Document shall be brought in the Bankruptcy Court (and, if the Bankruptcy Court does not have, or abstains from exercising such jurisdiction, the jurisdiction of the courts of the State of New York, the courts of the United States for the Southern District of New York and appellate courts of any thereof) and, by execution and delivery of this Agreement, the Borrower hereby irrevocably accepts for itself and in respect of its property, generally and unconditionally, the jurisdiction of the aforesaid courts.  The Borrower hereby further irrevocably consents to the service of process out of any of the aforementioned courts in any such action or proceeding by the mailing of copies thereof by registered or certified mail, postage prepaid, to the Borrower at its address for notices pursuant to Section 9.05, such service to become effective 30 days after such mailing or at such earlier time as may be provided under applicable law.  Nothing herein shall affect the right of the Administrative Agent or the Lender to serve process in any other manner permitted by law or to commence legal proceedings or otherwise proceed against the Borrower in any other jurisdiction.

(b)     The Borrower hereby irrevocably waives any objection that it may now or hereafter have to the laying of venue of any of the aforesaid actions or proceedings arising out of or in connection with this Agreement or any other Credit Document brought in the courts referred to in Section 9.07(a) and hereby further irrevocably waives and agrees not to plead or claim in any such court that any such action or proceeding brought in any such court has been brought in an inconvenient forum.

(c)     **EACH OF THE PARTIES TO THIS AGREEMENT HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER CREDIT DOCUMENTS (INCLUDING, WITHOUT LIMITATION, ANY AMENDMENTS, WAIVERS OR OTHER MODIFICATIONS RELATING TO ANY OF THE FOREGOING), OR THE TRANSACTIONS CONTEMPLATED HEREBY OR THEREBY. EACH PARTY HERETO HEREBY (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PARTY HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PARTY WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER, AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTIES HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS PARAGRAPH.**

Section 9.08     Counterparts.  This Agreement may be executed in any number of counterparts and by the different parties hereto on separate counterparts, each of which when so executed and delivered shall be an original, but all of which shall together constitute one and the same agreement. A set of counterparts executed by all the parties hereto shall be lodged with the Borrower, the Administrative Agent and the Lender.

Section 9.09     Integration.  This Agreement, the other Credit Documents and any separate letter agreements with respect to fees payable to the Administrative Agent or the Lender constitute the entire agreement among the parties relating to the subject matter hereof and thereof and supersede any and all previous agreements and understandings, oral or written, relating to the subject matter hereof or thereof.

NAI-1500501901v9

Case: 15-31141     Doc# 10     Filed: 09/10/15     Entered: 09/10/15 06:48:32     Page 125 of 136

Section 9.10        Headings Descriptive.   The headings of the several Sections and other portions of this Agreement are inserted for convenience only and shall not in any way affect the meaning or construction of any provision of this Agreement.

Section 9.11        Amendment or Waiver.

(a)        Neither this Agreement nor any other Credit Document, nor any terms hereof or thereof, may be amended, changed, waived or otherwise modified unless such amendment, change, waiver or other modification is in writing and signed by the Borrower and the Lender; provided, however, that (i) the Borrower shall provide the Administrative Agent with written notice of any such amendment, change, waiver or modification within two (2) Business Days prior to the execution thereof and (ii) no change may be made to ARTICLE VIII or any other provision that affects the rights or responsibilities of the Administrative Agent hereunder without the written consent of the Administrative Agent.

(b)        No failure or delay by the Administrative Agent or the Lender in exercising any right or power hereunder or under any other Credit Document shall operate as a waiver thereof, nor shall any single or partial exercise of any such right or power, or any abandonment or discontinuance of steps to enforce such a right or power, preclude any other or further exercise thereof or the exercise of any other right or power.  The rights and remedies of the Administrative Agent and the Lender hereunder and under the other Credit Documents are cumulative and are not exclusive of any rights or remedies that they would otherwise have.  No waiver of any provision of any Credit Document or consent to any departure by the Borrower therefrom shall in any event be effective unless the same shall be permitted by Section 9.11(a), and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given.  Without limiting the generality of the foregoing, the making of any Term Loan shall not be construed as a waiver of any Default, regardless of whether the Lender or the Administrative Agent may have had notice or knowledge of such Default at the time of such purchase.  No notice or demand on Borrower or any of its Subsidiaries  in any case shall entitle Borrower or any such Subsidiary to any other or further notice or demand in similar or other circumstances.

Section 9.12        Survival of Indemnities.  All indemnities set forth herein including, without limitation, in Article VIII and IX (subject to the limitations set forth in the last sentence of Section 9.02) shall survive the execution and delivery of this Agreement and the Full Payment of the Obligations.

Section 9.13        Confidentiality.

(a)        Each of the Administrative Agent and the Lender agrees to maintain the confidentiality of the Confidential Information, except that Confidential Information may be disclosed (1) to its Affiliates and any of its or its Affiliates' directors, officers, employees and agents, including accountants, legal counsel and other advisors on a "needs to know" basis (it being understood that the persons to whom such disclosure is made will be informed of the confidential nature of such Confidential Information and instructed to keep such Confidential Information confidential), (2) to any direct or indirect contractual counterparty in any Hedge Agreement (or to any such contractual counterparty's professional advisor), so long as such contractual counterparty (or such professional advisor) agrees to be bound by the provisions of this Section 9.13, (3) to the extent requested by any regulatory authority, (4) to the extent  required by applicable laws or regulations or by any subpoena or similar legal process, (5) to any other party to this Agreement, (6) to any other creditor of the Borrower or any of its Subsidiaries that is a direct or intended beneficiary of any of the Credit Documents, (7) in connection with the exercise of any remedies hereunder or under any of the other Credit Documents, or any suit, action or proceeding relating to this Agreement or any of the other Credit Documents or the enforcement of rights hereunder or thereunder, (8) subject to an agreement containing provisions substantially the same as those of this Section 9.13, to any assignee of or participant in any of its rights or obligations under this Agreement, (9) with the consent

NAI-1500501901v9

of the Borrower, or (10) to the extent such Confidential Information (i) becomes publicly available other than as a result of a breach of this Section 9.13, or (ii) becomes available to the Administrative Agent or the Lender on a non-confidential basis from a source other than the Borrower or any of its Subsidiaries and not otherwise in violation of this Section 9.13.

(b)     As used in this Section 9.13, "Confidential Information" shall mean all information received from the Borrower relating to the Borrower or its business, other than any such information that is available to the Administrative Agent or the Lender on a non-confidential basis prior to disclosure by the Borrower; *provided, however,* that, in the case of information received from the Borrower after the Closing Date, such information is clearly identified at the time of delivery as confidential.

(c)     Any Person required to maintain the confidentiality of Confidential Information as provided in this Section 9.13 shall be considered to have complied with its obligation to do so if such Person has exercised the same degree of care to maintain the confidentiality of such Confidential Information as such Person would accord to its own confidential information. The Borrower hereby agrees that the failure of the Administrative Agent or the Lender to comply with the provisions of this Section 9.13 shall not relieve the Borrower of any of its obligations under this Agreement or any of the other Credit Documents.

Section 9.14     Lender Not Fiduciary to Borrower, etc. The relationship among the Borrower and its Subsidiaries, on the one hand, and the Lender, on the other hand, is solely that of debtor and creditor, and the Lender has no fiduciary or other special relationship with the Borrower and its Subsidiaries, and no term or provision of any Credit Document, no course of dealing, no written or oral communication, or other action, shall be construed so as to deem such relationship to be other than that of debtor and creditor.

Section 9.15     Survival of Representations and Warranties. All representations and warranties herein shall survive the making of any Term Loan, the execution and delivery of this Agreement and the other Credit Documents, and any investigation made by the Administrative Agent or the Lender or any subsequent holder of any Obligations or on its behalf. All statements contained in any certificate or other document delivered to the Administrative Agent or the Lender or any subsequent holder of any Obligations by or on behalf of the Borrower or any of its Subsidiaries pursuant hereto or otherwise specifically for use in connection with the transactions contemplated hereby shall constitute representations and warranties by the Borrower hereunder, made as of the respective dates specified therein or, if no date is specified, as of the respective dates furnished to the Administrative Agent or the Lender, as applicable.

Section 9.16     Severability. Any provision of this Agreement held to be invalid, illegal or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such invalidity, illegality or unenforceability without affecting the validity, legality and enforceability of the remaining provisions hereof; and the invalidity of a particular provision in a particular jurisdiction shall not invalidate such provision in any other jurisdiction.

Section 9.17     Independence of Covenants. All covenants hereunder shall be given independent effect so that if a particular action, event, condition or circumstance is not permitted by any of such covenants, the fact that it would be permitted by an exception to, or would otherwise be within the limitations or restrictions of, another covenant, shall not avoid the occurrence of a Default or an Event of Default if such action is taken or event, condition or circumstance exists.

Section 9.18     Interest Rate Limitation. Notwithstanding anything herein to the contrary, if at any time the interest rate applicable to the Obligations, together with all fees, charges and other

Case: 15-31141     Doc# 10     Filed: 09/10/15     Entered: 09/10/15 06:48:32     Page 127 of 136

amounts that are treated as interest on the Obligations under applicable law (collectively, the "Charges"), shall exceed the maximum lawful rate (the "Maximum Rate") that may be contracted for, charged, taken, received or reserved by the Lender in accordance with applicable law, the rate of interest payable in respect of the Obligations hereunder, together with all Charges payable in respect thereof, shall be limited to the Maximum Rate and, to the extent lawful, the interest and Charges that would have been payable in respect of the Obligations but were not payable as a result of the operation of this Section 9.18 shall be cumulated and the interest and Charges payable to the Lender in respect of the Obligations or periods shall be increased (but not above the Maximum Rate therefor) until such cumulated amount, together with the applicable interest thereon to the date of repayment, shall have been received by the Lender.

Section 9.19    USA Patriot Act.  Each of the Administrative Agent and the Lender hereby notifies the Borrower that pursuant to the requirements of the USA Patriot Act, it is required to obtain, verify and record information that identifies the Borrower, which information includes the name and address of the Borrower and other information that will allow the Administrative Agent and the Lender to identify the Borrower in accordance with the USA Patriot Act.

Section 9.20    No Additional Perfection Steps Required.  Upon entry of the Interim Order and pursuant to its terms, all Liens granted by the Borrower in favor of the Administrative Agent, for the benefit of the Lender, shall be valid, binding, enforceable and perfected first priority Liens in the Collateral, senior in priority to all other Liens (subject to the terms of the Financing Orders and the Carve-Out), and the Administrative Agent shall not be required to file any financing statements, mortgages, notices of Lien or similar instruments in any jurisdiction or filing office, enter into any control agreements, or to take any other action in order to validate or perfect the Liens granted by the Borrower to the Administrative Agent, for the benefit of the Lender, pursuant to the Credit Documents or the Financing Orders.  Without in any way suggesting that the entry of the Interim Order is not sufficient for such purpose, the Borrower irrevocably and unconditionally authorizes the Administrative Agent (or its agent) to file at any time and from time to time such financing statements with respect to the Collateral naming the Administrative Agent, for the benefit of the Lender, as secured party and the Borrower as debtor, as the Administrative Agent or the Lender may require, and including any other information with respect to the Borrower or otherwise required by part 5 of Article 9 of the UCC, or otherwise, as the Administrative Agent or the Lender may determine, together with any amendment and continuations with respect thereto, which authorization shall apply to all financing statements filed on, prior to or after the Closing Date.  The Borrower hereby ratifies and approves all financing statements naming the Administrative Agent, for the benefit of the Lender, as secured party and the Borrower as debtor with respect to the Collateral (and any amendments with respect to such financing statements) filed by or on behalf of the Administrative Agent prior to the Closing Date and ratifies and confirms the authorization of the Administrative Agent to file such financing statements (and amendments, if any).  Without in any way suggesting that the entry of the Interim Order is not sufficient for such purpose, the Borrower shall take any other actions requested by Administrative Agent or the Lender from time to time to cause the attachment, perfection and priority of, and the ability of the Administrative Agent to enforce, any Liens of the Lender in any and all of the Collateral, including the filing of a financing statement, mortgage or the taking of delivery or control (including via any account control agreements) or by appropriate filings with the United States Patent and Trademark Office or United States Copyright Office, in accordance with the laws and regulations of the United States of America and its political subdivisions, or otherwise.

Section 9.21    Parties Including the Trustees; Bankruptcy Court Proceedings.  This Agreement, the other Credit Documents, and all Liens and other rights and privileges created hereby or pursuant hereto or to any other Credit Document shall be binding upon the Borrower, the bankruptcy estate of the Debtor, and any trustee, other bankruptcy estate representative or any successor-in-interest of the Debtor in the Chapter 11 Case or any subsequent case commenced under Chapter 7 of the Bankruptcy Code, and shall not be subject to Section 365 of the Bankruptcy Code.  The Liens created by the

NAI-1500501901v9

Case: 15-31141   Doc# 10   Filed: 09/10/15   Entered: 09/10/15 06:48:32   Page 128 of 136

Financing Orders, this Agreement and the other Credit Documents shall be and remain valid and perfected in the event of the substantive consolidation or conversion of the Chapter 11 Case or any other bankruptcy case of the Borrower to a case under Chapter 7 of the Bankruptcy Code or in the event of dismissal of the Chapter 11 Case or the release of any Collateral from the jurisdiction of the Bankruptcy Court for any reason, without the necessity that the Administrative Agent file financing statements or otherwise perfect its Liens under applicable law.

Section 9.22    First Day Motions and Orders.  The Borrower agrees that all First Day Motions and Orders filed in the Chapter 11 Case are to be previously approved by the Lender as being in form and substance reasonably satisfactory to the Lender, and that all First Day Orders entered by the Bankruptcy Court shall be in form and substance reasonably satisfactory to the Lender.

Section 9.23    Revival and Reinstatement of Obligations.  If the incurrence or payment of the Obligations by the Borrower or the transfer to the Administrative Agent or the Lender of any property should for any reason subsequently be declared to be void or voidable under any state or federal law relating to creditors' rights, including provisions of the Bankruptcy Code relating to fraudulent conveyances, preferences, or other voidable or recoverable payments of money or transfers of property (collectively, a "Voidable Transfer"), and if the Administrative Agent or the Lender is required to repay or restore, in whole or in part, any such Voidable Transfer, or elects to do so upon the reasonable advice of its counsel, then, as to any such Voidable Transfer, or the amount thereof that the Administrative Agent or the Lender is required or elects to repay or restore, and as to all reasonable costs, expenses, and attorneys fees, costs and expenses of the Administrative Agent and/or the Lender, the Obligations owing to such Administrative Agent or Lender shall automatically shall be revived, reinstated, and restored and shall exist as though such Voidable Transfer had never been made, and if the Maturity Date had previously occurred, it shall be rescinded and this Agreement, the other Credit Documents and all Liens granted hereunder and thereunder shall be immediately reinstated until the Payment in Full of the Obligations.

[Remainder of page intentionally left blank.]

NAI-1500501901v9

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 129 of 136

IN WITNESS WHEREOF, each of the parties hereto has caused a counterpart of this Agreement to be duly executed and delivered as of the date first above written.

**NEWZOOM, INC.**, as Borrower and as Debtor and Debtor-In-Possession

By:_____
Name:
Title:

*Note Purchase Agreement*

**MIHI LLC**, as Lender

By:_____
Name:
Title:


By:_____
Name:
Title:

**WELLS FARGO BANK, N.A.**, as
Administrative Agent

By:_____
Name:
Title:

*Note Purchase Agreement*

**GZJ KKV"E"**

**NewZoom, Inc.**
**DIP Budget**

| Week Ended: | BK Filing[1] FCST Week 1[2] 9/11/2015 | FCST Week 2 9/18/2015 | FCST Week 3 9/25/2015 | FCST Week 4 10/2/2015 | FCST Week 5 10/9/2015 | FCST Week 6 10/16/2015 | FCST Week 7 10/23/2015 | FCST Week 8 10/30/2015 | FCST Week 9 11/6/2015 | FCST Week 10 11/13/2015 | FCST Week 11 11/20/2015 | FCST Week 12 11/27/2015 | FCST Week 13 12/4/2015 | FCST Week 14 12/11/2015 | FCST Week 15 12/18/2015 | Total |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Beginning Cash Balance | $ 583,706 | $ 565,619 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 583,706 |
| Collections | 543,202 | 286,255 | 361,100 | 1,147,234 | 411,673 | 656,989 | 254,500 | 1,256,370 | 482,334 | 239,000 | 672,481 | 186,600 | 1,015,000 | 390,334 | 570,000 | 8,473,072 |
| Vendor Payments | (39,466) | (169,350) | (505,600) | (296,100) | (236,533) | (60,100) | (375,100) | (453,100) | (209,300) | (120,100) | (350,100) | (496,100) | (199,100) | (120,100) | (350,100) | (3,980,249) |
| Employee Related Costs | (358,475) | (322,077) | (10,000) | (382,985) | (10,000) | (430,405) | (10,000) | (390,985) | (10,000) | (10,000) | (430,405) | (10,000) | (390,985) | (10,000) | (806,405) | (3,582,723) |
| Rent and Lease Payments | (53,348) | (318,728) | (325,728) | (656,566) | (33,788) | (99,126) | - | (163,477) | (493,089) | (143,474) | - | - | (656,566) | (148,293) | - | (3,092,182) |
| Tax | (35,000) | - | - | (35,000) | - | - | - | (55,000) | - | - | - | - | (35,000) | - | - | (160,000) |
| **Total Operating Disbursements** | **(486,289)** | **(810,155)** | **(841,328)** | **(1,370,650)** | **(280,321)** | **(589,632)** | **(385,100)** | **(1,062,562)** | **(712,389)** | **(273,574)** | **(780,505)** | **(506,100)** | **(1,281,650)** | **(278,393)** | **(1,156,505)** | **(10,815,154)** |
| **Non-Operating/Bankrutcy Related Costs** | | | | | | | | | | | | | | | | |
| Professional Fees | (15,000) | - | (75,000) | - | - | (150,000) | - | (300,000) | - | (125,000) | - | - | (350,000) | - | (487,500) | (1,502,500) |
| Subsidiary Funding | (60,000) | | | | | | | | | | | | | | | (60,000) |
| Utilities and Other Deposits | - | (50,000) | (50,000) | (25,000) | - | - | - | - | - | - | - | - | - | - | - | (125,000) |
| Interest Expense | - | (111,000) | - | (3,803) | - | - | - | - | (11,597) | - | - | - | (17,929) | - | - | (144,329) |
| US Trustee Fees | - | - | - | - | - | - | - | - | - | - | - | - | - | (25,000) | - | (25,000) |
| **Total Non-Operating/Bankrutcy Related Costs** | (75,000) | (161,000) | (125,000) | (28,803) | - | (150,000) | - | (300,000) | (11,597) | (125,000) | - | - | (367,929) | - | (512,500) | (1,856,829) |
| **Cash Flow Before Draw** | 565,619 | (119,281) | (555,228) | (202,219) | 181,352 | (32,642) | (80,600) | (56,192) | (191,651) | (109,574) | (58,024) | (269,500) | (584,580) | 161,940 | (1,049,005) | (3,615,205) |
| DIP Loan Draws (Repayments) | - | 169,281 | 605,228 | 252,219 | (131,352) | 82,642 | 130,600 | 106,192 | 241,651 | 159,574 | 108,024 | 319,500 | 634,580 | (111,940) | 1,049,005 | 3,615,205 |
| **Ending Cash Balance** | $ 565,619 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ 50,000 | $ - | $ - |
| **Cumulative DIP Draw** | $ - | $ 169,281 | $ 774,509 | $ 1,026,729 | $ 895,376 | $ 978,019 | $ 1,108,619 | $ 1,214,810 | $ 1,456,462 | $ 1,616,036 | $ 1,724,060 | $ 2,043,560 | $ 2,678,140 | $ 2,566,199 | $ 3,615,205 | $ 3,615,205 |

[1] Filing occurs on Thursday September 10th, 2015.
[2] Majority of disbursements including professional fees in Week 1 were paid prior to filing.

Case: 15-31141    Doc# 10    Filed: 09/10/15    Entered: 09/10/15 06:48:32    Page 134 of 136

**NewZoom, Inc.**
**Interim Budget**

| Week Ended: | BK Filing[1] FCST Week 1[2] 9/11/2015 | FCST Week 2 9/18/2015 | FCST Week 3 9/25/2015 | FCST Week 4 10/2/2015 |
|---|---|---|---|---|
| Beginning Cash Balance | $ 583,706 | $ 565,619 | $ 50,000 | $ 50,000 |
| **Collections** | **543,202** | **286,255** | **361,100** | **1,147,234** |
| Vendor Payments | (39,466) | (169,350) | (505,600) | (296,100) |
| Employee Related Costs | (358,475) | (322,077) | (10,000) | (382,985) |
| Rent and Lease Payments | (53,348) | (318,728) | (325,728) | (656,566) |
| Tax | (35,000) | - | - | (35,000) |
| **Total Operating Disbursements** | **(486,289)** | **(810,155)** | **(841,328)** | **(1,370,650)** |
| **Non-Operating/Bankrutcy Related Costs** | | | | |
| Professional Fees | (15,000) | - | (75,000) | - |
| Subsidiary Funding | (60,000) | - | - | - |
| Utilities and Other Deposits | - | (50,000) | (50,000) | (25,000) |
| Interest Expense | - | (111,000) | - | (3,803) |
| US Trustee Fees | - | - | - | - |
| **Total Non-Operating/Bankrutcy Related Costs** | **(75,000)** | **(161,000)** | **(125,000)** | **(28,803)** |
| **Cash Flow Before Draw** | **565,619** | **(119,281)** | **(555,228)** | **(202,219)** |
| DIP Loan Draws (Repayments) | - | 169,281 | 605,228 | 252,219 |
| **Ending Cash Balance** | **$ 565,619** | **$ 50,000** | **$ 50,000** | **$ 50,000** |
| **Cumulative DIP Draw** | **$ -** | **$ 169,281** | **$ 774,509** | **$ 1,026,729** |

[1] Filing occurs on Thursday September 10th, 2015.
[2] Majority of disbursements including professional fees in Week 1 were paid prior to filing.

**NewZoom, Inc.**
*Professional Fees Schedule*

| Invoices Issued | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Total |
|---|---|---|---|---|---|---|
| **Company Advisors:** | | | | | | |
| FTI - Financial Advisor | $ 75,000 | $ 150,000 | $ 125,000 | $ 100,000 | $ - | $ 450,000 |
| Pachulski | 200,000 | 150,000 | 150,000 | 150,000 | - | 650,000 |
| Claims Agent | 25,000 | 25,000 | 25,000 | 12,500 | - | 87,500 |
| **Senior Lender Advisors:** | | | | | | |
| Senior Lendor Counsel | 50,000 | 50,000 | 50,000 | 50,000 | - | 200,000 |
| **Creditors Committee Advisors:** | | | | | | |
| UCC Counsel | 25,000 | 25,000 | 25,000 | 25,000 | - | 100,000 |
| **Total** | $ 375,000 | $ 400,000 | $ 375,000 | $ 337,500 | $ - | $ 1,487,500 |

| DISBURSEMENTS | Month 1 | Month 2 | Month 3 | Month 4 | Month 5 | Total |
|---|---|---|---|---|---|---|
| *Disbursement of Professional Fees - Fee Applications* | | | | | | |
| **Company Advisors:** | | | | | | |
| FTI - Financial Advisor | $ - | $ 75,000 | $ 150,000 | $ 125,000 | $ 100,000 | $ 450,000 |
| Pachulski | - | 200,000 | 150,000 | 150,000 | 150,000 | 650,000 |
| Claims Agent | - | 25,000 | 25,000 | 25,000 | 12,500 | 87,500 |
| **Senior Lender Advisors:** | | | | | | |
| Senior Lendor Counsel | - | 50,000 | 50,000 | 50,000 | 50,000 | 200,000 |
| **Creditors Committee Advisors:** | | | | | | |
| UCC Counsel | - | 25,000 | 25,000 | 25,000 | 25,000 | 100,000 |
| **Total**[1] | $ - | $ 375,000 | $ 400,000 | $ 375,000 | $ 337,500 | $ 1,487,500 |

[1] Represents postpetition professional fees.